**RECORD NOS. 14-2040(L); 14-2133 XAP**

In The

# United States Court Of Appeals
## For The Fourth Circuit

**KATHLEEN HIGGINS, Individually and as a personal representative of the estate of Francis Krivicich,**

*Plaintiff – Appellant/Cross-Appellee,*

**v.**

**FOREST LABORATORIES, INC.,**

*Defendant – Appellee/Cross-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT HARRISONBURG

_____

**BRIEF OF APPELLANT/CROSS-APPELLEE**

_____

Arnold Anderson Vickery
Fred H. Shepherd
THE VICKERY LAW FIRM
10000 Memorial Dr., Suite 750
Houston, Texas 77024
(713) 526-1100

Paul R. Thomson, III
THE THOMSON LAW FIRM, PLLC
2721 Brambleton Avenue, SW
Roanoke, Virginia 24015
(540) 777-4900

*Lead Counsel for*
*Appellant/Cross-Appellee*

*Local Counsel for*
*Appellant/Cross-Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. _14-2040_        Caption: _Kathleen Higgins v. Forest Laboratories_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Kathleen Higgins, Individually and as a Personal Representative of the Estate of_
(name of party/amicus)

_Francis Krivicich_

who is _Appellant_, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☒ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☒ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☒ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☒ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☒ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☒ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _____        Date:  October 15, 2014

Counsel for:  Appellant

## CERTIFICATE OF SERVICE
**************************

I certify that on  October 15, 2014  the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

    Joseph P. Thomas, Esq.
    John R. Ipsaro, Esq.
    Christopher J. Mulvaney, Esq.
    ULMER & BERNE, LLP
    600 Vine St., Suite 2800
    Cincinnati, OH  45202-2409

_____                    October 15, 2014
        (signature)                              (date)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................. iii

STATEMENT OF JURISDICTION ...................................................... 1

ISSUES PRESENTED ......................................................................... 1

STATEMENT OF THE CASE .............................................................. 2

    Procedural History and Context ..................................................... 2

    Statement of the Facts ..................................................................... 9

SUMMARY OF ARGUMENT ............................................................ 20

ARGUMENT ....................................................................................... 21

    I.    THIS COURT HAS A *DE NOVO* STANDARD OF REVIEW, PURSUANT TO WHICH IT MUST DECIDE WHETHER FOREST HAS CONCLUSIVELY ESTABLISHED ITS AFFIRMATIVE DEFENSE ............................................... 21

    II.    VIRGINIA PRODUCTS LIABILITY LAW IMPOSES A DUTY TO WARN ALL PERSONS WHO "MIGHT BE SUBJECTED TO DANGER" FROM THE PRODUCT ................... 23

    III.    VIRGINIA SHOULD NOT ADOPT THE LEARNED INTERMEDIARY DOCTRINE ......................................... 29

        A.    Virginia Has Not Adopted the Learned Intermediary Doctrine ................................................................ 29

        B.    Virginia Should Not/Will Not Adopt the Learned Intermediary Doctrine ............................................... 30

        C.    *IF* Virginia Adopted Some Version of the "Learned Intermediary" Doctrine, It is Likely that It Would Embrace Exceptions that Would Preclude Summary Judgment in this Case ............................................................... 43

IV.    EVEN IF "LEARNED INTERMEDIARY" EXISTS IN
       VIRGINIA, SUMMARY JUDGMENT WAS IMPROPER
       BECAUSE (A) FOREST DID NOT WARN THE
       PRESCRIBING PHYSICIANS AND (B) THEIR EQUIVOCAL
       TESTIMONY DOES NOT SUPPORT JUDGMENT AS A
       MATTER OF LAW ..........................................................................47

       A.    The First Element of the Affirmative Defense Is Proof that
             the Pharmaceutical Company Actually Warned the
             Prescribing Physician .................................................................47

       B.    A Prescribing Physician's Testimony is Not Necessarily
             Dispositive ...................................................................................49

CONCLUSION ..............................................................................................53

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ...........................54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Abbot by Abbot v. Am. Cyanamid Co.*,
    844 F.2d 1108 (4th Cir. 1988) ...............................................................49, 50

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...........................................................................22, 53

*Besser Co. v. Hansen*,
    415 S.E.2d 138 (1992) ..............................................................................23

*Bly v. Otis Elevator Co.*,
    713 F.2d 1040 (4th Cir. 1983) *on reh'g sub nom* ...........................................23

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...................................................................22, 47, 53

*Crocker v. Winthrop Labs., Div. of Sterling Drug, Inc.*,
    514 S.W.2d 429 (Tex. 1974) ......................................................................40

*Dobbs v. Wyeth Pharm.*,
    797 F. Supp. 2d 1264 (W.D. Okla. 2011)....................................................4

*Farish for Farish v. Courion Indus., Inc.*,
    754 F.2d 1111 (4th Cir. 1985) ...................................................................23

*Featherall v. Firestone Tire & Rubber Co.*,
    252 S.E.2d 358 (1979) .........................................................................*passim*

*Ford Motor Co. v. Boomer*,
    736 S.E.2d 724 (2013) .........................................................................45, 48

*Freeman v. Hoffman-La Roche, Inc.*,
    618 N.W.2d 827 (2000) ............................................................................45

*Garside v. Osco Drug, Inc.*,
    976 F.2d 77 (1st Cir. 1992)...................................................................50, 52

*Giles v. Wyeth, Inc.*,
500 F. Supp. 2d 1063 (S.D. Ill. 2007) ...........................................................49

*Gooden v. Howard Cnty., Md.*,
954 F.2d 960 (4th Cir. 1992) ..........................................................................22

*Gray v. Spillman*,
925 F.2d 90 (4th Cir. 1991) ............................................................................53

*Hart v. Savage*,
No. L-04-1663, 2006 WL 3021110
(Va. Cir. Ct. Oct. 19, 2006) ...........................................................................45

*Hillsborough County v. Automated Med. Labs., Inc.*,
471 U.S. 707 (1985)........................................................................................40

*Hubbard v. Dresser, Inc.*,
624 S.E.2d 1 (2006)........................................................................................23

*Hurley v. Heart Physicians, P.C.*,
898 A.2d 777 (2006).......................................................................................46

*In re Celexa & Lexapro Products Liab. Litig.*,
927 F. Supp. 2d 758 (E.D. Mo. 2013) ..................................................5, 32, 34

*King v. Flinn & Dreffein Eng'g Co.*,
No. 7:09-CV-00410, 2012 WL 4459568
(W.D. Va. May 16, 2012)................................................................................45

*Koho v. Forest Labs., Inc.*,
No. C05-0667RSL, 2014 WL 1744267
(W.D. Wash. Apr. 30, 2014).............................................................................8

*Kubicko v. Ogden Logistics Servs.*,
181 F.3d 544 (4th Cir. 1999) ..........................................................................21

*Larkin v. Pfizer, Inc.*,
153 S.W.3d 758 (Ky. 2004).............................................................................45

*Logan v. Montgomery Ward & Co., Inc.*,
219 S.E.2d 685 (1975)....................................................................................23

*McClanahan v. California Spray–Chemical Corp.*,
  75 S.E.2d 712 (1953) ...................................................................48

*Miller v. Pfizer, Inc.*,
  356 F.3d 1326 (10th Cir. 2004) ......................................................5

*Muzichuck v. Forest laboratories, Inc.*,
  No. 1:07CV16, 2014 WL 3530367
  (N.D.W. Va. July 15, 2014) ............................................................8

*Nye v. Bayer Cropscience, Inc.*,
  347 S.W.3d 686 (Tenn. 2011) ......................................................25

*Oman v. Johns-Manville Corp.*,
  764 F.2d 224 (4th Cir. 1985), *cert. denied sub nom*,
  *Oman v. H.K. Porter*, 474 U.S. 970 (1985)...........................................*passim*

*Pfizer, Inc. v. Jones*,
  272 S.E.2d 43 (1980) ......................................................29, 30, 48

*Pittman v. Upjohn Co.*,
  890 S.W.2d 425 (Tenn. 1994) ......................................................25

*Potter v. Eli Lilly & Co.*,
  926 S.W.2d 449 (Ky. 1996).............................................................3

*Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*,
  673 F.3d 294 (4th Cir. 2012) ...................................................22, 53

*Rimbert v. Eli Lilly & Co.*,
  577 F. Supp. 2d 1174 (D.N.M. 2008)...................................7, 41, 42

*Russell v. Wright*,
  916 F. Supp. 2d 629 (W.D. Va. 2013), *appeal dismissed*
  (Nov. 12, 2013) ........................................................................33, 45

*Sadler v. Lynch*,
  64 S.E.2d 664 (1951) ....................................................................40

*Spriggs v. Diamond Auto Glass*,
  242 F.3d 179 (4th Cir. 2001) ........................................................21

*Spruill v. Boyle-Midway, Inc.,*
    308 F.2d 79 (4th Cir. 1962) ..........................................................................48

*State ex rel. Johnson & Johnson Corp. v. Karl,*
    647 S.E.2d 899 (2007) ..................................................................7, 8, 41, 42

*Taboada v. Daly Seven, Inc.,*
    626 S.E.2d 428 (2006) *on reh'g,*
    641 S.E.2d 68 (2007) ..................................................................................40

*Tobin v. Smithkline Beecham Pharm.,*
    164 F. Supp. 2d 1278 (D. Wyo. 2001) ....................................................5, 14

*Vitanza v. Upjohn Co.,*
    778 A.2d 829 (2001)....................................................................................46

*Willis v. Raymark Indus., Inc.,*
    905 F.2d 793 (4th Cir. 1990) ...............................................................27, 33

*Wyeth v. Levine,*
    555 U.S. 555 (2009)...............................................................................4, 14

**Statutes:**

28 U.S.C. § 1291 ...............................................................................................1

28 U.S.C. § 1332(a)(1).......................................................................................1

**Constitutional Provision:**

U.S. Const. Art. VII .........................................................................................53

**Regulation:**

21 C.F.R. § 314.70(c)(6)(iii)(A) .....................................................................14

**Treatises:**

RESTATEMENT (SECOND) OF TORTS § 402A .......................................................24, 44

RESTATEMENT (SECOND) OF TORTS § 388...........................................................*passim*

RESTATEMENT (SECOND) OF TORTS § 388(c) ..........................................................30

RESTATEMENT (SECOND) OF TORTS § 388, Comment *n*...................................*passim*

RESTATEMENT (THIRD) OF TORTS § 6......................................................................45

RESTATEMENT (THIRD) OF TORTS § 6(d)................................................................44

RESTATEMENT (THIRD) OF TORTS § 6(d), Comment *e* .................................44, 47

RESTATEMENT (THIRD) OF TORTS § 10..................................................................44

RESTATEMENT (THIRD) OF TORTS § 27..................................................................45

**Other Authorities:**

Judith E. Beach et al., *Black Box Warnings in Prescription
Drug Labeling: Results of a Survey of 206 Drugs*,
    53 Food & Drug L.J. 403 (1998)....................................................3

Eric G. Campbell et al., *A National Survey of
Physician-Industry Relationships*,
    356 New. Eng. J. Med. 17422 (Apr. 2007) ...................................39

E. Ray Dorsey et al., *Impact of FDA Black Box Advisory on
Antipsychotic Medication Use*,
    170 Archives Internal Med. 96 (2010) .........................................3

Carl Elliott, *White Coat, Black Hat:
Adventures on the Dark Side of Medicine*
    78 (Beacon Press 2010) ................................................................38

Institute of Medicine of the National Academies, *Conflict of Interest in
Medical Research, Education and Practice*,
    12 (2009)........................................................................................39

Kramer's 1997 LISTENING TO PROZAC ..................................................10

THE ANTIDEPRESSANT ERA (Harvard Press, 1999) ...................................9

## STATEMENT OF JURISDICTION

The lower court had diversity jurisdiction.  28 U.S.C. § 1332(a)(1).  Summary Judgment was entered by the district court below on September 8, 2014.  Joint Appendix [hereinafter "JA"] 611.  (No final judgment was ever entered). A Notice of Appeal was filed on September 26, 2014.  JA 612.  Therefore, this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

This appeal concerns the "learned intermediary doctrine."  Summary judgment was granted in this Virginia, diversity jurisdiction, products liability, antidepressant/suicide wrongful death case based on this doctrine, an affirmative defense that has never been actually recognized by any appellate court in the Commonwealth of Virginia.  Therefore, the threshold issue is whether Virginia will adopt this doctrine at all, and, if so, what version of the doctrine.  Appellant has filed a separate Motion for Certification of this issue to the only court empowered to give a definitive and authoritative answer, *i.e.,* the Virginia Supreme Court.

Assuming *arguendo* that Virginia follows some version of the doctrine, the second issue is whether summary judgment is available to a defendant who did not adequately warn about the risk at issue and puts forth a summary judgment record to sustain its burden of proof that contains equivocal and conflicting testimony from the two prescribing physicians.

## STATEMENT OF THE CASE

In accordance with the new local rules, the Procedural History and Statement of Facts have been incorporated into this "Statement of the Case" portion of this Brief.

### Procedural History and Context

Because Forest has filed a cross appeal to challenge the MDL judge's conclusion that the methodology used by Plaintiffs' experts in reaching their conclusions was scientifically reliable, the increased scope of the appeal calls for a broader understanding of SSRI/suicide litigation. Plaintiff presents the procedural and factual history to give the court appropriate context for the entire case.

As noted in the Statement of the Facts, *infra,* the 1989 workplace slaughter by Prozac patient Joseph Wesbecker spawned nationally publicized litigation about the risks of SSRI[1]-induced violence. The actual trial of the case from that event resulted in a defense verdict, widely publicized by Eli Lilly as a "vindication" of Prozac. But then the courageous trial judge sniffed out the fact that there had been a secret settlement and issued a "show cause" order to rectify the public perception and protect the integrity of the judicial process. He was rewarded for his efforts

---

[1]  Selective Serotonin Reuptake Inhibitors (SSRI's) are a group of antidepressant medications that are treated as a class by the FDA because of their similar modes of action. Prozac was the first of this class to go to market.

with a joint attempt by Lilly and the plaintiffs' own lawyer to obtain a Writ of Prohibition against him. Ultimately, the Supreme Court of Kentucky ruled in favor of Judge Potter, and expressed its concern that Lilly might even have perpetrated a fraud on the court.[2]

But Eli Lilly and the other manufacturers of SSRI drugs, like the Appellee Forest, refused to warn either doctors or patients that, for a "small vulnerable subpopulation" of patients, these drugs were exceedingly dangerous.[3] JA 260 - 61. Indeed, as Forest pled in its Answer, JA 539, the lack of warnings was the "state of the art." With no warnings in the marketplace, it is perhaps not surprising that people continued to die. And parents and widows and widowers sought justice. Numerous SSRI suicide cases were filed across the country, many by the undersigned lead counsel for Kathleen Higgins. All of the other SSRI

---

[2] *Potter v. Eli Lilly & Co.,* 926 S.W.2d 449, 454 (Ky. 1996)("In this case, there was a serious lack of candor with the trial court and there may have been deception, bad faith conduct, abuse of the judicial process or perhaps even fraud. . . . We cannot tolerate even the possibility of such conduct at either the trial or appellate level.").

[3] It is well-known that stronger warnings, especially those that lead to black box warnings, "can have a profound effect on the sales of a drug." Judith E. Beach et al., *Black Box Warnings in Prescription Drug Labeling: Results of a Survey of 206 Drugs*, 53 Food & Drug L.J. 403, 409 (1998) (footnotes omitted); *see also, e.g.*, E. Ray Dorsey et al., *Impact of FDA Black Box Advisory on Antipsychotic Medication Use*, 170 Archives Internal Med. 96, 102 (2010).

manufacturers litigated the cases on an individual case basis. Forest, alone, sought MDL status.[4]

Typically, defendants raise three core issues in these cases: (1) that federal law preempts the failure to warn claims under state law; (2) that the plaintiffs' experts utilized an unreliable methodology in reaching their conclusions, making their opinions inadmissible under *Daubert*; and (3) that their interactions with the prescribing physician – the "learned intermediary" – foreclose any liability to the patient who ultimately took the drug. The Supreme Court effectively negated the federal preemption argument in *Wyeth v. Levine,* 555 U.S. 555 (2009), and SSRI plaintiffs have won every post-*Levine* preemption argument with the exception of one outlier.[5]

---

[4] As it has turned out, this strategy was a monumental success for Forest. It delayed the ultimate trials of Lexapro suicide cases for more than a decade, and, along the way, enabled Forest to reach *de minimus* settlements with the majority of cases, primarily with counsel who had no trial experience with SSRI cases. All of the suicide dockets of other SSRI manufacturers have now settled. Only this handful of Forest cases remains.

[5] The district court granted summary judgment based on preemption in *Dobbs v. Wyeth Pharm.,* 797 F. Supp. 2d 1264 (W.D. Okla. 2011), which involved the antidepressant drug Effexor. That case was settled shortly after oral argument to the Tenth Circuit. Forest has not included preemption in its cross-notice, so that there is no preemption issue in this appeal.

The industry's one "big win" in the SSRI *Daubert* arena was Pfizer's exclusion of Dr. David Healy's testimony in the *Miller* case involving the Zoloft-induced suicide of a 13-year old boy.[6]  It came in 2001, the same year as the plaintiffs' verdict in the Wyoming/Paxil murder/suicide case of Tim Tobin, in which Dr. Healy's testimony was vetted as *Daubert* admissible both before and after the trial.[7]  Three years after the *Tobin* verdict, in October of 2004, the FDA itself declared that "causality has been established" with regard to pediatric suicidality, and mandated a BLACK BOX WARNING, along with a direct-to-consumer Patient Medication Guide ("PMG") about this risk.  Armed with the subsequent regulatory history, Judge Sippel denied Forest's *Daubert* motion concerning Dr. Healy in the Lexapro MDL, observing that "[i]t could be argued, then, that Dr. Healy actually got it right in the *Miller* case and his opinions were ultimately validated by the FDA's own findings."[8]

The results in the learned intermediary context are more varied.  This is, perhaps, not surprising.  Physicians are naturally loath to admit that the drug that

---

[6]  *Miller v. Pfizer, Inc*., 356 F.3d 1326 (10th Cir. 2004).

[7]  *Tobin v. Smithkline Beecham Pharm*., 164 F. Supp. 2d 1278 (D. Wyo. 2001).

[8]  *In re Celexa & Lexapro Products Liab. Litig*., 927 F. Supp. 2d 758, 760 (E.D. Mo. 2013).  This public opinion is the critical "record" for appellate purposes on this issue.  Obviously, however, our responsive brief to Forest's *Daubert* cross appeal will cite other appropriate references in the Appendix in this case.

they prescribed caused their patients to take their own lives.  And some fear for their own reputations, if not liability.  As mass marketing of antidepressants has turned them into first-line drugs, moreover, the majority of prescriptions for SSRI drugs now are written by primary care doctors.  But when the "prescriber(s)" are psychiatrists, such as Dr. Andres and Dr. Doyle in this case, there is a particular reluctance by the doctors to concede that they were unaware of a risk of suicidality that has been prominently featured in their specialized scientific literature since early 1990.

There is also a significant issue of hindsight.  By the time prescribers are deposed in antidepressant litigation, most are aware that the FDA has *now* mandated **BLACK BOX WARNINGS** and patient medication guides about the risk of SSRI-induced suicidality for patients "of all ages."  The prescribers have to try to reconstruct what they actually knew years earlier at the time of prescription, before definitive regulatory action, while sitting in a deposition. Both Dr. Francis Andres and Dr. Brian Doyle, the physicians at issue in this case, testified that they were generally aware of a "controversy" about whether the SSRI class of drugs might be associated with suicidality, but neither had any **warning** from Forest about this risk. Nor had either been told that this was a very real risk and not simply a matter of "controversy."

Plaintiffs lost some of the SSRI suicide cases on learned intermediary based summary judgment motions. But they also won some. For example, in 2008, a federal judge in New Mexico acceded to Eli Lilly's insistence that he **not** certify the learned intermediary questions to the Supreme Court of that State, but then made an *Erie* prediction that that court would follow the lead of the West Virginia Supreme Court in the *Karl* case,[9] and reject the doctrine outright as "outmoded . . . unpersuasive" and completely contrary to the policy and rationale of strict tort liability.[10]

With regard to Forest's SSRI drugs, the record on learned intermediary based summary judgment rulings in the handful of cases remanded from the MDL currently stands at 2:1. On April 30, 2014, plaintiffs in the *Ilich* case in Seattle won their own affirmative motion for partial summary judgment with regard to this

---

[9] *State ex rel. Johnson & Johnson Corp. v. Karl*, 647 S.E.2d 899, 914 (2007) ("[W]e now hold that, under West Virginia products liability law, manufacturers of prescription drugs are subject to the same duty to warn consumers about the risks of their products as other manufacturers. We decline to adopt the learned intermediary exception to this general rule.").

[10] *Rimbert v. Eli Lilly & Co.,* 577 F. Supp. 2d 1174, 1222 (D.N.M. 2008)("The Court believes that the Supreme Court of New Mexico, given the opportunity in 2008, would not adopt the learned-intermediary doctrine, because of the erosion of the justifications for adoption of the doctrine, given the changing dynamics between doctors and patients, patients' self-diagnosis, and DTC advertising by drug manufacturers.").

affirmative defense.[11]   On July 17, 2014, the district court in the West Virginia *Muzichuck* case rejected Forest's attempt to "exhume the [learned intermediary] doctrine from its judicially-dug grave" and, applying the teachings of the West Virginia Supreme Court's opinion in *Karl, supra,* denied Forest's motion.[12]   That case is scheduled for trial on January 27, 2015.

The district court's ruling in this case stands in contrast to these decisions. Based on the prescribing physicians' (*equivocal,* in our assessment) after-the-fact recollections of their knowledge base years earlier, Judge Urbanski found that they were already aware when they treated and prescribed the SSRI Lexapro to Francis Krivicich that it might cause him to kill himself.  Thus, the court reasoned, there was no need for Forest to warn either of them in the first place.  JA 602, 609 - 10.

When Forest filed its motion for summary judgment on the basis of the "learned intermediary" doctrine, Plaintiffs responded by pointing out that **no Virginia appellate court** has ever even used the phrase.  Favoring accuracy over expediency,

---

[11]  *Koho v. Forest Labs., Inc.,* No. C05-0667RSL, 2014 WL 1744267 (W.D. Wash. Apr. 30, 2014)(" When decedent Ilich was prescribed Celexa, the warning label only cautioned that suicide was inherent in depression itself, and did not discuss the possibility that the initiation of drug treatment may increase the risk of suicidality. . . . As Dr. Gould states in both his declaration and deposition, he would have taken different steps with a different warning. That is sufficient to satisfy the causation prong of the learned intermediary doctrine.").  The same opinion denies Forest's preemption based summary judgment motion.

[12]  *Muzichuck v. Forest laboratories, Inc*., No. 1:07CV16, 2014 WL 3530367, at *3 (N.D.W. Va. July 15, 2014).

-8-

Plaintiffs asked the district court to certify the issue to the Virginia Supreme Court so that the case could be decided on the basis of an authoritative declaration of Virginia substantive law.  JA 124 - 140, 591, 2172 - 2177.  He declined to do so and then, on the eve of trial, granted summary judgment on the basis of this affirmative defense.

This appeal timely followed.  Here, as in the court below, as a matter of comity and federalism we urge the Court to certify this unsettled issue of Virginia common law to the one court that can definitively decide it, *i.e.,* the Virginia Supreme Court. Our contemporaneously filed Motion for Certification is hereby incorporated herein by reference.  Failing that, for reasons set out in section IV *infra*, we point out that, even under traditional "learned intermediary" precedents, the equivocal testimony of the prescribing physicians in this case, coupled with the undisputed fact that Forest took absolutely no steps, actions, or any effort whatsoever to warn about the risk of a drug-induced suicide, does not warrant summary disposition.

## Statement of the Facts

### *Dr. Jekyll and Mr. Hyde – the Full Story of the SSRI Wonder Drugs*

The modern "antidepressant era"[13] really began in January of 1988 when Eli Lilly launched Prozac.  It was the first of the so-called "Selective Serotonin Reuptake Inhibitors" or "SSRIs".  Although the clinical trial data for these drugs showed that

---

[13]  THE ANTIDEPRESSANT ERA (Harvard Press, 1999).  The author of this book is the renowned Irish neuropsychopharmacologist, Dr. David Healy, who is the principal target of Forest's *Daubert* based cross appeal in this case.

they were no more effective in treating depression than the long-used benzodiazepine class of antidepressants, SSRIs seemed to have two big advantages that appealed to both modern medicine men and eager patients. First, they were not addictive. Second, they were not toxic in overdose. Thus, a general practitioner could feel comfortable in prescribing one of these drugs without fear that his patient either would become addicted to the medicine or, worse, would use the doctor's medicine as an instrument of his own death.

Prozac became on overnight success and national phenomenon. It became the first of what was to become a trend of "blockbuster," billion dollar, company defining "flagship" drugs. The reduction of addition/overdose risk emboldened general practitioners, who had previously been reluctant to treat depression, leading to more diagnoses and prescriptions as a first-line drug. Patients eagerly embraced this supposedly "selective" wonder drug. Prozac was featured on the cover of Time Magazine, and popular artists wrote books, like Peter Kramer's 1997 LISTENING TO PROZAC to herald the cry. It seemed like medical utopia.

But then the violence began. In August of 1989 a man named Joseph Wesbecker, under the influence of Prozac, went on a shooting spree at his former Kentucky workplace. The incident was widely publicized and, not surprisingly, prompted multiple lawsuits. As noted in Ms. Higgins' Complaint, a January 1990 peer-reviewed article by two prominent Harvard psychopharmacologists sounded

the alarm in academic circles. JA 260 - 61. These men, Drs. Teicher and Cole, postulated that Prozac triggered a neurological condition called "akathisia" and that people who experienced the extreme turmoil of this condition were likely to commit acts or violence towards themselves or others. *Id.* By 1991 other prominent academics had joined the chorus. Anthony Rothschild, also of Harvard, conducted a "rechallenge" experiment on six patients who had become suicidal on Prozac. JA 7108. All became akathisic again. Dr. Rothschild wrote that "patients need to be reassured" that it was the drug causing these problems and that, once it was discontinued, they would be okay. JA 7110. The prominent suicidologist/psychopharmacologist J. John Mann wrote that, although the SSRI drugs might work for the majority of patients, there is a "small vulnerable subpopulation" of patients who were at risk for drug-induced akathisia and violence. He explained the likely biological pathway for this phenomenon. JA 2518, 2523. [14]

In 1991 in the UK, Dr. David Healy, who had done his post-graduate work on the human serotonin system (and who later became plaintiffs' expert in the Lexapro suicide MDL and in this case), and his colleagues also published an early peer-reviewed article about these unknown, dangerous side effects of SSRI drugs. JA

---

[14] Forest admitted the authenticity of these peer-reviewed publications. JA 533 - 534.

7488. All of the articles demonstrated that the danger period for these violent side effects was in the early days, *i.e.*, in the first month or so of drug therapy or dose change.[15]

In late 1991 the FDA convened an advisory committee to consider the issue of SSRI/antidepressant-induced suicidality. At the end of its deliberations, a divided committee declined to require a warning of an increased risk of suicide, based on the "not great quality data" before it. JA 2529. Even so, FDA's official spokesman bluntly admitted that "nobody in the agency dismisses the possibility

---

[15] The scientific literature since that time has continued to corroborate these early warnings. A 2007 article by several scientists, including Lilly's point man on Prozac suicidality, Dr. Charles Beasley, finally acknowledged Mann's "small subset of vulnerable patients" and expressly stated that:

> "[c]onsistent with a previous analysis of suicidal behavior, the majority of new [suicidal ideation] emerged within the first 4 weeks, with the greatest incidence in the first week. This result suggests that the initial 4-week treatment period is one where vigilance is particularly important. On the other hand some additional [suicidal ideation] emerged later in the study, indicating that individuals remain vulnerable to emergence of [suicidal ideation after the initial month…Indeed antidepressants are known to precipitate [states contributing to suicidality] in a small subset of vulnerable patients."

JA 7354, 7358.

Another article by Juurlink and colleagues, subsequently cited by the FDA, found that, although SSRI drugs reduce the risk of suicide for adult patients who tolerate the drugs well over time, which in the first month of drug therapy, there is a statistically significant 4.8x risk of violent suicidality for patients in Francis' age group. JA 7345.

-12-

that antidepressants in general or fluoxetine [Prozac] in particular may have – and I emphasize 'may' – the capacity to cause untoward injurious behaviors, acts, and/or intensify them."   JA 2527.   In the same year, the FDA underscored the uncertainty of its position in a response to a "Citizen Petition," in which it declined to require a warning, but wrote that "an actual court finding of a causal relationship" between Prozac and violent behavior would warrant modification of its position.  JA 1078. It would take ten years – until June of 2001 – for that "court finding" to materialize.

By the middle of the 1990's other pharmaceutical companies had joined the SSRI marketing party.  Pfizer launched its blockbuster "Zoloft" in 1992 and SmithKline Beecham launched "Paxil" in 1993.

Howard Solomon, CEO of relatively tiny Forest Laboratories was also anxious to join the fray.  However, he had a problem.  His company did no research and had no SSRI drug in its inventory or pipeline that were ready to go to market. JA 2618 - 2621.  So he traveled to Denmark to meet with the head of a company called Lundbeck.  *Id.*  It had a stereo-isomer drug called Citalopram; and a racemic twin S-citalopram called Escitalopram.  *Id.*  The former became Celexa; the latter "Lexapro" after Forest acquired the rights to market them in the United States.  *Id.* Both became billion dollar blockbusters for Forest.  JA 2626 - 27.

Meanwhile, antidepressant manufacturers did nothing to highlight any potential risk of violence or suicidality with these medications, and made no attempt to give appropriate warnings. The reality of federal drug regulation of prescription drugs is that the FDA has "limited resources" to monitor drugs once they are marketed to the public, and that it is drug companies that "have superior access to information about their drugs." *Wyeth v. Levine*, 555 U.S. 555, 578-79 (2009). With no prompting from antidepressant manufacturers, the FDA neither required nor prohibited a warning of the increased risk until 2004.

But things began to change in June 2001. A unanimous federal jury in Cheyenne, Wyoming, found that "Paxil can cause homicide and/or suicide" and that it did cause the four deaths at issue in that case. The trial judge found, both before and after the trial, that there was scientifically reliable, legally admissible, evidence to support the jury's verdict. *Tobin v. Smithkline Beecham Pharm.*, 164 F. Supp. 2d 1278 (D. Wyo. 2001). Dr. David Healy was plaintiffs' expert in that trial.

The British regulatory authorities were the first governmental regulators to respond, "contraindicating" Paxil for children. Finally, an antidepressant manufacturer used its "superior access to information" to comply with its regulatory duty. On August 22, 2003, Wyeth, the manufacturer of the antidepressant Effexor, used the FDA's "changes being effected" regulation[16] to add a warning of the risk

---

[16] 21 C.F.R. § 314.70(c)(6)(iii)(A).

in younger patients, concurrently sending a *sua sponte* "Dear Doctor" letter to alert physicians to the change it had made in the drug's label. JA 2808. The FDA observed that "[i]t should be noted that sponsors have the authority to make changes of this nature, *i.e.*, that are perceived to strengthen labeling from the standpoint of safety, without prior approval by FDA." JA 2537.

What the FDA did do, in February of 2004, was convene another session of the Psychopharmacologic Drugs Advisory Committee. But this time there was a significant difference. This time, it was a *joint* meeting that included pediatric specialists as well. The result of this meeting was a Public Health Advisory on March 22, 2004, entitled *Worsening Depression and Suicidality in Patients Being Treated with Antidepressant [sic]*. JA 2733 - 34. This document was the centerpiece of motion proceedings in the court below. Forest even asked the district court to take "judicial notice" of it. JA 581. It contained both warnings about the danger, and instructions on how to use the drug and avoid the danger in patients of all ages.

This was a significant change in the warning information that was available to physicians at that time. For at the time of Francis' Lexapro prescription, the Lexapro labeled contained the following "precautionary" statement regarding "suicide" on page 7:

-15-

> "The possibility of a suicide attempt is inherent in major depressive disorder and may persist until significant remission occurs. Close supervision of high risk patients should accompany initial drug therapy. As with all drugs effective in the treatment of major depressive disorder, prescriptions for Lexapro should be written for the smallest quantity of tablets consistent with good patient management, in order to reduce the risk of overdose."

JA 2711 - 12.  This provision contains no hint that the drug itself – as opposed to the disease of depression – carries any risk, and limits the need for "close supervision" to "high risk patients."

Given the obvious inadequacy of the existing language and the lethality of the risk concerned, both underscored by the March 2004 Public Health Advisory, Forest should have done everything within its power to bring this newly acknowledged risk to the attention of both doctors and patients.  But it did not do so.  Although it claims to have complied with the FDA request for a change to the small print in the product labeling, it did nothing to actually admit that Lexapro could cause such behaviors or to call that risk to prescribers' attention.  It did not send out a "Dear Doctor" letter as Wyeth had done the preceding August.  And it did not instruct its sales force to alert the prescribers to this change in labeling or newly acknowledged risk.  To the contrary, its sales representatives were told **not** to proactively discuss side effects with any physicians, to include the sales representative who called on Dr. Andres in the very month proceeding Francis' death.  JA 2817:18 - 22; 2822:4 - 2824:22;

-16-

2828:1 - 2829:9. Rather, the internal directive from Forest to its sales force specifically instructs them *not* to "proactively" discuss new warning information about suicidality with physicians. JA 2837.

There were additional regulatory changes in subsequent years. Because Francis Krivicich died on July 23, 2004, however, we will not belabor the Court with an extensive discussion, except to note that, in the Fall of 2004, the FDA extended and strengthened the warning by insisting that it be in a **BLACK BOX.** JA 1358 - 59. In 2006, when the FDA completed a reanalysis of adult suicidality data (the prior warnings had been based on a reanalysis of data from pediatric patients only), the **BLACK BOX** warning was extended to "patients of all ages." JA 1397.

### Dr. Andres and Mr. Krivicich
### A Sad Tale of a Wrongful and Unnecessary Death

The year 2003 was a tough one for Harvard educated architect and sculptor Francis Krivicich. In September of that year, his wife and business partner, Kathleen Higgins, contracted Lyme's Disease. JA 2869. She could not work full time and required care from her husband. By early 2004, Francis' stress was compounded by the death of his mother-in-law, with whom he had been exceptionally close. *Id*. Consequently, on February 7, 2004, he sought professional help from a psychiatrist, Dr. Francis Andres. JA 1412.

Dr. Andres diagnosed Francis with an Adjustment Disorder and started him on another antidepressant, Remeron. On February 28, 2004, Dr. Andres switched

the prescription to Lexapro. JA 1417. The Lexapro dose was increased after a few days. JA 1418. But sometime in March or April of 2004, Francis discontinued the Lexapro because he did not like the way that it made him feel. Although Forest will seek to brand Francis – who had an aversion to psychoactive medications – as "non-compliant," the fact is that he kept coming back to Dr. Andres and, by July of 2004, when his condition was not better, he sought a second opinion from Dr. Brian Doyle in Washington, D.C. JA 1562. He took the Lexapro that, in his widow's opinion, killed him, pursuant to the prescriptions and strong advice of these physicians. JA 1563. Although Francis had prescriptions for other medications, the only one found in his bloodstream at the time of his death was the Lexapro. JA 2673.

As noted above, the FDA's Public Health Advisory was issued on March 22, 2004 – after Dr. Andres' initial prescription of Lexapro for Francis, but before he re-prescribed it on July 10, 2004. JA 2733 - 34. Between those two dates, *i.e.,* on June 24, 2004, Dr. Andres had a sales call from Lexapro salesperson Patricia Grimm. JA 2821:21 - 25; 7816. Ms. Grimm confirmed, in her June 2014 deposition, that she was unaware of any risk of violence or suicide,[17] and that Forest had instructed her not to initiate any discussion of *any* side effects. JA 2817:8 - 25; 2828:1 - 2829:9.

---

[17] In fact, Ms. Grimm unequivocally testified that she had no recollection of ever seeing or being provided by Forest the March 22, 2004 FDA advisory regarding SSRI-induced suicidality despite the fact that this notice specifically named Lexapro, a drug she was marketing to Dr. Andres. JA 2822:4 - 2825:6. Ms. Grimm did not even know what an FDA Public Health Advisory was.

Indeed, she was trained that the worst side effect of Lexapro was dry mouth. JA 2818:18 - 24.

In his single visit with Dr. Doyle on July 16, 2004 – six days after Dr. Andres had doubled Francis' dosage of Lexapro. JA 2869. Dr. Doyle found Francis to be "agitated," "restless," and "playing with his hands; in fact, he was picking at his fingers…he just couldn't sit still." JA 2902:1 - 15. He had "significant" agitation. JA 2917:20 - 2918:5. Francis expressly reported the Lexapro made him "edgy." *Id*.; JA 2875. Moreover, Francis noted on his mental status questionnaire not once, *but twice*, that he felt agitated, was "picking at his fingers" and that he "can't sit still." JA 2871 - 72. These observations are important because they are consistent with an SSRI-induced akathisia, the very thing that the FDA Public Health Advisory sought to warn doctors and patients about, and the very "biologically plausible pathway" by which Plaintiff's expert opines that Lexapro was a substantial factor in Francis Krivicich's death. Nonetheless, Dr. Doyle urged Francis to stay on the medication. JA 2870.

Seventeen days after he began taking Lexapro, Francis Krivicich shot himself in the head. JA 2690. As Forest's own expert in the case acknowledged, the firsthand accounts of his behavior on the day he died – from **both** Kathleen Higgins and family friend Jeffrey Gateman – are consistent with a drug-induced akathisia.

JA 2929:11 - 23. His death fit the "classic" pattern of SSRI-induced suicidality, as evidenced in all of the scientific articles that have examined this issue.

His widow Kathleen, who had been concerned all along about Francis taking such powerful mind altering drugs, immediately wondered whether Lexapro could have cost her husband his life. She sought justice from the courts. Ten years later, on the eve of trial, her case was tossed out on summary judgment.

## SUMMARY OF ARGUMENT

The Virginia Supreme Court has held that product manufacturers have a duty to warn all people "who might in the ordinary and natural course of events be subjected to danger" from their products. The "learned intermediary" doctrine is totally incompatible with this public policy based statement of common law. Therefore, this Court should certify the question to the Virginia Supreme Court which should, based on the arguments set forth herein, reject or limit this very specialized defense in a way that not comports with public policy and the 21st Century practice of medicine, but would also result in the summary judgment in this case being reversed. Absent certification, this Court should make a current *Erie* prediction that Virginia will either not adopt this Twentieth Century doctrine for its Twenty First Century public, or will, at minimum, recognize exceptions that would defeat summary judgment on the record facts in this case.

-20-

Alternatively, even *if* Virginia adopts the learned intermediary doctrine, the summary judgment in this case must be reversed for one of two different reasons. First, in most states, the initial element that a defendant must plead and prove to invoke this affirmative defense is that it effectively communicated a legally adequate warning. The district court's opinion ignores this basic tenet and holds that the drug company defendant does not have to present any evidence that it warned, or tried to warn, the prescribing physician. Second, the common denominator on the line of cases that have upheld summary judgments under the learned intermediary doctrine is that the doctor must testify *unequivocally* that he/she was fully aware of *all* of the information concerning the side effect in issue that a legally adequate warning would convey. The equivocal and conflicting testimony of both Dr. Andres and Dr. Doyle falls woefully short of this standard.

## **ARGUMENT**

### I.   **THIS COURT HAS A *DE NOVO* STANDARD OF REVIEW, PURSUANT TO WHICH IT MUST DECIDE WHETHER FOREST HAS CONCLUSIVELY ESTABLISHED ITS AFFIRMATIVE DEFENSE.**

This Court's review of the grant of summary judgment is *de novo*. *Kubicko v. Ogden Logistics Servs.,* 181 F.3d 544, 551 (4th Cir. 1999); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (reversing summary judgment based on an affirmative defense). Here, as in the district court below, all inferences from the evidence should be indulged in favor of the non-movant, Appellant Higgins.

Given the *de novo* standard of review, the Supreme Court's admonition regarding the appropriate summary judgment analysis in *Anderson* is old, but still well worth remembering in that regard:

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. . . .

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

Finally, "[w]here, as here, the movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 331 (1986) (defendant may prevail on a motion for summary judgment on an affirmative defense when it has produced credible evidence that would entitle it to a directed verdict if not controverted at trial)." *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc*., 673 F.3d 294, 299 (4th Cir. 2012). *Accord Gooden v. Howard Cnty., Md.*, 954 F.2d 960, 971 (4th Cir. 1992)("If summary judgment motion is on an affirmative defense as to which the movant would have the burden of persuasion at trial, the summary judgment burden is a correspondingly heavy one.").

## II.  VIRGINIA PRODUCTS LIABILITY LAW IMPOSES A DUTY TO WARN ALL PERSONS WHO "MIGHT BE SUBJECTED TO DANGER" FROM THE PRODUCT.

Unquestionably, *Featherall v. Firestone Tire & Rubber Co.,* 252 S.E.2d 358 (1979) is the lead "duty to warn"[18] products case in Virginia.  The holding is succinct:

> The duty to warn stems from the view that the manufacturer should have superior knowledge of his product and it extends not only to the immediate purchaser but **to other persons who might in the ordinary and natural course of events be subjected to danger**.

With respect for the court below, it is impossible to square the logic, rationale, and holding of *Featherall* with the "learned intermediary" doctrine.  Rather, the doctrine transmutes the language and holding of *Featherall* to the following absurdly extreme principles:  (1) although the law maintains the "view that the manufacturer should have superior knowledge of his product," *IF* the product is a prescription medication and *IF* the doctor who prescribes that product for someone else to use testifies years later that he had "independent knowledge" of the danger, then the product

---

[18]  As this Court noted in *Bly v. Otis Elevator Co.*, 713 F.2d 1040, 1045-46 (4th Cir. 1983) on reh'g sub nom. *Farish for Farish v. Courion Indus., Inc.,* 754 F.2d 1111 (4th Cir. 1985), the failure to warn theory is cognizable under both negligence and warranty.  *Accord Besser Co. v. Hansen*, 415 S.E.2d 138, 144 (1992); *Logan v. Montgomery Ward & Co., Inc.,* 219 S.E.2d 685, 687 (1975); *Hubbard v. Dresser, Inc.,* 624 S.E.2d 1, 2 (2006). The main difference between the two is that the duty to warn under warranty principles does not stop at the time the product is sold, or in this case, initially prescribed.  On the unique facts of this case, that distinction might be important at the time of the ultimate trial.  It is not necessarily germane to the issues in this appeal.

manufacturer has absolutely no duty to warn whatsoever;  (2) unlike other product manufacturers, drug companies have no duty to warn either "the immediate purchaser," *i.e.,* the patient who is at risk for the side effect, or any "other persons who might in the ordinary and natural course of events be subjected to danger," like his wife, but escape liability entirely by warning the prescribing physician, who does not profit from the sale of the drug, who does not have to pay money to buy the product, and who is not in any "danger" whatsoever.  Surely such an end result is not one that can comport with *Featherall.*

The implicit rationale for creating this specialized rule of law solely for the benefit of pharmaceutical companies is the unspoken, paternalistic notion that Virginia citizens are simply not sophisticated enough to participate in their treatment decisions, despite being bombarded with direct to consumer advertising in the modern age, or to otherwise decide what drugs they will, or will not, ingest into their bodies. This Court should not countenance such an ill-founded, antiquated rule of law.

Because Virginia is primarily a negligence state, as opposed to a strict tort liability state, the *Featherall* court framed its discussion of the common law duty to warn, not from RESTATEMENT (SECOND) OF TORTS, § 402A (which it has never adopted), but rather from § 388 to that same RESTATEMENT.[19]  The section provides, in relevant part, that "one who supplies directly or through a third person a chattel

_____

[19]  Section 388 *Chattel Known to be Dangerous for Intended Use.*

-24-

[drug, product] for **another** to use is subject to liability **to those** whom the supplier should expect to use the chattel . . . or with the consent of the other or to be **endangered** by its probable use, . . . if the supplier (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and (b) has no reason to believe that **those for whose use** the chattel is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care **to inform them** of its dangerous condition or of the facts which make it likely to be dangerous." Plain.  Simple.  Nothing ambiguous.  It is a simple tri-element rule of liability with nothing to suggest that the purveyor of the chattel should be able to limit his/her liability by claiming "to inform a [learned] intermediary" of the dangerous condition.

Neither the Virginia Supreme Court nor this Court has addressed whether § 388 would countenance the use of an "intermediary" to convey the warnings.[20]  But in *Oman v. Johns-Manville Corp.,* 764 F.2d 224, 233 (4th Cir. 1985) *cert. denied sub nom. Oman v. H.K. Porter,* 474 U.S. 970 (1985), this Court, sitting en banc, was

---

[20]  There is some authority from other jurisdictions, but it is sparse.  The Tennessee Supreme Court found support in section 388 and comment *n* for the adoption of the learned intermediary doctrine in *Pittman v. Upjohn Co.,* 890 S.W.2d 425 (Tenn. 1994).  But, more recently that court has reiterated that under comment *n* to section 388, "the **duty** to warn of hazards associated with the use of a product **increases** with the amount of **danger** involved."  *Nye v. Bayer Cropscience, Inc.,* 347 S.W.3d 686, 704 (Tenn. 2011)(Emphasis added).  In 2013, a federal district court certified a question to the Tennessee Supreme Court as to whether it would recognize RESTATEMENT or common law exceptions to the learned intermediary rule.  Sadly, the Tennessee high court declined to hear the case. *Jones v. Abbott*, Case 2:07-cv-02120-WGY-tmp; Document 227; Filed 09/09/13; Page 1 of 5; Pages ID 3858-62.

confronted with an argument by the defendant product manufacturer that its duty to warn could be satisfied, NOT by evidence of a warning to the ultimate user, but rather by evidence of a warning to a "sophisticated" intermediary.[21]  The Court recognized that comment *n* to § 388 provides a discussion of the limited circumstances which might justify the use of an intermediary to convey the warning, but, on the case before it, this Court affirmed the district court's **refusal** to give the "sophisticated user" instruction to the Jury.  Comment *n* contains a list of the factors that should be considered to make the decision.  Those will form the framework for our discussion in section III.B, *infra,* of whether, given this common law foundation, Virginia should or will adopt the learned intermediary doctrine.  But the decisive consideration in this Court's *Oman* opinion was the magnitude of the danger to the user.  In footnote 5 to the opinion, this Court quoted Comment *n* which recognizes that for a "slightly dangerous" product, the duty might be fulfilled by warning the intermediary, but that "if the danger involved in the ignorant use of a particular chattel is very great, it may be that the supplier does not exercise reasonable care in entrusting the communication of the necessary information even to a person whom

---

[21]  The "sophisticated user" defense is sometimes discussed in tandem or parallel with the "learned intermediary" doctrine, although they are not the same thing.

he has good reason to believe to be careful." *Id*. at 233.[22]  These teachings apply with equal force to the case at bar.

There are no Virginia cases, and no cases from this Court, discussing the application of Comment *n* of RESTATEMENT § 388 to physicians who prescribe drugs with dangerous side effects.  Accordingly, in Section III.B, *infra,* we will analyze the issue in terms of the six factors articulated in the Comment.  But at the inception, while we are still discussing *Featherall* itself, it is important to highlight a fundamental difference in the focus between Comment *n* and the "learned intermediary" doctrine that is so significant that it makes any attempt to fit the latter within the ambit of the former somewhat like trying to put the proverbial "square peg" in a "round hole."  It is this.  By its express wording, Comment *n* is concerned with informing and guiding the actions of the *user* of the product, not anyone else.  Thus, the Comment speaks in terms of "entrusting the communication of the necessary information" to some third party, and factor four in its analysis is the "reliability" of the intermediary "*as a conduit*."  The warning is not meant to control the *actions* of the third party.  It is meant to be "conveyed" to the person in danger.

This is a natural, "fairness" corollary of the fact that liability is negligence based and that the product manufacturer can defend by claiming *contributory*

---

[22]  A panel of this Court followed that holding in *Willis v. Raymark Indus., Inc.*, 905 F.2d 793, 797 (4th Cir. 1990).

*negligence*. In this case, Forest has alleged and will undoubtedly seek to prove that the patient who used its drug, *i.e.*, Francis Krivicich, was "negligent." JA 538 at ¶¶9, 12. But, of necessity, any negligence on his part must be gauged within the framework of *his knowledge* of the danger. And, without a warning, he has no such knowledge. The symbiotic nature of the warning *vis-à-vis* the negligence/contributory negligence relationship is illustrated by the holding of *Featherall* itself. The trial court there found the plaintiff Tom Featherall to be negligent as a matter of law for working on the pressurized lid without the locknut in place. But the Supreme Court reversed. Its evaluation of his contributory negligence was tied directly to his knowledge of the danger, which, of course, a legally adequate warning would have communicated to him:

> Critical to our determination of this issue is the testimony, first, that on the day of the accident Featherall was **unaware** that full source pressure would pass through a regulator of this type which lacked a locknut and, second, that he was **unaware** that the locknut served a safety function. . . . Given the testimony that **plaintiff did not know of the safety purpose of the nut** *or of the dangerous condition caused by its absence,* we think reasonable minds can differ whether plaintiff failed to act properly and promptly and whether such failure was a cause of his injury.

*Featherall,* 252 S.E.2d at 370. (Emphasis added). The *Featherall* court was very concerned with what Mr. Featherall did or did not know about the dangers of the product.

By contrast, the "learned intermediary" doctrine, as wielded by Forest and other pharmaceutical companies, is not concerned with what the patient knows or with what the patient does. Rather, the focus is on the actions of the prescribing doctor. Pharmaceutical defendants frame the decisive inquiry as a hypothetical question: "IF the prescriber had received the warning that the plaintiff claims he should have, would *he* still prescribe the drug?" Indeed, it was a major component of Forest's motion in this case. JA 82. This altogether ignores the rights and the role of the end user, Patient Krivicich.

Because of this distinct disparity in focus between the intermediary and the end user, Comment *n* to RESTATEMENT § 388 is simply incompatible with the adoption of a learned intermediary defense, either wholesale or in this specific case. The Court should so hold.

## III.  VIRGINIA SHOULD NOT ADOPT THE LEARNED INTERMEDIARY DOCTRINE.

### A.    Virginia Has Not Adopted the Learned Intermediary Doctrine.

The district court's holding in this case rests principally on the district court's belief that *Pfizer, Inc. v. Jones*, 272 S.E.2d 43, 45 (1980) demonstrates that Virginia has adopted the learned intermediary doctrine. JA 599. With respect, this is incorrect. *Pfizer* concerns the *adequacy of a warning* to a physician, not the existence of a *duty to warn* someone *in addition* to the physician. *Pfizer* neither uses the phrase "learned intermediary" nor cites RESTATEMENT § 388/Comment *n*. Especially considering

the Virginia Supreme Court's year-old holding in *Featherall* that the duty extends to warn all persons in "danger," *Pfizer* simply cannot be read to adopt the learned intermediary doctrine.  The only mention of a duty to warn concerns the substance, *not the audience*, of the warning.  The slate is clear, and this Court must either (a) certify to the Virginia Supreme Court, or (b) make a reasoned *Erie* prediction as to what that court would likely do in 2015 on the record before this Court.

**B.    Virginia Should Not/Will Not Adopt the Learned Intermediary Doctrine.**  Whether this Court chooses to certify to the Virginia Supreme Court,   as we urge it to do, or to make an *Erie* prediction, the starting place for analysis of the question of whether Virginia will or should adopt this doctrine is RESTATEMENT § 388, as discussed in *Featherall* and section II of this Brief.  As noted above, the "rule" of section 388 is straightforward and seems to brook no exceptions.  However, in *Oman,* 764 F.2d at 224, this Court recognized that there are some justifications for an exception to that rule, and observed that Comment *n* laid out the matrix for analysis of the question of when and under what circumstances the RESTATEMENT § 388 duty to warn might be satisfied by a warning to a third party.

> Comment *n* discusses the various factors a court must balance to determine what precautions the manufacturer or supplier of a product must take to satisfy the requirement of reasonable care found in § 388(c). These factors include: (1) the *dangerous condition* of the product; (2) the *purpose* for which the product is used; (3) the form of any *warnings given*; (4) the reliability of the third party *as a conduit* of necessary information about the product; (5) the

> *magnitude* of the involved; and (6) the *burdens* imposed
> upon the supplier by requiring that he directly warn all
> users.

*Id*. at 233 (emphasis added). "These considerations must be balanced to determine if the manufacturer owes a duty to place a warning on his product." *Id*. As mandated by this Court, we address them *seriatim* and analyze how the pleadings and proof in the record on appeal in this case measure up to them.

First: "*dangerous condition*." As the Complaint alleges, Lexapro is a mind-altering drug. It is designed to alter the chemistry of a person's brain. Specifically, it alters the neurotransmitter serotonin, which governs aggression and impulse control. JA 260 - 61. Because it comes in the benign guise of a medication, it is a true wolf in sheep's clothing for some people, *i.e.*, the "small vulnerable subpopulation" alleged in the Third Amended Complaint and documented in the scientific literature. The biggest danger is that the drug, paradoxically, will trigger suicidal thoughts and behavior in some of the very people whose anxiety and depression it is supposed to alleviate.

This is no illusory danger. On March 22, 2004, in a document that Forest asked the district court below to judicially notice, JA 581, the FDA discussed this "danger" at some length. As it noted, one of the truly pernicious things about the risk of drug-induced suicidality is that, *without a warning*, no one – not patients, not

family members, not even their doctors – will recognize that the incipient behavioral signs are drug-induced. This is dangerous indeed.

The ways by which that danger might manifest itself were detailed at length in the general causation report of plaintiff's expert, Dr. David Healy, and vetted by the MDL court below in the context of Forest's *Daubert* challenge. *In re Celexa & Lexapro Products Liab. Litig.*, 927 F. Supp. 2d 758, 760 (E.D. Mo. 2013). Unless this Court decides, in the context of Forest's cross appeal, that this was an "abuse of discretion" by the district court, it is the law of this case.

Second: "*purpose.*" This life-threatening drug was not given to treat an immediately life-endangering condition. This is not to minimize the depression and stress with which Francis Krivicich was dealing. But the drug is used to help patients feel better. The fact that the risk concerns a paradoxical reaction that can, in and of itself, separate and apart from the underlying illness, be life threatening is beyond significant. It is directly contrary to why the drug is being used in the first instance. The contradiction places incredible importance upon disseminating safety information to those in a position to prevent and/or reduce the harm. As Dr. Andres made clear, those people are the family members. JA 2751:21 - 2753:3.    Third: "*form* of any warnings.*" The law is that the adequacy of a company's warnings must be determined by the jury as a question of fact. This determination comes not from reference to a "sole piece of paper," but rather to the totality of the communications

between the manufacturer and the patient, or his surrogate. *E.g., Russell v. Wright,* 916 F. Supp. 2d 629, 654 (W.D. Va. 2013), *appeal dismissed* (Nov. 12, 2013).

Within a year after Francis Krivicich's death, Forest was required to place a BLACK BOX WARNING on Lexapro's label and to provide a Patient Medication Guide, specifically focused on the risk of suicidality, to be given directly to patients, with respect to an increased risk of suicidal behavior in pediatric patients. JA 1358 - 59. Two years later, the BLACK BOX warning was extended to "patients of all ages." JA 1397. Almost a decade later, the prescribing physicians had to attempt to reconstruct what they knew about the risk when they prescribed it to Francis Krivicich, ignoring the knowledge of the subsequent, significant regulatory developments. In that regard, it is significant that this Court has held that a product manufacturer may not "escape liability by **reconstructing the past** to show merely what the [physician or patient] employer/purchaser knew. Comment *n* clearly focuses on what the product manufacturer knew and the reasonableness of its reliance on the employer *prior to and during the time the workers [patient was] were exposed"* to its product. *Willis v. Raymark Indus., Inc*., 905 F.2d 793, 797 (4th Cir. 1990)(Boldface added; italics in original).

Regardless of what Dr. Andres could or could not recall, it is undisputed that when he first prescribed Lexapro to Francis in February of 2004, there was absolutely no warning whatsoever about the potential role of the drug in inducing

suicidal thoughts and behavior.  Plaintiff's FDA expert, Dr. Hamrell, has opined that Forest had knowledge, or "reason to know" in *Featherall* terminology, by at least June 2001 that there was a risk that required a warning.  *In re Celexa & Lexapro Products Liab. Litig*., No. MDL 1736, 2013 WL 791784, at *5-6 (E.D. Mo. Mar. 4, 2013) (Finding Dr. Hamrell's testimony regarding notice to Forest to be both reliable and admissible in this case.).

On March 22, 2004, the FDA itself finally issued a prominent Public Health Advisory, but that certainly does not fulfill Forest's explicit duty to warn under *Featherall* and RESTATEMENT § 388.  Forest apparently did change the Lilliputian print in its "package insert" on May 31, 2004.  However, it took no steps whatsoever to communicate the risk that FDA had finally acknowledged in the Public Health Advisory to physicians or to patients, for example by issuing a "Dear Doctor" letter to alert physicians to this label change.  More importantly, it instructed its sales force *not* to initiate discussions with prescribers about this label change.  Consequently, when Forest sales rep Patricia Grimm visited Dr. Andres on June 24, 2004, she did nothing to alert him to this risk.  JA 2817:8 - 25; 2821:21 - 25; 2822:4 - 2824:22; 2828:1 - 2829:9; 7816.  Per Forest's instructions, she said nothing to him about the FDA Advisory or the new label change.  *Id.*

At their July 10, 2004, appointment, Francis told Dr. Francis that he had restarted Lexapro.  JA 2853.  Dr. Andres gave Frances yet another 30-day

-34-

prescription renewal for Lexapro and instructed him to double his dose. *Id*. On July 12, 2004, Francis wrote in his day planner "God, deliver me from this hell." JA 2865. In sum, therefore, the only arguable "form" for any "warning" issued by Forest before Francis Krivicich's death was via tiny boilerplate print in an innocuous document that the sales force was essentially told to ignore or downplay.

Most importantly, there was *nothing* in this format that was designed to reasonably facilitate Dr. Andres' role as a "*conduit*" of this critical safety information. This is important because the FDA Advisory on March 22nd had specifically recommended that manufacturers tell doctors to "instruct patients, their families, and their caregivers to be alert for the emergence of agitation, irritability" and restlessness as a possible precursor to emergent suicidality. Dr. Andres[23] confirms this was new information that was not contained in the previous warning label.

The importance of the family member's role in the warning dissemination cannot be emphasized enough: a patient who is having a severe, paradoxical reaction to an SSRI-antidepressant is likely *not* to understand what is happening to them. Indeed, Dr. Andres[24] and Dr. Doyle[25] unequivocally stated they would have warned

---

[23] JA 2751:21 - 2753:3.

[24] JA 2754:25 - 2756:1; 2759:23 - 2761:9.

[25] JA 2914:9 - 2915:6.

Francis' wife to monitor for these symptoms if they had been so warned because family members are in the best position to protect a patient from suicide. Sadly, Kathleen confirms that if she had been warned about these potential side effects, she would have prevented Francis from ever taking the drug. JA 2840.

Forest's own actions confirm the inadequacy of the warnings to Francis Krivicich. Forest actually _drafted_ a consumer letter about this very risk in the April-May 2004 time frame,[26] but the letter was "embargoed," and was never disseminated. JA 7799 - 7802.

Fourth: "*reliability of . . . conduit.*"  As noted in Section I, *supra*, this is the complete disconnect between RESTATEMENT § 388/Comment *n* and the "learned intermediary" doctrine.  IF "learned intermediary" is an affirmative defense, as Forest alleged in its Answer, then to prevail under Comment *n*'s requirements, Forest had the *Celotex* burden to plead and prove that it actually provided a warning to Dr. Andres (and/or to Dr. Doyle) *and* that the prescriber was a "reliable conduit" of that information to his patient, Francis Krivicich. It did neither. Forest's counsel asked neither of the prescribers a single question about his role as a **conduit** of any warnings. Rather, the focus of defense counsel's deposition colloquy was on some vague general awareness of a potential risk that either did affect or could have affected the **physician's** decision to prescribe or not prescribe. There was nothing

---

[26] JA 7786 - 87.

whatsoever about whether the doctor "passed on" any warnings via his "informed consent" discussion with the patient.[27]  There was nothing to evidence that these doctors were actually aware of a real (vice theoretical risk).  Simply stated there was nothing to suggest that these physicians were warned that this risk is real, significant, and that their treatment decisions and recommendations needed to be altered to reflect this important safety information.  The doctor cannot be a reliable conduit of information if he is not adequately warned of the true nature of the risk.  A vague awareness based on some outside source is not being completely and adequately warned.[28]

Moreover, the district court did not grant summary judgment based on the content of any warnings actually given by Forest, but relied on its own interpretation of what the *doctors* already knew about this risk.  By focusing on the doctors' incomplete knowledge and the doctors' decisions, the district court completely ignored both RESTATEMENT § 388 and Comment *n.*

Forest did allege, and intended to prove, that Francis Krivicich was somehow negligent himself because he was purportedly a noncompliant patient.  But it did nothing to prove that any warning was designed to reach, or did reach Francis

---

[27]  In fact, the contrary is true.  As discussed *supra*, both physicians testified that if they had been warned to warn Kathleen about this risk, they would have done so.

[28]  Indeed, Dr. Doyle testified that he expects drug companies to give him definitive answers as to the true risks of using a medication.  JA 2910:22 - 2911:4.

Krivicich.  IF contributory negligence is a viable defense in Virginia, then, as the last holding of *Featherall, supra*, indicates, as a precursor to asserting it, the manufacturer must, in all fairness, show that it had warned **him** or empowered a "reliable conduit" to do so in its behalf.  One cannot be noncompliant if one is unaware of the true risks involved in using the product. If Tom Featherall deserved a warning about the dangers of a missing locknut that might cause a lid to explode, then surely Francis Krivicich was entitled to a warning about a pill that just might cause him end his life due to an alteration in his brain chemistry.

In assessing the reliability of a prescribing physician as a conduit, moreover, the Court should consider the realities of modern medicine/prescription drugs.  The learned intermediary doctrine is a judicially crafted concept, formulated at a time when Marcus Welby was the archetype of the independent prescribing physician. The doctrine is outdated in today's world of direct-to-consumer advertising and modern telecommunications.  These changes in medicine have profoundly affected prescribing physicians.  According to a 2004 study of the 15 largest drug companies in the United States, the drug industry spent just under a third of its total marketing budget on payments to physicians. Carl Elliott, *White Coat, Black Hat: Adventures on the Dark Side of Medicine* 78 n.3 (Beacon Press 2010). According to a national survey published in *The New England Journal of Medicine* in 2007, 94 percent of physicians had some sort of financial relationship with a pharmaceutical company.

-38-

Eric G. Campbell et al., *A National Survey of Physician-Industry Relationships*, 356 New. Eng. J. Med. 1742, 1746 & 1746 tbl.2 (Apr. 2007). And the Institute of Medicine has gone so far as to recommend strictly limiting personal contact by drug company representatives in order to mitigate the potential conflict of interest inherent in that relationship. *See* Institute of Medicine of the National Academies, *Conflict of Interest in Medical Research, Education and Practice* 12, 20 (2009). Certainly most physicians attempt to use independent judgment in their prescribing decisions. But despite their best efforts, they remain human. To pretend that prescribing physicians can function as the sole reliable conduit of risk information in the modern world is naïve at best.

Fifth: "*magnitude*" of risk. Death by a patient's own hand. Few, if any risks are of greater magnitude, especially for the patient's spouse. On July 25, 2004, Kathleen Higgins watched her husband pacing around in a manner that even Forest's specific causation expert concedes, in retrospect, is consistent with a Lexapro-induced "akathisia." JA 2929:11 - 23. No one told her or her husband what these behaviors indicated, although the March 2004 Public Health Advisory expressly identified the risk. JA 2733. She heard the sound of a solitary gunshot. And she then went to the place where her husband's bleeding body lay. JA 3643. One cannot overstate the magnitude of the risk.

In *Oman, supra,* this Court focused on the pervasiveness of the risks attendant to asbestos exposure.  Asbestos is dangerous to everyone who is exposed to it. Fortunately, SSRI-induced suicidality is a relatively rare phenomenon.  It affects only a small percentage of patients who take these drugs.  But common law courts, which are more concerned with the wellbeing of all of their citizens,[29] have often held that the rarity of a drug's known side effects does not excuse the manufacturer from warning, especially where, as here, the side effects in issue are lethal.[30]

In Virginia, as elsewhere, it has long been the law that the duty to warn is commensurate with the magnitude of the risk.  *See Taboada v. Daly Seven, Inc.,* 626 S.E.2d 428, 434 (2006) *on reh'g*, 641 S.E.2d 68 (2007); *Sadler v. Lynch*, 64 S.E.2d 664 (1951).  The risk of suicide, triggered by a medication that you believe will actually make you better, is so significant that the duty to warn should not be minimized by permitting the drug manufacturer to escape liability by warning the physician instead of the patient.

Sixth: *"burdens" of communicating warnings.*  The most common and ardent "justification" that drug companies put forward for the "learned intermediary"

---

[29]  *See, e.g., Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985) ("[t]he regulation of health and safety matters is primarily, and historically, a matter of local concern").

[30]  *E.g., Crocker v. Winthrop Labs., Div. of Sterling Drug, Inc.,* 514 S.W.2d 429, 432 (Tex. 1974) ("The failure to warn of a danger cannot always be excused by the mere fact that the potentially endangered users are few in number.").

doctrine is the burden of communicating warnings to patients. If this were a burden

when Minnesota. "How on Earth can we warn patients?" they ask. The two judicial

opinions that have addressed this in the most systematic and scholarly way are the

West Virginia Supreme Court's decision in *Karl*, *supra*, 647 S.E.2d 899, 914 and

Judge Browning's 54-page tome in *Rimbert v. Eli Lilly & Co.,* 577 F. Supp. 2d 1174,

1217 (D.N.M. 2008).[31]

    In addition to these authorities, there is evidence in the record of this appeal,

and in the public domain subject to judicial notice, that show that Forest, if it chose,

could have warned Francis Krivicich. First, Forest actually drafted a letter

specifically focused on suicidality and specifically designed to warn patients. JA

---

[31] Judge Browning quoted the *Karl* court's list of "justifications" as follows:

> Among the primary justifications that have been advanced for the
> learned intermediary doctrine are (1) the difficulty manufacturers
> would encounter in attempting to provide warnings to the ultimate users
> of prescription drugs; (2) patients' reliance on their treating physicians'
> judgment in selecting appropriate prescription drugs; (3) the fact that it
> is physicians who exercise their professional judgment in selecting
> appropriate drugs; (4) the belief that physicians are in the best position
> to provide appropriate warnings to their patients; and (5) the concern
> that direct warnings to ultimate users would interfere with
> doctor/patient relationships.

*Id*. Both courts thoroughly debunked these justifications. However, because the
only one that is remotely cognizable under the Comment *n* factors is the "difficulty"
or "burden" factor, we have spared the Court a lengthy discourse on the other
putative justifications, and rely instead on a citation to these two well-reasoned,
recent judicial opinions.

7786.  Although designed to be sent out in response to consumer inquiries, any "reasonable" pharmaceutical company could easily have proactively provided similar letters to physicians, pharmacists, or even via direct mail to patients filling prescriptions for Lexapro.  Second, less than one year later, Forest was actually utilizing a "Patient Medication Guide" concerning this very risk.  JA 2493.  *See also* JA 2095 - 96.  There is nothing to suggest that Forest could not have implemented the process even before seeking or receiving such approval.  And it is beyond the pale to suggest that the FDA, which actually required a similar warning less than a year later, would have prohibited it in the Spring of 2004, especially if the document referenced the FDA's own March 22, 2004, Public Health Advisory and used similar verbiage. Indeed, the district court judge made this very observation.  JA 281

In addition to these matters, as both the *Karl* and *Rimbert* courts noted, Forest could have used its www.lexapro.com website, or paid advertising, in magazines, newspapers, or even television, had it chosen to do so.

The "burden" must also be gauged in risk/benefit terms.  Forest was making more than one billion dollars per year on Lexapro.  JA 2626:6 - 2627:18.  Patients like Francis Krivicich were putting their lives at risk by buying and ingesting these pills.  The "burden" on Forest is simply not high enough to eliminate any duty to warn the patient as a matter of law.  The weighing of that burden on Forest, versus the risk to Francis Krivicich, is a classic jury question.

-42-

Taking all six of the Comment *n* factors into account, we submit that it simply does not justify the holding of the court below that Virginia has, or would, recognize a "learned intermediary" defense in this case.  Consequently, we urge this Court to either (a) certify the question to the Virginia Supreme Court, or (b) apply the teachings of *Featherall* and *Oman* to the case before it to hold that the learned intermediary doctrine did not justify a summary judgment in this case.

**C.    *IF* Virginia Adopted Some Version of the "Learned Intermediary" Doctrine, It is Likely that It Would Embrace Exceptions that Would Preclude Summary Judgment in this Case.**  In the context of existing Virginia and Fourth Circuit jurisprudence, this section is, perhaps, a lawyer's "how many angels can dance on the head of a pin" musing.  The reason is that it is discussing exceptions to a legal doctrine that is already an "exception" to the scope of product manufacturer's duties under Virginia law.  Nonetheless, it cannot be ignored and must be briefly addressed.

The "*rule*" of *Featherall* and its progeny in Virginia is that, if the three conditions set forth in RESTATEMENT § 388 are met, then the product manufacturer must take "reasonable" steps to convey a warning to "persons who might be subjected to danger."  Comment *n* sets forth six considerations that should be considered "by the Court" to decide whether to recognize a "third party warning" *exception* to that "rule."  Although the "balancing" required by Comment *n* would

-43-

not seem to support this holding, we assume *arguendo* in this subsection that Comment *n* can be utilized as support for a "learned intermediary" exception, even in a pure negligence/contributory negligence state.

The question then is whether Virginia courts – which have obviously never addressed the matter – would recognize an exception to the exception, and, would still require a warning to the consumer himself. There are two potential sources for exceptions to the learned intermediary doctrine. One is contained in RESTATEMENT (THIRD) OF TORTS § 6(d). It requires a warning, not only to "health care providers" but also to the patients themselves if the drug company knows, or should know, that the health care providers might not be in a position to mitigate the risks. Comment *e* to this RESTATEMENT section explains that one situation which would justify a holding in favor a duty to warn the patient under this wording would be where the FDA had recommended or required such patient warnings. Any fair reading of the FDA's March 22, 2004, Public Health Advisory would satisfy the conditions in this comment.

There would, of course, be some irony in Virginia now embracing the RESTATEMENT (THIRD), which is part of a strict liability sequence of sections. As noted above, it has never adopted RESTATEMENT (**SECOND**) § 402A. And, yet, two federal district courts sitting in Virginia have recently cited RESTATEMENT (THIRD) OF TORTS § 10 in support of *Erie* predictions that Virginia will recognize a post-sale

duty to warn in products liability cases. *King v. Flinn & Dreffein Eng'g Co.,* No. 7:09-CV-00410, 2012 WL 4459568, at \*8 (W.D. Va. May 16, 2012); *Russell v. Wright*, 916 F. Supp. 2d 629, 650 (W.D. Va. 2013), appeal dismissed (Nov. 12, 2013).[32]  More importantly, the Virginia Supreme Court itself recently looked to RESTATEMENT (THIRD) OF TORTS § 27 as support for a multiple substantial concurring causes holding that makes good sense, promotes true justice, and, frankly, will be critical in the ultimate trial of this case. *Ford Motor Co. v. Boomer*, 736 S.E.2d 724, 732 (2013).  Even without adopting strict liability, therefore, Virginia looks to the RESTATEMENT (THIRD) for guidance in appropriate situations

Therefore, this Court may also predict that the Virginia Supreme Court would adopt RESTATEMENT (THIRD) § 6,[33] which is the *only* purported codification of the common law, and which the Supreme Courts of both Kentucky[34] and Nebraska[35] have done.  Such a prediction would necessarily result in reversal of the summary judgment in this case.

---

[32]  A Virginia Circuit Court judge considered the same RESTATEMENT authority and reached a contrary result in *Hart v. Savage*, No. L-04-1663, 2006 WL 3021110, at \*3 (Va. Cir. Ct. Oct. 19, 2006).

[33]  Oddly enough, Forest itself invokes the RESTATEMENT (THIRD) in its July 11, 2014 Answer to Plaintiff's Third Amended Complaint.  JA 541 (¶ 34, pp. 10/13.).

[34]  *Larkin v. Pfizer, Inc.,* 153 S.W.3d 758, 770 (Ky. 2004).

[35]  *Freeman v. Hoffman-La Roche, Inc.,* 618 N.W.2d 827 (2000).

-45-

An alternative pathway to the same result would be for Virginia to recognize a stand-alone common law exception to the learned intermediary doctrine for (a) over-promotion, (b) direct to consumer promotion, or (c) FDA recommendation. Common law courts have recognized at least six different exceptions to the learned intermediary exception. *See Vitanza v. Upjohn Co.*, 778 A.2d 829, 846-47 (2001)(recognizing the "learned intermediary" doctrine as an exception, and listing six different exceptions to the exception). Two of these are "drugs advertised directly to consumers" and "over-promotion." *Id*. An example of the latter is *Hurley v. Heart Physicians, P.C.,* 898 A.2d 777, 788 (2006), decided five years after *Vitanza*. There the Supreme Court of Connecticut reversed a summary judgment for the product manufacturer, and held that the manufacturer's conduct in encouraging an unsafe use of its product could vitiate adequate warnings in the product manual.

The record in this case justifies invocation of these exceptions to the exception. Although there is no evidence that Forest engaged in the kind of extensive television advertising that other drug companies have, there is also no dispute that it promoted Lexapro through its website, www.lexapro.com. Also, Forest sales representative Grimm's testimony that Forest instructed her "not to initiate" any discussion of side effects, especially in light of its failure to inform her that the FDA had issued a Public Health Advisory of a risk posed by the drug she was detailing, coupled with her June 24, 2004, visit to Dr. Andres, is direct evidence

of "over-promotion."  And, in addition to the authority of RESTATEMENT (THIRD) §

6(d), Comment *e*, an exception under the *sui generis* facts of this case, is just and

equitable.

## IV.  EVEN IF "LEARNED INTERMEDIARY" EXISTS IN VIRGINIA, SUMMARY JUDGMENT WAS IMPROPER BECAUSE (A) FOREST DID NOT WARN THE PRESCRIBING PHYSICIANS AND (B) THEIR EQUIVOCAL TESTIMONY DOES NOT SUPPORT JUDGMENT AS A MATTER OF LAW.

This final section assumes that this Court predicts or the Virginia Supreme

Court concludes that Comment *n* will, on balance, support an exception to the rule

of RESTATEMENT § 388, and that there are no exceptions to this exception.  Even

under a the most draconian formulations of the learned intermediary doctrine,

summary judgment is <u>still</u> not appropriate in this case, for two different and

independent reasons.

### A.    The First Element of the Affirmative Defense Is Proof that the Pharmaceutical Company Actually Warned the Prescribing Physician.

Although state law governs the substantive issues in this case, federal law governs

procedure.  Under *Celotex* and its progeny, it is incumbent upon a defendant to plead

and prove each element of its affirmative defense, beyond cavil.  Forest asserted the

learned intermediary doctrine as an affirmative defense in paragraph 22 of the

Affirmative Defenses section of its Answer to Plaintiff's Third Amended Complaint

in this case.  JA 540.  Forest bears the burden of proof on its own affirmative defense.

At the hearing on Forest's summary judgment motion in this case, the district court acknowledged repeatedly that there was a triable issue regarding whether Forest acted in a reasonable manner to produce, disseminate, and convey a legally adequate warning.  JA 280-81; 348 - 49.  Thus, when the court decided to grant summary judgment, the district judge did not base his holding on the purported adequacy of the "warnings" as a matter of law, the issue in *Pfizer v. Jones, supra.* Rather, he held that no warning was required because the prescribers were already aware of the risk.

Even in states that have clearly adopted the learned intermediary doctrine, the law regarding burdens of proof varies from state to state. Because Forest has acknowledged that the "learned intermediary" doctrine is an "affirmative defense," Forest must plead and prove *something* to prevail on it.  The first element of that "something" in states that follow the traditional defense is that Forest itself reasonably conveyed a legally adequate warning about the risk to the prescribing physician.  In 2013, the Virginia Supreme Court echoed its prior holding that "an insufficient warning is in legal effect no warning." *Ford Motor Co. v. Boomer*, 736 S.E.2d 724, 734 (2013), quoting and citing *McClanahan v. California Spray–Chemical Corp.*, 75 S.E.2d 712, 719 (1953).  The "question of the sufficiency of the warning is normally for the jury." *Spruill v. Boyle-Midway, Inc.,* 308 F.2d 79, 86 (4th Cir. 1962).  There is no evidence that Forest communicated the substance of the

-48-

warning set forth in the FDA's March 2004 Public Health Advisory to either of the prescribing physicians in this case. Without any such proof, summary judgment was inappropriate.

Case law from other jurisdictions supports this conclusion. One of the cases most on point, factually and legally, is *Giles v. Wyeth, Inc.*, 500 F. Supp. 2d 1063 (S.D. Ill. 2007) which involved a suicide of an older white male taking an SSRI-antidepressant medication. In the context of his opinion denying summary judgment, Judge Gilbert wrote: "The Supreme Court of Illinois has not spoken on this issue clearly. It has, however, held that when a drug company fails to warn doctors sufficiently, doctors 'cannot be considered "learned intermediaries" and the adequacy of warnings is a question of fact, not law, for the jury to determine." *Id.* at 1066. He further held that the absence of a legally adequate warning gave rise to a presumption that any warning would have been heeded by the prescribing physician. This Court could and should so hold as well. Needless to say, it would result in a reversal and remand for trial.

**B.    A Prescribing Physician's Testimony is Not Necessarily Dispositive.**

In *Abbot by Abbot v. Am. Cyanamid Co.*, 844 F.2d 1108 (4th Cir. 1988), this Court was confronted with a situation which, quite frankly, was far more favorable to the pharmaceutical defendant than that in the case at bar. The drug company in that case had, in fact, warned the prescribing doctor, who had testified that, in his opinion, the

warning provided to him was "adequate."  The trial court granted summary judgment.  But this Court reversed.  It squarely held that:  "Virginia law does not support the notion that the treating physician's *subjective* view as to adequacy conclusively determines that issue," and, accordingly, that "[s]ummary judgment on the failure to warn claim was improper."  *Id*. at 1115.  The summary judgment in this case could be reversed purely on the basis of this authority alone.

Through the years, in other jurisdictions, there have been a number of cases that have upheld summary judgments based on a prescribing physician's testimony, essentially, that he/she would not have heeded a legally adequate warning.  The case law was summarized and distilled by the First Circuit in *Garside v. Osco Drug, Inc*., 976 F.2d 77 (1st Cir. 1992) as follows:  "In all such cases, courts have required that the physician's testimony show **unequivocally** that s/he knew at the relevant time *all* the information which would have been included in a proper warning."  *Id*. at 82 (Italics in original; boldface added).

In this case, of course, the physicians' testimony was not that they would have ignored a legally adequate warning.  But it is analogous to such testimony in the line of cases chronicled by the *Garside* court.  In fact, both Dr. Andres and Dr. Doyle testified that they do heed warnings.  Specifically, Dr. Andres confirmed at his deposition that the information contained in the March 22, 2004 FDA Public Health Advisory was not contained in the package insert when he prescribed

Lexapro to Francis. JA 2751:21 - 2753:3. Moreover, he testified that there was no information in the operative December 2003 label[36] that warned him the drug may play a role in worsening suicidality. *Id.* Nor was there warning information directing him to tell families and caregivers about these issues. *Id.* Significantly, *IF* Dr. Andres had been provided or warned about the need to counsel patients about worsening suicidality from drug use or to discuss the need for close monitoring for unusual behavior with families and caregivers, he "probably" would have discussed with Francis. JA 2754:25 - 2756:1. He replied he "sure" would discuss this information with families, *if* he had known it at the time. *Id.* If he had known this drug could cause suicide in his patients, irrespective of the illness, he would warn family members directly. JA 2759:23 - 2761:9. He would have done so because he recognized – as did the FDA in the March 2004 Public Health Advisory – that family members are in the best position to protect the patient from drug-induced suicide. *Id*.

Dr. Doyle has no recollection of ever seeing the March 2004 FDA Public Health Advisory. JA 2904:20 - 24. Although aware of a "question" concerning suicidality and antidepressants, Dr. Doyle would expect drug companies to give him definitive answers. JA 2910:22 - 2911:4. *If* Dr. Doyle had been told or warned of a

---

[36] The December 2003 Lexapro label was the label in effect at the time of Francis' first prescription for Lexapro.

true risk of increased suicidality due to the use of Lexapro and that families needed to be warned to watch patients, he would have taken a different course of action designed to safeguard Francis Krivicich's life. *Id*.

Thus, in *Garside* terms, Forest has failed, as summary judgment movant, to show that these physicians were aware of "**all**" of the information included in the March 22nd Public Health Advisory, and the testimony of both is conflicting and far from "unequivocal." Both have testified that they were not given the March 22nd warning, and that if they had have been so warned, they would have acted in a different way. Moreover, neither was asked any questions about whether they functioned as a "reliable conduit" for transmitting these warnings to the patient. Consequently, this testimony simply will not support a summary judgment in this case. The court below focused on a *portion* of each physician's testimony, *i.e.*, that he was aware of a "long standing controversy" or "debate" or "question" about the potential role of SSRI drugs in inducing suicidality. But neither indicates that he was aware of akathisia or the other precursor conditions mentioned in the FDA Advisory. Indeed, if Dr. Doyle was truly aware of the dangers surrounding severe agitation, restlessness, and the resultant danger of suicidality from Lexapro treatment, he would have taken different steps to address this harm when Francis presented to him with these very symptoms after restarting Lexapro. JA 2914:9 - 2915:3. In view of the fact that the plaintiff's expert opinion evidence in this case

-52-

is that Francis Krivicich's death was most likely triggered by Lexapro-induced akathisia, the omission of this part of "all" is critical.  JA 2968 - 69.

The district court mentioned this testimony, but, made a credibility choice to discount it in light of the prescribers' general knowledge of the controversy. Ignoring the inferences in plaintiff's favor violates *Celotex/Anderson*.  Weighing the testimony tramples the Seventh Amendment.  *See Gray v. Spillman,* 925 F.2d 90, 95 (4th Cir. 1991) ("It is not our job to weigh the evidence ... or to disregard stories that seem hard to believe.  Those tasks are for the jury."); *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 305 (4th Cir. 2012)("[C]redibility determinations are not fodder for summary judgment proceedings.").  Neither can be countenanced in a *de novo* review.

## CONCLUSION

The learned intermediary doctrine is a specialized defense, available only to pharmaceutical defendants in those jurisdictions that have adopted it.   The manufacturers of ladders, cars, chain saws, and other products have a legal duty in Virginia to warn the people who actually pay for their products, and whose lives are endangered by those products, of the risks inherent in them. Under the learned intermediary doctrine, pharmaceutical companies alone gain preferential treatment. Under the district court's decision, a pharmaceutical company can do absolutely nothing to warn, and indeed to instruct its employees not to mention even risks

acknowledged by the FDA in a Public Health Advisory, yet, still be absolved of liability. Surely, this cannot be the law.

Forest knew that there was a risk of increased suicidality for a "small vulnerable subpopulation" of patients taking Lexapro. It knew that, because that risk was inherent in all SSRI drugs, doctors would be prescribing it to patients in spite of that risk. It knew that legally adequate warnings to consumers and their "families and caregivers" had been ordered by the FDA in order to ameliorate that risk. And, yet, it did precious little (if anything) to alert the physicians to that risk, and absolutely nothing to alert Francis Krivicich himself.

There was an opportunity to avoid this death. However, Forest chose to direct the very salesperson who could have conveyed the message to Dr. Andres to "not bring it up." As a result, neither physician was adequately warned that this risk was very real and that they needed to modify their treatment plans and directives in order to ensure patient safety. As a result of this failure, a good man is dead, and his wife is a widow. She deserves a day in court. The summary judgment in this case should be reversed.

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

This is an extremely important case involving sensitive concerns regarding comity and federalism and an important issue of first impression under Virginia substantive law. Although we have attempted to be thorough in the briefing, counsel

believe that that the opportunity for dialogue to address any questions or concerns that

the members of the Court have would facilitate a prompt and just result in the case.

Dated this 7th day of January, 2015.

Respectfully submitted,

THE VICKERY LAW FIRM

*/s/ Arnold Anderson Vickery*
Arnold Anderson Vickery
Texas Bar No. 20571800
Fred H. Shepherd
Texas Bar No. 24033056
10000 Memorial Dr., Suite 750
Houston, TX  77024-3485
Telephone:  713-526-1100
Facsimile:  713-523-5939
Email: andy@justiceseekers.com
Email:  fred@justiceseekers.com
*Lead Counsel for Plaintiff-Appellant*

Earl Landers Vickery
Texas Bar No. 20571900
3007 Dancy
Austin, TX  78722
Telephone:  512-435-6666
Facsimile:  512-435-6669
Email:  lanny@justiceseekers.com
*Counsel for Plaintiff-Appellant*

Paul R. Thomson, III
VSB 38765
THE THOMSON LAW FIRM, PLLC
2721 Brambleton Avenue, SW
Roanoke, VA  24015
Telephone:  540-777-4900
Facsimile:  540-772-0578
Email: paul@roanokeinjurylawyer.com

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>
Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    this brief contains <u>13,629</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

                                        <u>*/s/ Arnold Anderson Vickery*          </u>
                                        Arnold Anderson Vickery

Dated: January 7, 2015

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on January 7, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Linda E. Maichl
> Joseph P. Thomas
> ULMER & BERNE LLP
> 600 Vine Street, Suite 2800
> Cincinnati, Ohio 45202
> (513) 698-5000
>
> *Counsel for*
>   *Appellee/Cross-Appellant*

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

> */s/ Melissa A. Dockery*
> Melissa A. Dockery
> GIBSON MOORE APPELLATE SERVICES, LLC
> 421 East Franklin Street, Suite 230
> Richmond, VA 23219
> (804) 249-7770