Case Nos: 14-2040, 14-2133

---

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

**KATHLEEN HIGGINS,**
**Plaintiff-Appellant/Cross-Appellee,**

**v.**

**FOREST LABORATORIES, INC.,**
**Defendant-Appellee/Cross-Appellant.**

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT HARRISONBURG
CASE NOS: 5:07-CV-00054-MFU-JGW
5:06-MDL1736

---

## BRIEF OF FOREST LABORATORIES, LLC
## APPELLEE/CROSS-APPELLANT

---

LINDA E. MAICHL
JOSEPH P. THOMAS
ULMER & BERNE LLP
600 VINE STREET, SUITE 2800
CINCINNATI, OHIO 45202
TEL: (513) 698-5000
FAX: (513) 698-5001

ATTORNEYS FOR FOREST LABORATORIES, LLC

# CORPORATE DISCLOSURE

Defendant-Appellee/Cross-Appellant Forest Laboratories, LLC, makes the following disclosure statement pursuant to Federal Rule of Appellate Procedure 26.1:

Appellee/Cross-Appellant Forest Laboratories, LLC, is wholly-owned by Tango US Holdings, Inc., which is wholly-owned by Actavis Plc. Actavis Plc is the only publicly-traded company.

March 11, 2015                    *s/ Linda E. Maichl*
                                  Linda E. Maichl
                                  Counsel for Forest Laboratories, LLC

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ................................... 1

STATEMENT OF THE CASE AND FACTS.................................................. 2

    A.    NATURE OF THE CASE, PROCEDURAL POSTURE, AND PLAINTIFF'S ALLEGATIONS.................................................................. 2

    B.    FEDERAL REGULATION OF PRESCRIPTION PHARMACEUTICALS ............ 6

    C.    HISTORY OF THE LABELING AND SUICIDE WARNINGS FOR SSRIS........11

    D.    LEXAPRO ........................................................................19

    E.    MR. KRIVICICH AND HIS USE OF LEXAPRO AND OTHER MEDICATIONS...................................................................20

    F.    MR. KRIVICICH'S PHYSICIANS.................................................32

        1.    Dr. Francis Andres................................................32

        2.    Dr. Brian Doyle...................................................33

    G.    PLAINTIFF'S EXPERTS...........................................................35

        1.    Dr. Healy........................................................35

        2.    Dr. Hamrell......................................................44

SUMMARY OF ARGUMENT ...................................................................46

ARGUMENT..................................................................................48

    A.    STANDARD OF REVIEW.......................................................48

    B.    THE DISTRICT COURT CORRECTLY HELD THAT FOREST IS ENTITLED TO SUMMARY JUDGMENT UNDER THE LEARNED-INTERMEDIARY DOCTRINE ...............................................48

        1.    Virginia Has Adopted and Steadfastly Applies the Learned-Intermediary Doctrine..........................................51

        2.    The Learned-Intermediary Doctrine Bars Plaintiff's Claims ...53

    C.    ANY ALLEGATIONS THAT FOREST SHOULD HAVE WARNED THAT LEXAPRO INCREASES THE RISK OF SUICIDALITY OR SUICIDE IS PREEMPTED ...............................................................57

    D.    THE COURT ERRED IN RULING DR. HEALY'S AND DR. HAMRELL'S TESTIMONY IS RELIABLE.................................................62

1.    Dr. Healy's Opinions Are Not Reliable.....................................64

2.    Dr. Hamrell's Opinions Are Not Reliable ..............................68

CONCLUSION ..........................................................................................73

STATEMENT REGARDING ORAL ARGUMENT ...........................................73

CERTIFICATE OF COMPLIANCE.........................................................................74

# TABLE OF AUTHORITIES

## Cases

*Aaron v. Wyeth*,
No. 2:07cv927, 2010 WL 653984 (W.D. Pa. Feb. 19, 2010).............................59

*Abarca v. Franklin Cnty. Water Dist.*,
761 F. Supp. 2d 1007 (E.D. Cal. 2011) ............................................................67

*Arnold v. Amada North America, Inc.*,
77 Fed. R. Evid Serv. 248, 2008 WL 2411789 (E.D. Mo. 2008).......................63

*Barnette v. E.R. Squibb & Sons, Inc.*,
670 F. Supp. 650 (E.D. Va. 1987)....................................................................51

*Baumgardner v. Wyeth*,
No. 06-2518, 2010 WL 3431671 (E.D. Pa. Aug. 31, 2010) ..............................59

*Brooks v. Howmedica, Inc.*,
273 F.3d 785 (8th Cir. 2001),
*cert. denied* 535 U.S. 1056 (2002) ................................................................... 7

*Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ........................................................................................ 8

*Daubert v. Merrell Dow Pharm.*,
509 U.S. 579 (1993) ..........................................................................62, 63, 64

*Dobbs v. Wyeth Pharms.*,
797 F. Supp. 2d 1264 (W.D. Ok. 2011) ......................................................61, 62

*Dorsett v. Sandoz, Inc.*,
699 F. Supp. 2d 1142 (C.D. Cal. 2010).............................................................59

*Forst v. SmithKline Beecham Corp.*,
639 F. Supp. 2d 948 (E.D. Wis. 2009) ..............................................................59

*General Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ............................................................63

*Glynn v. EDO Corp.*,
    710 F.3d 209 (4th Cir. 2013) ..........................................48

*Hamlett v. Virginia Vascular Assocs.*,
    61 Va. Cir. 468 (2003).......................................................52

*Hart v. Savage*,
    No. L-04-1663, 2006 WL 3021110 (Va. Cir. Ct. Oct. 19, 2006).......................52

*In re Celexa and Lexapro Marketing and Sales Prac. Litig.*,
    --- F.3d ---, 2015 WL 727970 (1st Cir. 2015) ...........................58, 59

*In re Rezulin Products Liab. Litig.*,
    369 F. Supp. 2d 398 (S.D.N.Y. 2005)...........................................67

*In re Zyprexa Prods. Liab. Litig.*,
    Nos. 04-MD-1696, 06-CV-2798, 2009 WL 2487305
    (E.D.N.Y. July 27, 2009) ...................................................55, 56

*Kling v. Key Pharms., Inc.*,
    35 F.3d 556 (4th Cir. 1994) ..........................................52

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ..........................................................62

*Lauzon v. Senco Prods., Inc.*,
    270 F.3d 681 (8th Cir. 2001) ....................................62, 64

*Mason v. SmithKline Beecham Corp.*,
    596 F.3d 387 (7th Cir. 2010) ......................................59

*Mutual Pharm. Co. v. Bartlett*,
    133 S. Ct. 2466 (2013).......................................................58

*Norris v Baxter Healthcare Corp.*,
    397 F.3d 878 (10th Cir. 2005) .....................................66

*Peters-Martin v. Navistar Intern. Transp. Corp.*,
410 Fed. Appx. 612 (4th Cir. 2011) .......................................48, 62, 69

*Pfizer, Inc. v. Jones*,
221 Va. 681 (1980) .........................................................................51

*PLIVA, Inc. v. Mensing*,
131 S. Ct. 2466 (2011).........................................................58, 59, 60

*Reyes v. Wyeth Labs.*,
498 F.2d 1264 (5th Cir. 1974),
*cert. denied*, 419 U.S. 1096 (1974) ................................................51

*Rimbert v. Eli Lilly & Co.*,
No. 1:06-cv-00874, 2009 WL 2208570 (D. New Mex. 2009),
*aff'd* 647 F.3d 1047 (10th Cir. 2011) ........................................66, 67

*Rosen v. Ciba-Geigy Corp.*,
78 F.3d 316 (7th Cir. 1996) ............................................................64

*Stanback v. Parke, Davis & Co.*,
502 F. Supp. 767 (W.D. Va. 1980) .....................................51, 55, 56

*Talley v. Danek Med., Inc.*,
179 F.3d 154 (4th Cir. 1999) ..........................................................52

*Talley v. Danek Med., Inc.*,
7 F. Supp. 2d 725 (E.D. Va. 1998),
*aff'd*, 179 F.3d 154 (4th Cir. 1999) ................................................56

*Target Market Publishing, Inc. v. ADVO, Inc.*,
136 F.3d 1139 (7th Cir. 1998) ........................................................63

*Tucker v. Smithkline Beecham Corp.*,
701 F. Sup. 2d 1040 (S.D. Ind. 2010) .............................................65

*United States v. Davis*,
690 F.3d 226 (4th Cir. 2012) ..........................................................48

*United States v. Delfino,*
   510 F.3d 468 (4th Cir. 2007) ...........................................................48

*Wyeth v. Levine,*
   555 U.S. 555 (2009) ...............................................................58, 59

**Statutes**

21 U.S.C. §301 ...............................................................................6, 8

21 U.S.C. §355(a) ...........................................................................6, 8

21 U.S.C. §355(b) ............................................................................. 6

21 U.S.C. §355(b) (1)(F) ................................................................... 6

21 U.S.C. §355(b)(1)(A) ................................................................... 6

21 U.S.C. §355(e) ............................................................................. 8

21 U.S.C. §355(j) .............................................................................. 6

21 U.S.C. §355(k)(1) ........................................................................ 8

21 U.S.C. §371 ................................................................................. 6

21 U.S.C. §393 ................................................................................. 6

28 U.S.C. §1291 ............................................................................... 1

28 U.S.C. §1332(a)(1) ...................................................................... 1

28 U.S.C. §1407 ............................................................................... 1

**Other Authorities**

Citizen's Petition from Rosellen Meysenburg, January 2, 1996 ...........................13

FDA Adverse Event Reporting System (FAERS), FDA website.........................71

FDA Amicus Brief, *Kallas v. Pfizer, Inc.*,
Case No. 2:04CV0998-PGC, U.S. District Court, District of Utah,
(September  2005) ................................................................14, 18, 19

FDA Amicus Brief, *Wyeth v. Levine*,
No. 06-1249, U.S. Supreme Court, (June 2008)..........................................10, 11

FDA Letter to Ms. Meysenburg, June 25, 1997....................................13

FDA News Release, May 2, 2007, "FDA Proposes New Warnings
About Suicidal Thinking, Behavior in Young Adults Who Take
Antidepressant Medication" ............................................................18

FDA Public Health Advisory, "Suicidality in Adults Being Treated with
Antidepressant Medication," June 30, 2005  ....................................17

FDA Public Health Advisory, "Suicidality in Children and Adolescents Being
Treated with Antidepressant Medications," Oct. 15, 2004 ................16

FDA Public Health Advisory, "Worsening Depression and Suicidality in
Patients Being Treated with Antidepressant Medications,"
March 22, 2004 ....................................................................15, 16

FDA Talk Paper, "FDA Issues Public Health Advisory on Cautions
for Use of Antidepressants in Adults and Children," March 22, 2004...............15

FDA's "Questions and Answers on Antidepressant Use in Children, Adolescents,
and Adults ............................................................................18

Healy, D., MD, FRCPsych,
"Are Selective Serotonin Reuptake Inhibitors a Risk Factor for Adolescent
Suicide," The Canadian Journal of Pyschiatry, No. 2, Feb. 2009 ......................36

Khan, Arif, et al.,
"Symptom Reduction and Suicide Risk in Patients Treated with Placebo in
Antidepressant Clinical Trials:  A Replication Analysis of the Food and Drug
Administration Database, Int'l J. of Neuropsychopharmacology
(2001), 4, 113-118 ....................................................................39

*Labeling and Prescription Drug Advertising; Content and Format for Labeling Human Prescription Drugs – Final Rule*,
  44 Fed. Reg. 37434 (June 26, 1979) ...........................................................7, 11

Letter from FDA to Ida Hellander, June 3, 1992 ..............................................12, 13

*New Drug and Antibiotic Regulation – Final* Rule,
  50 Fed. Reg. 7470 (Feb. 22, 1985)...................................................................6, 9

*New Drug and Antibiotic Regulation – Proposed Rule*, ........................................ 9

PDAC Transcript, December 12, 2006...................................................................17

*Requirements on Content and Format of Labeling for Human Prescription Drugs and Biologics; Requirements for Prescription Drug Product Labels – Proposed Rule*,
  65 Fed. Reg. 81082 (Dec. 22, 2000) .................................................................. 7

Stobaugh, D.J., et al.,
  "Alleged Isotretinoin-Associated Inflammatory Bowel Disease:
  Disproportionate reporting by attorneys to the Food and Drug Administration
  Adverse Event Reporting System," Journal of the American Academy of
  Dermatology, May 16, 2013 ..........................................................................72

*Sulfiting Agents; Labeling in Drugs for Human Use; Warning Statement*,
  51 Fed. Reg. 43900 (Dec. 5, 1986) .................................................................11

Tarek Hammad, et al.,
  "Incidence of suicide in randomized clinical trials of patients with major
  depressive disorder," Pharmacoepidemiology and Drug Safety
  2003; 12:S1-S156 (Abstracts)........................................................................15

Thomas P. Laughren, M.D., Dept. of Health and Human Services,
  "Background Comments for February 2, 2004, Meeting of [PDAC]
  and Pediatric Subcommittee of the Anti-Infective Drug Advisory Committee
  (Peds Ac),*"Background on Suicidality Associated with Antidepressant*
  *Drug Treatment,"* January 5, 2004 ..........................................................14, 15

Thomas P. Laughren, M.D., Memorandum, "Overview for December 13 Meeting of PDAC Meeting," November 16, 2006 ........................................................17

Transcript of Proceedings, Psychopharmacological Drugs Advisory Committee, September 20, 1991 .................................................................................12

**Rules**

Fed. R. Evid. 702 ....................................................................................62

**Regulations**

21 C.F.R. § 201.80(e).............................................................................11, 73

21 C.F.R. §201.56 ..................................................................................... 6

21 C.F.R. §201.56(a)(1) ............................................................................ 7

21 C.F.R. §201.56(d)(1) ............................................................................ 7

21 C.F.R. §201.57 ..................................................................................... 6

21 C.F.R. §201.57(c) ...............................................................................10

21 C.F.R. §201.57(c)(6) ...........................................................................10

21 C.F.R. §208.1(b) .................................................................................11

21 C.F.R. §208.1(c) .................................................................................11

21 C.F.R. §208.24 ..............................................................................11, 73

21 C.F.R. §314.70(c)(6)(iii)(A) ................................................................ 9

21 C.F.R. §314.70(b) ............................................................................... 8

21 C.F.R. §314.70(c) .......................................................................8, 9, 59

21 C.F.R. §314.80................................................................................... 8

## JURISDICTIONAL STATEMENT

The lower court had jurisdiction under 28 U.S.C. §1332(a)(1). The United States District Court for the Eastern District of Missouri had jurisdiction over the multi-district litigation ("MDL"), including this case, pursuant to 28 U.S.C. §1407. The Missouri District Court ruled that the plaintiffs' regulatory and general causation experts' opinions had reliable bases. (JA4699, 4723.) The United States District Court for the Western District of Virginia granted Forest Laboratories, LLC's motion for summary judgment on September 8, 2014, (JA588, JA611), at which time the Missouri District Court's orders became final. Plaintiff-Appellant filed her notice of appeal on September 26, 2014. (JA612.) Forest filed its cross-appeal on October 8, 2014. (JA615.) This court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Issue Presented by Plaintiff-Appellant-Cross-Appellee's Appeal:

Whether the district court properly granted summary judgment to Forest Laboratories, LLC, on the claims in plaintiff's complaint?

Issue Presented by Defendant-Appellee-Cross-Appellant's Cross-Appeal:

(1)    Whether the Missouri district court erred in ruling that the testimony of plaintiff's general causation expert Dr. David Healy is reliable?

(2)     Whether the Missouri district court erred in ruling that the testimony of plaintiff's regulatory expert Dr. Michael Hamrell is reliable?

## STATEMENT OF THE CASE AND FACTS

A.     **NATURE OF THE CASE, PROCEDURAL POSTURE, AND PLAINTIFF'S ALLEGATIONS**

Plaintiff Kathleen Higgins originally filed this product liability action in the United States District Court for the Eastern District of Missouri. (*See* Dkt. 34.) She alleged that Francis Krivicich took his own life as a result of taking the prescription pharmaceutical Lexapro. (JA20.) Plaintiff asserted that pharmaceutical products known as selective serotonin reuptake inhibitors ("SSRI"), of which Lexapro is one, approved to treat major depressive disorder ("MDD"), increase the risk of suicidality in some patients. (JA21-24.)

When plaintiff filed her Complaint, there was an MDL before Judge Sippel in the Missouri District Court ("MDL Court") to coordinate personal injury lawsuits involving Lexapro (generically known as escitalopram) and Celexa (generically known as citalopram which is another SSRI sold by Forest Pharmaceuticals, Inc.). As plaintiff's lawsuit was improperly venued, Judge Sippel transferred it to the United States District Court for the Western District of Virginia. (Dkt. 34.) Subsequently, the Judicial Panel on Multidistrict Litigation transferred the case to the MDL. (Dkt. 35-39.)

The gravamen of plaintiff's claims was that Forest did not provide "any

warning whatsoever about the risk of drug-induced suicidality, or its precursor conditions." (JA22.) In the MDL, plaintiffs designated David Healy, M.D., to opine regarding general causation, i.e., whether and how Lexapro (and other SSRIs) increases the risk of suicide and suicidality in the general population of patients who take them. Plaintiffs designated Michael Hamrell, Ph.D., to opine regarding regulatory issues including the adequacy of Lexapro's warnings. Both experts were challenged in the MDL. Judge Sippel ruled that Dr. Healy's and Dr. Hamrell's methodologies were reliable. (JA4699, 4723.) When the case subsequently was remanded to the Virginia District Court, Judge's Sippel's Pretrial Order No. 1736 for Remanded Cases and Suggestion of Remand was entered. (Dkt. 40, 41.)

After case-specific discovery, dispositive motions and motions directed to the reliability of case-specific experts were filed. Plaintiff initially alleged that Forest did not provide "treatment 'instructions' about the antidotes and treatment regimens to avoid the risk of SSRI-induced suicidality." (JA22.) Plaintiff asserted that Mr. Krivicich's "physicians did not realize that these physical manifestations were symptomatic of Lexapro-induced akathisia, and that it could be a serious risk for suicidal thinking and behavior." (JA25.) Plaintiff did not identify "these physical manifestations." Instead, she merely stated that Mr. Krivicich lacked focus and concentration, was fatigued and had problems sleeping, had lost weight,

was agitated and irritable, and had low energy. (JA25, 26.) She contended that when Mr. Krivicich's physician "doubled his dose of Lexapro," it "exacerbated [his] condition and increased his risk of suicide." (JA26.) Plaintiff asserted negligence and strict liability causes of action. (JA26.)

In its summary judgment motion, Forest pointed out that Virginia does not recognize strict liability claims. (JA64, JA78-79.) Plaintiff immediately moved to amend her complaint, arguing she mistakenly titled the claim as one for strict liability, but meant to allege a breach of warranty. (Dkt. 97.) After briefing was completed, the district court held a hearing. (JA269-482.)

At the hearing, the district court asked plaintiff to clarify the nature of her failure-to-warn claim. (JA270 ("It's not clear to me from the pleadings, and I want to know just exactly what it is that the plaintiff thinks that Forest should have done in early 2004.").) In response, plaintiff identified three actions Forest should have taken.

First, plaintiff stated that before March 22, 2004, when FDA issued its public health advisory, Forest should have warned that Lexapro "could, for a small vulnerable population of patients…cause a person to take their [sic] own life, to be at risk for suicide." (JA279, JA301, JA324-5, JA481.) Second, plaintiff stated Forest "could have taken reasonable steps to disseminate the warning" that FDA requested be included in all SSRI labeling in March 2004 regarding the monitoring

of patients (hereafter the "March 2004 warning").  (JA280-1, JA481.)   Third, plaintiff stated Forest could have unilaterally changed the March 2004 warning by "including Lexapro-specific data for the doctors."  (JA281, JA331, JA481.)

At the close of the hearing, the district court granted plaintiff leave to add a breach of warranty claim.  (JA474.)   After her Third Amended Complaint was filed, Forest filed a motion for summary judgment and incorporated its earlier motions.  (JA496-528.)

The district court ruled on Forest's last motion for summary judgment (JA296), stating its ruling rendered the other pending motions moot.  (JA588.)  In its Memorandum Opinion, the court properly concluded that under a "straightforward application of Virginia law," Forest could not "be liable for a failure to warn of a risk of which [decedent's] treating physician[s] [were] independently aware, and [decedent's] doctors plainly testified as to their awareness of the risk of increased suicidality associated with SSRIs" warranting summary judgment for Forest.  (JA609-610.)

Plaintiff appealed and Forest cross-appealed the MDL Court's orders regarding the reliability of plaintiff's experts' opinions.[1]

---

[1] Plaintiff contends that preemption is not an issue in this appeal.  (Plaintiff's Brief, p. 4, n.5.)   Forest did not "cross-appeal" the preemption issue because the district court did not rule on that motion.   Preemption provides an alternative basis on which this Court may affirm the district court's decision.

## B.    FEDERAL REGULATION OF PRESCRIPTION PHARMACEUTICALS

Drugs are governed by the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §301 *et seq.*, which is implemented and enforced by the federal Food and Drug Administration ("FDA"), 21 U.S.C. §393; 21 U.S.C. §371. A drug may not be marketed unless an approved application pursuant to 21 U.S.C. §355(b)[2] or §355(j)[3] is effective. 21 U.S.C. §355(a).

An NDA applicant must submit "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use...."[4] 21 U.S.C. §355(b)(1)(A). Determinations of safety and efficacy are inextricably intertwined with the drug's use under the conditions provided in the proposed labeling, which is submitted with the application. 21 U.S.C. §355(b)(1)(F). "Drug labeling serves as the standard under which FDA determines whether a product is safe and effective." 50 Fed. Reg. 7470 (Feb. 22, 1985), JA692.

FDA regulations govern the content and format of prescription drug

---

[2] Section 355(b) applies to new drugs, like Lexapro, and requires the submission of a new drug application ("NDA").

[3] Section 355(j), which is not at issue here, applies to generic drugs approved pursuant to an abbreviated new drug application.

[4] Each proposed use must be supported by clinical studies that show safety and efficacy for that use. Once approved, a manufacturer must submit a supplemental NDA ("sNDA") with the same type of supporting information as the original NDA for a new indication. Each sNDA undergoes the same review process as the original NDA.

labeling.   21 C.F.R. §§201.56 (general requirements), 201.57 (specific requirements), JA754-5, JA749-54.[5]  A drug's labeling must include "a summary of the essential scientific information needed for the safe and effective use of the drug," including the drug's description and pharmacology, indications and usage, contraindications, warnings, precautions, and adverse reactions.   21 C.F.R. §201.56(a)(1), (d)(1).

In the end, a drug's labeling reflects the careful balance FDA strikes between notifying users of potential dangers associated with the product and not deterring beneficial uses by over-warning.  *See* 71 Fed. Reg. 3935 (Jan. 24, 2006), JA776.  "Exaggeration of risk could discourage appropriate use of a beneficial drug," and cause harm to public health.  *Id*.  Furthermore, excessive warnings diminish the significance of meaningful warnings.  *See* 44 Fed. Reg. 37447 (June 26, 1979), JA854; *accord* 71 Fed. Reg. 3935, JA776; 65 Fed. Reg. 81082 (Dec. 22, 2000), JA876.  "Warnings about dangers with less basis in science or fewer hazards could take attention away from those that present confirmed, higher risks." *Brooks v. Howmedica, Inc.*, 273 F.3d 785, 796 (8th Cir. 2001), *cert. denied* 535 U.S. 1056 (2002).  There are "sound reasons why FDA may prefer to limit warnings on product labels."  *Id.*

---

[5]In June 2006, certain regulations were revised and some were renumbered. Citations to §§201.56 and 201.57 are to the C.F.R. sections in effect before June 2006 and applicable to the product in this case.

After approval, manufacturers must maintain records, conduct additional testing as directed, and advise FDA of significant reported adverse health consequences. 21 U.S.C. §355(k)(1); 21 C.F.R. §314.80. If FDA finds that "clinical or other experience, tests, or other scientific data show that [an approved] drug is unsafe for use" or, "on the basis of new information," the labeling is "false or misleading in any particular," FDA must withdraw the approval. 21 U.S.C. §355(e). *See also Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 134 (2000).

No provision in the FDCA permits a manufacturer, following approval, to change a drug's labeling without prior FDA approval. *See generally* 21 U.S.C. §301 *et seq.* Changes to labeling render the drug product a new unapproved drug subject to the misbranding provisions. 21 U.S.C. §355(a). Changes, including changes to labeling, require a prior approval supplement ("PAS"). 21 C.F.R. §314.70(b). Despite FDCA's prohibition that drugs without "effective" approvals not be distributed in interstate commerce, FDA issued a regulation providing that it would not take enforcement action if NDA holders instituted labeling changes before approval

    (i)    to add or strengthen a contraindication, warning, precaution, or adverse reaction;
    (ii)   to add or strengthen a statement about drug abuse, dependence, or overdosage;
    (iii)  to add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product;
    (iv)  to delete unsupported indications for use or claims of effectiveness.

21 C.F.R. §314.70(c). Those changes are made using FDA's "changes being effected" ("CBE") procedure and must be based on "newly discovered safety information" and "sufficient evidence of a causal association with the drug." 21 C.F.R. §314.70 (c)(6)(iii)(A); 30 Fed. Reg. 993-94 (Jan. 30, 1965), JA931; 73 Fed. Reg. 2849 (Jan. 16. 2008), JA934. CBE supplements *must* be submitted to FDA for ultimate approval and can be accepted or rejected. 21 C.F.R. §314.70(c)(7).

The CBE procedure is premised on FDA's enforcement discretion. 30 Fed. Reg. 993, JA931; 73 Fed. Reg. 2849, JA935. To expedite certain label changes, FDA advised industry that it would "take no action" if an NDA holder made certain changes "prior to his receipt of a written notice of approval of the supplemental new drug application," under certain conditions. 30 Fed. Reg. 993, 994, JA931-32. In 1982, FDA proposed the current CBE procedure. 47 Fed. Reg. 46622 (Oct. 19, 1982), JA942; *see also* 73 Fed. Reg. 2849, JA935. In its proposed rule, FDA stated that the CBE procedure is to be used only where the applicant becomes aware of newly discovered information. 47 Fed. Reg. 46635, JA955. In the final rule, FDA reiterated that CBEs are narrow exceptions to the rule of pre-approval.

> Substantive changes in labeling...are more likely than other changes to affect the agency's previous conclusions about the safety and effectiveness of the drug. Thus, they are appropriately approved by FDA in advance, unless they relate to important safety information, like a new contraindication or warning….

50 Fed. Reg. 7470, JA692.

On January 15, 2008, FDA proposed a rule to make "explicit the agency's understanding that a sponsor may utilize the CBE provision only to reflect *newly acquired* safety information." 73 Fed. Reg. 2850, JA936. FDA pointed out that "labeling should include only known hazards and not theoretical possibilities." *Id.* at 2851, JA937; *see also* 21 C.F.R. §201.57(c). Current regulations require "a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association with a drug." 73 Fed. Reg. 2850, JA936; *see also* 21 C.F.R. §201.57(c)(6). Not all observed adverse events are included in labeling, but rather "only those adverse events for which there is some basis to believe there is a causal relationship between the drug and the occurrence of the adverse event." *Id.*

FDA explained the circumstances in which NDA holders may utilize the CBE provisions to add or strengthen warnings in its amicus brief in *Wyeth v. Levine*, No. 06-1249, U.S. Supreme Court, (June 2008), JA988-1030.

[A] manufacturer ordinarily must submit a supplemental application before making any changes to an approved drug, including changes in labeling. 21 C.F.R. §314.70(b)(2)(v). As a general rule, the manufacturer must obtain prior approval by FDA before making such changes. Section 314.70(c)(6)…provides only a *limited* exception to that rule permitting "the holder of an approved [new drug] application [to] commence distribution of the [changed] drug product involved upon receipt by the agency of a supplement for the change" if, among other requirements, the change "add[s] or strengthen[s]" a warning or a statement about administration of

10

the drug in order to promote safety.  21 C.F.R. 314.70(c)(6)(iii)(A) and (C).
And even that limited exception requires submission of a supplemental new
drug application to, albeit not prior approval by, the agency.

....however, substantive changes may be made without prior FDA
approval only to "correct concerns about *newly discovered* risks from the use
of the drug."  47 Fed. Reg. at 46,623 (emphasis added).

*Id.* (bracketed language and emphasis in original), JA1019.

An NDA holder may not add black box warnings or distribute Medication
Guides without prior FDA approval.  21 C.F.R. §201.80(e) (only FDA may require
addition of boxed warning); 21 C.F.R. §208.24 (manufacturer must "obtain FDA
approval of the Medication Guide before [it] may be distributed").  FDA created
the black box warning for "special problems" of the most serious nature and
specifies when one is required.  21 C.F.R. §201.80(e); *see also* 44 Fed. Reg.
37448, JA855.  FDA exercises "restraint in requiring warnings to be boxed
because overuse of the box will ultimately lead to reducing its effect."  51 Fed.
Reg. 43902 (Dec. 5, 1986), JA1034.

Regulations appearing in 21 C.F.R. part 208 provide that only FDA may
determine when a Medication Guide is required, 21 C.F.R. §208.1(b), (c), and that
a manufacturer must obtain FDA's approval *before* a Medication Guide may be
distributed, 21 C.F.R. §208.24.

## C.    HISTORY OF THE LABELING AND SUICIDE WARNINGS FOR SSRIS

FDA approved the NDA for Prozac, the first "SSRI," in 1987.  In October

11

1990, FDA received a citizen's petition under 21 C.F.R. §10.30 from the Citizens Commission on Human Rights, established by the Church of Scientology, requesting Prozac's approval be withdrawn based on a claim it caused suicidality. (JA1062.) FDA responded that "[n]one of the information…differentiates between suicidality caused by the underlying disease, intervening life events, or drug therapy" and documentation demonstrates depressed people commit suicide more frequently than non-depressed people. (JA1065.) After review, FDA denied the petition finding that available data "do not indicate that Prozac causes suicidality or violent behavior." (JA1064.)

In May 1991, another citizen's petition requested that Prozac "include a boxed warning regarding its association with intense, violent suicidal preoccupation…in a small minority of patients." (JA1086.) In September 1991, the Psychopharmacological Drugs Advisory Committee ("PDAC"), comprised of outside experts, was convened to investigate "suicidal ideation" in connection with the treatment of depression. (JA1108-9.) The PDAC unanimously agreed there was no credible evidence (1) "to support a conclusion that antidepressant drugs cause the emergence and/or intensification of suicidality and/or other violent behaviors," and (2) "to indicate that a particular drug or drug class poses a greater risk…of suicidal thoughts and acts and/or violent behaviors," and that there should not be a labeling change. (JA1115-17.) In June 1992, FDA denied the citizen's

petition because "[t]here is no reasonable evidence of an association between the use of Prozac and suicidality." (JA1102.)

In 1997, a third petition[6] sought to require Prozac's label to indicate that people who are "at risk for suicide and who begin to take [Prozac] should be carefully observed and should consider taking a sedative as well." (JA1119, JA1123.) FDA denied the petition finding that "no credible scientific evidence has caused the agency to depart from its conclusion that the current Prozac labeling appropriately reflects the level of concern about Prozac and suicidality." (JA1126.)

In April 1999, FDA asked Forest and other sponsors to submit data from the controlled portion of their randomized controlled trials. (JA1854.) FDA wanted to determine the "absolute suicide rate pooled for placebo compared to pooled treatment data for each indication." (*Id.*) In June 2000, after reviewing that data, FDA requested SSRI manufacturers to submit four datasets to assist in FDA's evaluation of suicide and all-cause deaths associated with antidepressant use. (JA1860.) In September 2002, following extensive analysis, FDA requested additional data. (JA1869.)

That same year, 2002, FDA completed its internal review of SSRIs. *See*

---

[6] All three petitions cited much of the same literature plaintiffs still claim indicates reasonable evidence of an association between antidepressants and suicidality.

FDA Amicus Brief, *Kallas v. Pfizer, Inc.*, Case No. 2:04CV0998-PGC, U.S. District Court, District of Utah, Sept. 15, 2005 ("*Kallas* Brief"), p. 14, JA1143. That review disclosed no difference in the risk of suicide between SSRIs and placebo. (JA1178, JA1191.) After more than a decade of analysis of data provided by multiple manufacturers,[7] including Forest, FDA concluded that no credible scientific evidence demonstrated that SSRIs cause suicide. *Id.*

On January 5, 2004, Dr. Thomas Laughren, Team Leader, Psychiatric Drug Products, Division of Neuropharmacological Drug Products, who oversaw FDA's analysis of the suicidality issue from 2003 through December 2012 (JA645, 655), described FDA's review in adult patients. *See* Thomas P. Laughren, M.D., Dept. of Health and Human Services, "Background Comments for February 2, 2004, Meeting of [PDAC] and Pediatric Subcommittee of the Anti-Infective Drug Advisory Committee (Peds Ac)," *Background on Suicidality Associated with Antidepressant Drug Treatment,* January 5, 2004, JA1203. According to Dr. Laughren,

> FDA has done several analyses on completed suicides for adult data sets provided to us in response to a request for patient level data sets for all relevant studies involving 20 antidepressants drugs studied in 234 randomized controlled trials with Major Depressive Disorder. Based on our initial analyses of these data, we have reached a…conclusion…that there does not appear to be an increased risk of completed suicide associated with

---

[7]FDA has access to data from other antidepressant manufacturers to which Forest is not privy.

assignment to either active drug or placebo in adults with MDD.

*Id.,* p. 4, JA1206 (citing Tarek Hammad, et al., "Incidence of suicide in randomized clinical trials of patients with major depressive disorder," Pharmacoepidemiology and Drug Safety 2003; 12:S1-S156 (Abstracts)).

After the February 2, 2004, meeting, FDA instructed antidepressant manufacturers, including Forest, to add a new subsection to the warnings section entitled "Clinical Worsening and Suicide." (JA1913.)  The March 2004 warning FDA wrote stated:  "Although there has been long-standing concern that antidepressants may have a role in inducing worsening of depression and the emergence of suicidality in certain patients, a causal role of antidepressants in inducing such behaviors has not been established." (JA1914.)

FDA also asked the manufacturers to include a statement recommending "close observation of adult and pediatric patients [] for worsening depression or the emergence of suicidality."  *See* FDA Public Health Advisory "Worsening Depression and Suicidality in Patients Being Treated with Antidepressant Medications," March 22, 2004 ("March 22 Advisory"), JA1349; FDA Talk Paper, "FDA Issues Public Health Advisory on Cautions for Use of Antidepressants in Adults and Children," March 22, 2004 ("March 22 Talk Paper"), JA1352.[8]   In the Public Health Advisory, FDA stated:  "Although FDA has not concluded that these

_____

[8] The Public Health Advisory was publicized in mainstream media and medical publications.  (JA589.)

drugs cause worsening depression or suicidality, health care providers should be aware that worsening symptoms could be due to the underlying disease or might be the result of drug therapy." (JA1349.) The warning and public notices also stated that although FDA "has not concluded that" anxiety, agitation, panic attacks, insomnia, irritability, hostility, impulsivity, akathisia, hypomania, and mania are precursors to "the emergence of suicidal impulses, there is concern that patients who experience one or more of these symptoms may be at increased risk for [] suicidality." (*Id*.)

In October 2004, FDA issued another Public Health Advisory and instructed SSRI manufacturers "to include a boxed warning and expanded warning statements that alert health care providers to an increased risk of suicidality…in children and adolescents being treated with those drugs." FDA Public Health Advisory "Suicidality in Children and Adolescents Being Treated with Antidepressant Medications," Oct. 15, 2004, JA1355. Based on e-mails from FDA advising that it would consider modifications to the proposed wording of the October labeling changes, Forest submitted proposed modifications with specific Celexa/Lexapro data, along with the rationale for those modifications. (JA1943-47, 1949-78.) FDA rejected Forest's proposal and advised that it had developed standardized labeling for all antidepressants and "**asked all sponsors to use the same language.**" (JA1990 (emphasis added).)

In December 2004, FDA asked sponsors to re-evaluate adult data "for 'possibly suicide related' adverse events occurring in placebo-controlled trials for patients with major depressive disorder." (JA1980.) On June 30, 2005, FDA issued another Public Health Advisory, explaining that it had begun "a complete review of all available data to determine whether there is an increased risk of suicidality…in adults being treated with antidepressant medications." FDA Public Health Advisory, "Suicidality in Adults Being Treated with Antidepressant Medication," June 30, 2005, JA1358; *see also* FDA Talk Paper, "FDA Reviews Data for Antidepressants in Adults," July 1, 2005, JA1361.

On November 16, 2006, Dr. Laughren, in a memo to the PDAC, described FDA's meta-analysis of the adult study results. He described it as a "major effort, involving 372 placebo-controlled trials and almost 100,000 patients." (JA668-69.) Dr. Laughren summarized FDA's finding that, beyond age 30, antidepressants begin to show a protective effect for suicidality, which is most pronounced beyond age 65. *See* Memo from Thomas P. Laughren, M.D., "Overview for December 13 Meeting of PDAC Meeting," November 16, 2006, JA1363. Following a December 13, 2006, PDAC meeting, the PDAC concluded that labeling should reflect the beneficial effect of antidepressants in adults. (JA1390, 1392-95.)

On May 1, 2007, FDA advised Forest to revise its labeling to reflect that scientific data did not show an increased risk in adults older than 24 and that adults

65 and older have a decreased risk of suicidality. (JA2066.) *See also* FDA News Release, May 2, 2007, "FDA Proposes New Warnings About Suicidal Thinking, Behavior in Young Adults Who Take Antidepressant Medication," JA1397; and FDA's "Questions and Answers on Antidepressant Use in Children, Adolescents, and Adults, JA1401.

After fully examining all controlled trials in children and adults, FDA has not found reasonable evidence of an association between SSRIs and an increased risk of suicide. After nearly two decades of scrutiny and analysis, FDA concluded that the warnings plaintiffs claim were needed have no reasonable scientific basis. In December 2012, when Dr. Laughren retired from FDA after nearly 30 years of service, neither he nor FDA believed any reliable scientific data showed Lexapro caused suicide or suicidality in patients older than 24. (Deposition of Thomas Laughren, M.D., pp. 190-93, Dkt. 88-2.) Dr. Laughren would not have approved the label changes plaintiffs contend should have been made. (*Id.*, p. 175, Dkt. 88-2.)

In *Kallas*, a Zoloft case involving pediatric suicide, FDA noted that "even today, [September 15, 2005], after examining all controlled trials in children and adults, FDA has not found reasonable evidence of an association between SSRIs and an increased risk of suicide." *Kallas* Brief, pp. 13-14, JA1142-43.

Based on our initial analyses of these data, we have reached a…conclusion…that there does not appear to be an increased risk of

completed suicide associated with assignment to either active drug or placebo in adults with MDD.

*Id.*, pp. 32-36 (citations and footnote omitted), JA1161-65.

FDA could reach conclusions regarding antidepressants and suicidality only by aggregating the clinical trial data from all manufacturers. (JA644.) Only FDA had access to the other manufacturers' clinical trial data and could perform a pooled meta-analysis. (JA641-43.) In relation to adults, FDA would not have permitted Forest to warn more strongly about suicide based on Forest's data.

### D.    LEXAPRO

On March 23, 2001, Forest submitted an NDA for Lexapro. (JA118.) FDA approved Lexapro on August 14, 2002, for the treatment of MDD in adults. (JA119.) Forest later sought approval of Lexapro for the treatment of generalized anxiety disorder ("GAD"). (*Id.*) FDA approved Lexapro's sNDA for the treatment of GAD, including the labeling, on December 18, 2003. (*Id.*) The final printed labeling following the approval of Lexapro for treatment of GAD was submitted to FDA on January 20, 2004. (*Id.*)

In response to FDA's March 2004 request, Forest submitted updated labeling for Lexapro to include the warning FDA requested. FDA approved Forest's updated label on May 20, 2004. (JA1933.) Forest gave its sales representatives the revised package insert on May 27, 2004, and began shipping

19

product with the revised insert on May 31, 2004.  (JA3192.)

### E.   MR. KRIVICICH AND HIS USE OF LEXAPRO AND OTHER MEDICATIONS

Mr. Krivicich, born in 1943, died of a self-inflicted gunshot wound on July 25, 2004.  (JA1405.)  When he was 18, his mother attempted suicide by overdose.  After her hospitalization, she spent two months in a mental health facility.  (JA1410-16.)  When he was 25, his mother died suddenly of a brain aneurysm.  (*Id.*)

Mr. Krivicich married plaintiff Kathleen Higgins in 1973.  They had two children.  In 1986, Mr. Krivicich and Ms. Higgins formed an architectural and landscape-architecture business, which they ran from home until around fall 2003.  (JA1449.)  In August 2003, Ms. Higgins contracted lyme disease and could not work.  (*Id.*)  Mr. Krivicich, who cared for Ms. Higgins, worked only sporadically.  (*Id.*)

During a physical exam on November 7, 2003, Mr. Krivicich told his primary care physician, Dr. Royston, that he was extremely stressed by Ms. Higgins' illness and his mother-in-law's metastatic cancer.  (JA1482-83.)  He also reported experiencing insomnia.  (*Id.*)  On January 5, 2004, Mr. Krivicich obtained a 30-day prescription through his pharmacist for Ativan (generically known as lorazepam) to help him sleep.  (JA1485.)

In early 2004, Mr. Krivicich's son, a high school senior, was accused of

plagiarizing a book report.  (JA1451.)  The school principal threatened to expel Alexander from high school, prohibit him from graduating, and inform the colleges to which Alexander had applied.  (JA1451-52.)  Mr. Krivicich hired an attorney to assist with his son's disciplinary problems.  (JA1458.)

On February 2, 2004, Ms. Higgins' mother, who was like a surrogate mother for Mr. Krivicich, died of cancer.  (JA1445.)  Her loss had a traumatic impact on him.  (*Id.*)

The combination of events and the increasing financial strain of Ms. Higgins' illness severely impacted Mr. Krivicich; so much so, that a friend suggested he seek professional help and referred him to Francis Andres, M.D., a psychiatrist.  Mr. Krivicich first met with Dr. Andres on February 7, 2004.  (JA1410-16; JA1507.)  During that visit, Mr. Krivicich reported increasingly severe insomnia, anxiety, and tension since his wife became ill.  (JA1410-16.)  He explained to Dr. Andres that he had been caring for his wife and that she had been started on two new "expensive" medications.  (*Id.*)  He also confided in Dr. Andres about the stress of trying to run the business without his wife, of his son's disciplinary problems, and of his mother-in-law's death.  (*Id.*)  In addition to insomnia, Mr. Krivicich reported minor panic attacks with shortness of breath and sweating at night, along with trouble getting up in the morning, being tired during the day, irritability, difficulty concentrating, and having "tripping and 'sea legs.'"

(*Id.*)  Finally, Mr. Krivicich admitted occurrences of suicidal ideation "now and then," but denied having any plan to commit suicide.  (*Id.*)  Mr. Krivicich rated his mood as 3/10, his energy as 5/10, and concentration as 5/10.  (*Id.*)

Dr. Andres' assessment of Mr. Krivicich was "adjustment disorder with anxiety and depression."  (*Id.*)  Dr. Andres prescribed Remeron (an antidepressant) and gave Mr. Krivicich another prescription for Ativan.  (*Id.*)  A follow-up appointment was scheduled for February 14, 2004.

When Mr. Krivicich did not show up for his February 14 appointment, Dr. Andres called him.  (JA1416; JA1513.)  Mr. Krivicich said that he forgot, but would see Dr. Andres the following week.  (JA1416.)  Contrary to his assurance to Dr. Andres, Mr. Krivicich did not return the following week.  Mr. Krivicich did not see Dr. Andres again until February 28, 2004.  (JA1417.)  At that time, Mr. Krivicich reported continued anxiety, and that he was sleeping only 5 hours per night.  (*Id.*)  Dr. Andres noted that he "asks a lot of questions w/repeats about his wife who continues to be ill" and taking medications.  (*Id*.)  He also mentioned to Dr. Andres that his son would be leaving for college soon.  (*Id.*)  Although Mr. Krivicich continued to take Ativan (and had independently increased his dose to 2 tablets), he had discontinued the Remeron claiming it made him sleepy. (JA1514.)

Dr. Andres' assessment at the February 28 appointment was "generalized

anxiety disorder and adjustment disorder with anxiety and depression." (*Id.*) Dr. Andres ordered lab work, and prescribed Lexapro to be taken ½ tablet daily for 7 days and then 1 tablet daily thereafter. (*Id.*) He gave Mr. Krivicich another Ativan prescription and prescribed trazodone (another antidepressant for anxiety and insomnia) and told him to decrease his Ativan dose. (*Id.*) Mr. Krivicich filled the trazodone prescription that day (JA1552), but did not fill the prescriptions for the 30-day supply of Ativan or the 7 tablets of Lexapro until March 8, 2004. (*Id.*)

It is unclear exactly when Mr. Krivicich began taking Lexapro from the prescription he filled on March 8. At his March 20, 2004, appointment with Dr. Andres, Mr. Krivicich reported that he had increased his dose of Lexapro to 10 mg (1 tablet) 5 days earlier. If Mr. Krivicich followed Dr. Andres instructions, the 7 pills would have lasted only 10 days (7 days at 5 mg = 3 ½ pills; leaving 3 ½ pills to be taken 1 per day, with ½ left). As a result, if Mr. Krivicich began taking Lexapro the day he filled the prescription, he would have taken all the pills by March 18, 2004. If Mr. Krivicich was taking Lexapro on March 20, 2004, when he saw Dr. Andres and had taken it as prescribed, he did not take his first 5 mg dose until March 10, 2004. There are no witnesses who can attest to when Mr. Krivicich took Lexapro.

At his March 20 appointment, Mr. Krivicich presented as "somewhat irritated and demanding." (JA1418.) He had discontinued taking the Remeron

because it made him sleepy and had discontinued the trazodone because he felt it increased his heart rate. (*Id.*) Mr. Krivicich again mentioned his son's disciplinary problems and again reported they had hired a lawyer. (*Id.*) However, he told Dr. Andres that his mood was improved, rating it 7 out of 10; his energy level was improved, also rated 7 out of 10, but he rated his concentration only 3 out of 10. (*Id.*) Mr. Krivicich reported he was sleeping better and getting up in the morning was not a problem. He stated he only had "fleeting" suicidal ideation, but expressed that he felt "moments of hopelessness." (*Id.*)

Dr. Andres' assessment was generalized anxiety disorder and adjustment disorder with depression and anxiety. (*Id.*) He gave Mr. Krivicich another Lexapro prescription (30-day supply of 10 mg tablets to be taken once daily) and Ativan (30-day supply to be taken 1 to 2 mg at bedtime). Mr. Krivicich filled both prescriptions the same day. (JA1552.) On April 5, 2004, Mr. Krivicich filled another prescription for 30 tablets of Ativan. (JA1485.) Two days later, on April 7, 2004, he filled yet another prescription for 30 tablets of Ativan at another pharmacy. (JA1552.)

On April 17, 2004, Mr. Krivicich saw Dr. Andres again. (JA1419.) Mr. Krivicich reported that he continued to feel anxious and complained of indigestion. (*Id.*) He reported his wife was doing better, his son wanted to attend college at John Hopkins, Cornell, or the University of Southern California, and he

expressed concerns over his financial situation. (*Id.*) He told Dr. Andres that he had taken Lexapro for one month, but had stopped it one week earlier. (*Id.*) He continued to take Ativan to help him sleep. (*Id.*)

Dr. Andres assessed Mr. Krivicich as having generalized anxiety disorder versus adjustment disorder. (*Id.*) He prescribed Zoloft (another SSRI) to be taken 25 mg for 1 week and then increased to 50 mg per day and Klonopin to help with anxiety and sleep. (JA1521.) On April 30, 2004, Mr. Krivicich filled a prescription for Ativan (30 tablets) at The Plains Pharmacy. (JA1485.)

On May 18, 2004, Mr. Krivicich visited Dr. Rudolf Bickel, M.D., for a physical exam. (JA1556.) While Mr. Krivicich reported to Dr. Bickel that he was taking Klonopin and Ativan once a week, he did not report that he was taking Zoloft. (*Id.*) He described himself as under a lot of stress due to his wife's illness and his financial situation. (JA1557-58.) Mr. Krivicich complained of constant indigestion and not sleeping well since January, having difficulty falling asleep and then waking frequently during the night. He told Dr. Bickel that he wanted to rule out any physiologic causes. (*Id.*) Dr. Bickel assessed Mr. Krivicich as having insomnia, depression, and situational stress. (*Id.*) Dr. Bickel gave Mr. Krivicich samples of Nexium (for gastric complaints) and Effexor (a SNRI anti-depressant) to be taken in increasing doses. (*Id.*) Mr. Krivicich was scheduled to return to see Dr. Bickel for reassessment in two weeks. (*Id.*) The same day Mr. Krivicich saw

25

Dr. Bickel, he filled a prescription for 20 tablets of Sonata (a sleeping pill). (JA1485.)

A few days later, Mr. Krivicich was scheduled to see Dr. Andres. When he did not show for his appointment, Dr. Andres called him. (JA1420; JA1523.) During that call, Mr. Krivicich reported that he had discontinued the Ativan three days earlier, and had stopped taking the Zoloft two weeks earlier because he felt it interfered with his concentration. (JA1420; JA1523.) He rescheduled his appointment for the following week. (JA1420; JA1523.)

One week later, Mr. Krivicich again failed to show up for his appointment with Dr. Andres. (JA1420.) Again, Dr. Andres called him. (JA1527.) Mr. Krivicich reported not feeling well and told Dr. Andres that he had discontinued all medications and now was sleeping only one to two hours per night. (*Id.*)

On July 8, 2004, Ms. Higgins called Dr. Hoebel at the Countryside Family Practice about Mr. Krivicich. (JA1480.) On July 9, 2004, Mr. Krivicich visited Countryside complaining of a tick bite. (JA1481.) Although he had not seen Dr. Andres in more than one month, Mr. Krivicich reported to the Countryside physician that he had been seeing Dr. Andres for depression and had "started Lexapro 1 [week] ago" and was taking Ativan until "2 weeks ago." (*Id.*) Mr. Krivicich requested testing for lyme disease and was started on doxycycline

26

(an antibiotic). (*Id.*) He filled the prescription for 28 tablets of doxycycline on July 12, 2004. (JA1485.)

On July 10, 2004, Mr. Krivicich saw Dr. Andres for the last time. (JA1421.) He had restarted taking Lexapro because it helped him sleep and was now sleeping 10 hours per night. (JA1534-35.) He told Dr. Andres that he had been taking 5 mg of Lexapro for 5 days and would increase his dose to 10 mg daily. (*Id.*) Mr. Krivicich said he was not suicidal, his appetite was so-so, getting up in the morning was easy, but his energy level was low, concentration was a problem, and his mood was worse than before. (JA1535.) However, he reported his self-confidence was improved and his ability to enjoy life also was improved. (JA1535-36.) In fact, a short time after that visit, at a social event, a mutual friend told Dr. Andres that Mr. Krivicich appeared happy. (JA1536.) Dr. Andres gave Mr. Krivicich a new prescription for 30 tablets of Lexapro. (JA1421.) That prescription was not filled until July 23, 2004. (JA1485.)

In the interim, at the recommendation of a friend, Mr. Krivicich saw another psychiatrist, Brian Doyle, M.D., on July 16, 2004, in Washington D.C. (JA1561.) Mr. Krivicich described himself to Dr. Doyle as increasingly depressed and anxious since his wife was diagnosed with lyme disease that past September. (JA1562-63.) He reiterated the stress caused by his mother-in-law's death, the accusation of his son's plagiarism, and his financial worries. (*Id.*) He told

27

Dr. Doyle that his savings had dwindled, his retirement funds had dwindled, he was not working, and the bills were coming in. (JA1597.) Mr. Krivicich explained that he had been seeing Dr. Andres and his general practitioner who had prescribed various medications for him including Zoloft and Ativan, which he stated "he tried briefly if at all." (JA1562-63.) He also told Dr. Doyle that his primary care physician had prescribed Klonopin, but he had not taken it. (*Id.*) Finally, he reported that he had restarted Lexapro on July 6, 2004, first at 5 mg a day, and then increased to 10 mg a day. (*Id.*)

Dr. Doyle's observations of Mr. Krivicich were that his expression was blank, he was tense, related warily but had a cordial manner, and that his mood was sad and anxious. (*Id.*) He also observed Mr. Krivicich to be suffering from ongoing depression and acute, generalized anxiety and that Mr. Krivicich's concerns over his symptoms interfered with his life. (*Id.*) Dr. Boyle noted that although Mr. Krivicich stated he despaired at times, he was not suicidal at that time. (*Id.*) In fact, he specifically denied having thoughts or plans of committing suicide. (JA1600.) Dr. Doyle did not think Mr. Krivicich was acutely or severely suicidal. (JA1623.) Dr. Doyle explained that had he believed Mr. Krivicich was, he would have contacted Ms. Higgins or taken steps to have Mr. Krivicich promptly evaluated in a more secure environment. (*Id.*)

Dr. Doyle's assessment of Mr. Krivicich was major depression and severe

generalized anxiety. (JA1562-63.) He noted that Mr. Krivicich felt "overwhelmed by the cumulative stresses of the last several months, [was] ambivalent about medications, [and that] he has not been able to take antidepressant or anti-anxiety med[ications] consistently enough to profit by them." (*Id.*) Dr. Doyle encouraged him to continue taking the Lexapro and discussed the pros and cons of medication with him, including the side effects and the delayed onset of action. (*Id.*) They also discussed alternative medications and Dr. Doyle recommended that Mr. Krivicich try one-fourth to one-half a tablet of Klonopin to treat his anxiety. (*Id.*) Dr. Doyle noted that Mr. Krivicich might need additional medication, hospitalization, or electroconvulsive therapy ("ECT") depending on his response to Lexapro and that he continued to need to treat with a psychiatrist. (*Id.*) When Dr. Doyle asked Mr. Krivicich for permission to speak with Dr. Andres, Mr. Krivicich refused to give consent. (*Id.*) Dr. Doyle concluded that Mr. Krivicich was severely ill, not yet responsive to treatment and that if he failed to respond and economic pressures mounted, he would be at increased risk for suicide. (*Id.*) As Dr. Doyle explained, Mr. Krivicich "had a particularly malignant form of depression, severely anxious or agitated depression, [and] it's quite clear that patients under economic difficulties are more likely than others to commit suicide and his were worsening with every day that he wasn't getting architecture done, his wife wasn't able to do much; [] the burdens were very substantial."

29

(JA1622.)

On July 22, 2004, Mr. Krivicich called Countryside Family Practice because he needed another two to three week prescription for doxycycline, which was filled the next day.  (JA1480.)

Other than from July 6, 2004, forward, none of Mr. Krivicich's family members knew that he had been prescribed medication.   (JA1428; JA1633; JA1637.)   His children did not know before his death that Mr. Krivicich was prescribed or took Lexapro and Ms. Higgins did not know until July 6, 2004. (JA1428, JA1438, JA1440.)  Similarly, no family member ever saw Mr. Krivicich take any prescriptions with the exception of Ms. Higgins who saw him take Lexapro on the Friday and maybe the Saturday before his death.  (JA1430-31.)

Even though Ms. Higgins had no knowledge that Mr. Krivicich was taking Lexapro until perhaps July 6, 2004, at the scene of his death, she told the medical examiner that he began experiencing side effects from his medication in January 2004—two months before Mr. Krivicich first took Lexapro.  Similarly, while Ms. Higgins describes Mr. Krivicich's behavior as strange during the spring and early summer of 2004 (which she attributes to his Lexapro use), the only evidence is that Mr. Krivicich, at most, took 36 Lexapro tablets from sometime around March 8 or 10 through around April 10 and then not again until the beginning of July 2004.  (JA1459; JA1421; JA1562; JA1481.)  Further, Ms. Higgins admits that

Mr. Krivicich never told her that he believed he was experiencing any side effects related to Lexapro.  (JA1465.)

Ms. Higgins described Mr. Krivicich on the days immediately preceding his death as frantic and extremely agitated.  She testified that he paced around the house, unable to sit still, and continually picked, pulled, and bit his hands until he had pulled the skin off and they were visibly bleeding.[9]  (JA1469-70.)  According to Ms. Higgins, on the evening before his death, Mr. Krivicich alternated between being agitated, pacing around the house and continuing to pick at his hands, and collapsing on the bed all curled up.  (JA1472.)

The day of his death Ms. Higgins and Mr. Krivicich met an old friend, Jeff Gatemen, at a tenant house that Ms. Higgins and Mr. Krivicich were renovating.  Mr. Gatemen was helping with the renovations.   (JA1470; JA1677.)   The descriptions of Mr. Krivicich's behavior that day by Ms. Higgins and Mr. Gateman are vastly different.  While Ms. Higgins describes Mr. Krivicich as agitated and "completely wild eyed," Mr. Gatemen testified that he was "normal."  (JA1680.)  While Ms. Higgins claims Mr. Krivicich was unable to do any task while at the tenant house (JA1470), Mr. Gatemen described him as "clamoring up over the

---

[9] There was no physical evidence on Mr. Krivicich's hands of the picking, pulling, or biting of his hands and fingers at the time of his death.  (JA1640.)  The medical examiner and pathologist testified that had there been wounds, like those Ms. Higgins described, on Mr. Krivicich's hands and fingers, it would have been noted on the autopsy report.   (JA1664-65; JA1668.)

roof" (JA1680).   Mr. Gateman testified that not only did Mr. Krivicich appear normal, but also that he "appear[ed] to be more upbeat" and less depressed than the day before.  (JA1680-81.)

Both testified that Mr. Krivicich ran in and out of the house several times from the time they arrived at the house until his death.   (JA1475; JA1682-83.) Both attributed his disappearances to diarrhea, which Ms. Higgins testified had begun the night before.  (JA1469; JA1682-83.)   The house, which was in the middle of a big empty field of weeds, did not have a working bathroom and the nearest house was some distance away.  (JA1682-83.)

The gun Mr. Krivicich used belonged to Mr. Gateman.   On a trip for supplies the day before, they had taken Mr. Gateman's pick-up truck.   During the ride, Mr. Gateman commented about having a gun in his truck, but did not say it was stored in the compartment under the bench seat.  (JA1690-91.)  The gun was loaded with shot shells (which are not deadly) followed by regular .38 shells. (JA1687.)   The shot shells were found in Mr. Krivicich's pocket after his death. (JA1696-98.)

### F.   MR. KRIVICICH'S PHYSICIANS

#### 1.   Dr. Francis Andres

Dr. Andres began practicing psychiatry in the mid-1960s.   (JA1491.) Throughout his career, Dr. Andres has stayed current with literature and scientific

information regarding medications he prescribes and the potential side effects of those medications. (JA1498.) During the time Dr. Andres saw Mr. Krivicich in 2004, he was aware of the ongoing issues regarding whether SSRIs increase the risk of suicidality in patients and considered it in his practice. (JA1499, 1501.)

Dr. Andres repeated multiple times that a key issue when treating any patient suffering from depression, whether on medications or not, is to watch for signs of worsening of their symptoms. (JA1503, JA1544, JA1549.) And, he watched for signs of worsening of his patient's symptoms in 2004, just as he does today. (*Id.*) He also advises his patients that they should call if their symptoms worsen. (JA1517.) Dr. Andres' practice when prescribing medications is to discuss the benefits and the risks of the medication. (JA1541-42.) In 2004, that practice included speaking to them about concerns of worsening of their symptoms or the development of suicidal thinking, even before the cautionary language was added to SSRI labeling. (JA1548.)

A Forest sales representative visited Dr. Andres's office on June 24, 2004, leaving copies of the Lexapro package insert that included the March 2004 warning. (JA7814-18.)

### 2.    Dr. Brian Doyle

Dr. Doyle began practice as a psychiatrist in 1970. (JA1569.) He regularly attends conferences and subscribes to journals to remain current regarding the

medical conditions he treats and the medications he prescribes. (JA1571-72.) Dr. Doyle was aware in 2004 of the ongoing issues relating to SSRIs and whether they increase the risk of suicidality and considered it in his practice. (JA1579, 1581.) Dr. Doyle agrees that patients suffering from depression may become suicidal independent of taking medications. (JA1586.) His routine practice is, and was in 2004, to advise patients that they might have reactions to prescribed medications and that they should contact him if that occurred. (JA1588-90.) He explained that he tells his patients that "while overall the benefit of these medicines, including Lexapro, is very clearly established, that on rare occasions people might either feel more acutely depressed or have suicidal thoughts or feelings, or if they were already having suicidal thoughts or feelings, that those could get worse." (JA1590; JA1610-13.)

Dr. Doyle saw Mr. Krivicich only once. (JA1593-94.) Nick Kotz, a neighbor who had arranged the appointment, drove Mr. Krivicich to see Dr. Doyle. (JA1593.) Mr. Kotz was not present during Dr. Doyle's session with Mr. Krivicich and Dr. Doyle did not have any conversation with Mr. Kotz about Mr. Krivicich's symptoms or diagnosis because Mr. Krivicich "was placing very sharp restrictions on whom I could communicate information about him." (JA1593-94.)

A Forest sales representative visited Dr. Doyle's office on June 1, 2004, and left copies of the Lexapro package insert that included the March 2004 warning. A

Forest sales representative also visited Dr. Doyle's office on June 3, 14, 23, and 28, 2004, leaving Lexapro samples with the updated Lexapro package insert that included the March 2004 warning.  (JA3200.)

### G.    PLAINTIFF'S EXPERTS

#### 1.    Dr. Healy

In the MDL proceedings, plaintiffs designated David Healy, M.D., to offer expert opinions regarding general causation (i.e., whether and how Lexapro (and other SSRIs) increase the risk of suicide and suicidality in the general population of patients who take the products.)  Dr. Healy is a physician/psychiatrist from Wales.  Dr. Healy opines that Lexapro causes some persons who take it to become suicidal.  (JA3271.)  He claims the product does so by causing akathisia (a movement disorder), emotional blunting, or psychotic decompensation.  (*Id.*)  Dr. Healy says his opinions are based on "healthy volunteer studies" involving SSRI antidepressants and his analysis of data from Celexa and Lexapro clinical trials.  (JA3280.)

The "healthy volunteer" studies include a study he conducted of 20 volunteer workers from the North Wales district general hospital who were given either reboxetine (an SNRI not approved in the U.S.) or Zoloft; a study with the drug reserpine, which is used to treat hypertension; and undisclosed and uncited trials involving Paxil (paroxetine) and Zoloft (sertraline).  Dr. Healy did not review

or rely on any "healthy volunteer" studies involving Celexa and Lexapro because he saw "no reason to believe the studies undertaken with [those products] [to] differ [from] those done with Paxil or Zoloft." (JA3288.) In forming his opinions, Dr. Healy did not consider the meta-analysis FDA conducted of SSRI clinical trials that included data on over 13,000 persons prescribed antidepressants for non-psychiatric indications. He discounted those study results because he deemed them not to involve "healthy volunteers," even though he considered the people involved in the resperine study, who received the medication for hypertension, "healthy volunteers."

While Dr. Healy contends he is relying on "data from Celexa and Lexapro clinical trials," he really is actively manipulating that data in his report to present odds ratios that are contrary to his own published data on Celexa and Lexapro. (JA3293-94.) In his published article,[10] Dr. Healy provides data for Celexa that demonstrates a suicide rate that is only about one-half the rate it is for placebo. For Lexapro, the suicide rate was zero. While there was a rate for placebo in the Lexapro trials, it cannot be compared mathematically to zero for the purpose of determining how many times greater the risk is for placebo. (JA4983-4992.) However, the data in his article clearly demonstrates a suicide rate for placebo

---

[10] Healy, D., MD, FRCPsych, "Are Selective Serotonin Reuptake Inhibitors a Risk Factor for Adolescent Suicide," The Canadian Journal of Pyschiatry, No. 2, Feb. 2009.

greater than the rate for either Celexa or Lexapro. In his report, at Table 2, Dr. Healy combines Celexa and Lexapro data with data for other drugs for the purpose of increasing the rate so that it appears to be greater than the rate for placebo. The self-serving calculations in his report have not been published in a peer-reviewed journal. At his deposition, Dr. Healy's only explanation for the different calculations was his use of various statistical software packages he used to calculate figures over time. (*Id.*) He could not recall how the figures in his report were derived. (*Id.*) Dr. Healy did admit he took Table 2 of his report from the article he published and confirm that left to right, they represented "suicides on drug," "suicides on placebo," "suicidal acts on drug," and "suicidal acts on placebo." (JA5053-55.) Given that information, Dr. Healy admitted that looking at data for citalopram, it showed a *protective* effect as to suicide, saying, "it certainly doesn't look bad. That's correct." He also agreed that, for escitalopram, the data in Table 2 show a relative risk of zero regarding suicide. (JA5055.) Dr. Healy never discussed those individual favorable figures regarding citalopram and escitalopram. He only reports increased relative risks derived by his calculations for all the drugs reported.

Table 1 of Dr. Healy's report also is suspect. It is captioned "Suicide & Suicide Acts in Antidepressant Clinical Trials," and Dr. Healy claims in his report to have gotten the data from FDA. However, Dr. Healy actually took the data in

that table from a 2001 article by Dr. Arif Kahn.  Dr. Kahn used the data in his paper to research whether it was ethical to conduct placebo-controlled trials with antidepressants because there were data showing that antidepressants prevent suicides and suicidal acts in comparison to persons taking placebo.  In other words, if the data available to Dr. Kahn in 2001 provided persuasive support that antidepressants prevented suicide and suicidal acts in depressed persons, then giving placebo to depressed persons during future clinical trials of antidepressants would present ethical concerns.

The results of the data Dr. Kahn examined and published in his paper in 2001 (including data for Celexa) found no statistically significant difference in the occurrence of suicide or suicide attempts among persons using antidepressants in clinical trials versus persons given placebo.  Dr. Kahn's article and Dr. Healy's report demonstrate that Dr. Healy inaccurately claimed he took the data from FDA and that Dr. Healy did not employ the data in Dr. Kahn's article that actually reflect the number of patients taking Celexa or the number of suicides in that group.

Table 1, Section A of Dr. Kahn's article demonstrates what Dr. Healy has done:

**Table 1.** Incidence of suicides and suicide attempts in worldwide phase I, II, and III investigational antidepressant clinical trials[a]

| | Section A. Crude suicide and suicide attempt frequency | | |
| --- | --- | --- | --- |
| Investigational drug | Patient randomization (n) | Suicides (n) | Suicide attempts (n) |
| Citalopram hydrobromide[c] | | | |
|    Investigational drug | 19666 | 27 | 129 |
|    Active comparator | 1576 | 2 | 24 |
|    Placebo | 792 | 2 | 12 |
| Venlafaxine hydrochloride ER | | | |
|    Investigational drug | 705 | 1 | 4[d] |
|    Active comparator | 177 | 0 | na |
|    Placebo | 285 | 0 | 3[d] |
| All patients in database per treatment group | | | |
|    Investigational drug | 20371 | 28 | 133 |
|    Active comparator | 1753 | 2 | 24 |
|    Placebo | 1077 | 2 | 15 |
| Total patients in database | 23201 | 32 | 172 |

| | Section B. Suicide and suicide attempt frequency rates based on available PEY | | |
| --- | --- | --- | --- |
| Investigational drug | Patient randomization (n)   PEY | Suicides (n) (%)[b] | Suicide attempts (n) (%)[b] |
| Citalopram hydrobromide[c] | | | |
|    Investigational drug | 4168   1347.7 | 8 (0.6) | 91 (6.8) |
|    Active comparator | 1021   184.3 | 2 (1.1) | na |
|    Placebo | 691   150.3 | 1 (0.7) | 10 (6.7) |
| Venlafaxine hydrochloride ER | | | |
|    Investigational drug | 705   161.6 | 1 (0.6) | 4 (2.5)[d] |
|    Active comparator | 177   26.6 | 0 (0.0) | na |
|    Placebo | 285   42.4 | 0 (0.0) | 3 (7.1)[d] |
| All patients with PEY per treatment group | | | |
|    Investigational drug | 4873   1509.3 | 9 (0.6) | 95 (6.3) |
|    Active comparator | 1198   210.9 | 2 (0.9) | na |
|    Placebo | 976   192.7 | 1 (0.5) | 13 (6.7) |
| Total patients with PEY | 7047   1912.9 | 12 (0.6) | 108 (6.3) |

[a] PEY indicates patient exposure years, cumulative time that subjects were exposed to investigational antidepressant, active comparator, or placebo while in a research programme.
[b] Denominator is PEY. Rates per PEY are determined by number of suicides divided by PEY per treatment cell.
[c] Section A includes all data from all clinical trials. Section B includes only phase II/III trials that had available PEY.
[d] Includes suicide events; suicide attempts, intentional overdose, and suicide ideation.
na, Not available.

(JA5490.)  At the top of Dr. Kahn's table are the number of persons exposed to citalopram and placebo and the number of suicides for each group.  If one calculates the rates (27/19666 for citalopram and 2/792 for placebo) the rate for

placebo is almost twice as high (0.137% versus 0.252%). Dr. Healy did not like that result. Therefore, he conveniently borrowed the data in Table 1, Section B, pretending that it reflected the total number of persons on Celexa and placebo. In reality, the number Dr. Healy used is nothing other than the number of subjects for whom "patient exposure years" could be calculated. Dr. Kahn had desired to determine the difference in rates of suicide based upon exposure years as well as his determination of rates based on total exposures. Interestingly, Dr. Kahn also found a lower rate for citalopram based upon patient exposure years. Dr. Healy, on the other hand, used the data in Table 1, Section B, as though it were the data in Section A, the section that reflected the total number of persons exposed:

**Table 1: Suicides & Suicidal Acts in Antidepressant Clinical Trials**

| Investigational Drug | Patient No | Suicide No | Suicide Attempt No | Suicides & Acts as a % of Patient No |
|---|---|---|---|---|
| **Zoloft** | 2,053 | 2 | 7 | 0.44% |
| Active comparator | 595 | 0 | 1 | 0.17% |
| Placebo | 786 | 0 | 2 | 0.25% |
| **Paxil** | 2,963 | 5 | 40 | 1.52% |
| Active comparator | 1151 | 3 | 12 | 1.30% |
| Placebo | 554 | 0 | 3 | 0.54% |
| **Serzone** | 3,496 | 9 | 12 | 0.60% |
| Active comparator | 958 | 0 | 6 | 0.63% |
| Placebo | 875 | 0 | 1 | 0.11% |
| **Remeron** | 2,425 | 8 | 29 | 1.53% |
| Active comparator | 977 | 2 | 5 | 0.72% |
| Placebo | 494 | 0 | 3 | 0.61% |
| **Wellbutrin** | 1,942 | 3 | ---- | |
| Placebo | 370 | 0 | ---- | |
| **Celexa** | 4,168 | 8 | 91 | 2.38% |
| Placebo | 691 | 1 | 10 | 1.59% |
| **Prozac** | 1,427 | 1 | 12 | 0.91% |
| Placebo | 370 | 0 | 0 | 0.00% |
| **Efexor** | 3082 | 7 | 36 | 1.40% |
| Placebo | 739 | 1 | 2 | 0.41% |
| **All New drugs** | 21,556 | 43 | 232 | 1.28% |
| **All SSRIs** | 13,693 | 23 | 186 | 1.53% |
| Active comparator | 3,681 | 5 | 24 | 0.79% |
| Total Placebo | 4,879 | 2 | 21 | 0.47% |
| SSRI Trial Placebo | 3,140 | 2 | 16 | 0.57% |

(JA3294.) He did that with impunity because he claimed he got the data from FDA, rather than from Dr. Kahn's article—and who would know that he was not being honest? As a result, Dr. Healy's analysis is meaningless. Using only the subset of patients for whom "patient exposures years" are available and treating that number as the total number of exposed patients is the equivalent of using only the data for persons with blue shoes and treating that number as the total number of exposed patients. As a result of Dr. Healy's chicanery, Table 1 of his report shows

41

there were 4,168 patients using citalopram (Celexa) with 8 suicides and 91 suicide attempts and 691 patients on placebo with 1 suicide and 10 suicide attempts.

As to the 4,168 patients taking citalopram and the 691 patients taking placebo, for which Dr. Kahn had data allowing him to calculate "patient exposure years," *Dr. Kahn's results showed no increase* in suicide or suicidal acts in the group using citalopram compared to placebo. (JA3339.) In other words, Dr. Healy's manufactured results show an elevated risk for persons using citalopram whereas Dr. Kahn's legitimate data and method of analysis do not. (JA3339-40.)

Dr. Healy's explanation for using the subset of 4,168 patients for which Dr. Kahn had exposure year data rather than the almost 20,000 patients reported by Dr. Kahn as the total citalopram data was that he speculated the smaller data set was more reliable and because if he had used the larger data set, there would have been more information for citalopram than "all other antidepressants put together." (JA4977.) Thus, Dr. Healy discarded approximately 75% of the data available in 2001 from Dr. Kahn's article regarding the incidence of suicide and suicidal acts in persons taking citalopram versus placebo. Dr. Healy never disclosed that the data for citalopram was obtained from the literature or that it showed no increased risk of suicide or suicidal acts for citalopram in comparison to placebo. Dr. Healy

rejects methodology that provides a fair basis for a comparison in favor of one that creates a "false impression of an association." (JA3337-40.)

Dr. Healy selectively used other data as well. For instance, he extracts data from a 2006 FDA clinical review research paper and claims the data reflects an increase in risk in the age bracket 18-64, as well as 25-64. In the case of 45-54 year olds, the data showed a 2.29 fold increase in risk, while the 45-64 year olds showed a 1.75 fold increase. (JA3302-03.) However, Dr. Healy does not disclose that those individual point estimates were not statistically significant. Nor does Dr. Healy disclose that FDA in its analysis of the same data, found no association with suicidality among adults older than 25, a modest protective effect in persons 25-64, and a stronger protective effect in persons 65 and older. (JA5435, JA5437.)

Dr. Healy's opinions regarding the mechanisms by which Lexapro purportedly causes suicidality or suicide are unsupported. For his agitation/akathisia mechanism, he cites only his three-page 1997 editorial on resperine that includes a two-paragraph section that discusses akathisia to support his contention that he has written extensively on the emergence of akathisia. (JA5297.) As for his contention that a "consensus" exists that akathisia can be linked to both suicide and violence, he offers no support whatsoever. Dr. Healy does not present evidence that any persons among those identified in all the clinical

trials reported to FDA, both pediatric and adult, who reported suicidal thoughts or acts, or attempted suicide while taking study medication, experienced akathisia.

Dr. Healy's opinions that SSRIs can produce "emotional blunting" and "an abnormal absence of fear" are similarly unsupported. In fact, Dr. Healy was unaware of a study that found SSRIs are not associated with affective blunting, although he admitted the study was readily available and could have been found easily. (JA5137, JA5139.)

Finally, Dr. Healy claims that all SSRIs he has reviewed cause psychotic decompensation. He contends that up to 8% of persons admitted to psychiatric facilities may suffer from mania or psychosis induced by SSRI antidepressants and that there is a well-known link between psychosis and suicide. (JA3305.) The only support Dr. Healy provided for his assertion that SSRIs cause psychosis is his claim that he has access to unpublished, non-peer-reviewed data that shows psychotic decompensation occurring "at a higher rate with SSRIs than occurs on placebo." (*Id*.) He does not provide any other information about that data, however.

## 2. Dr. Hamrell

Dr. Hamrell was designated to offer opinions regarding regulatory matters and, more specifically, to offer opinions regarding the inadequacy of Lexapro's warnings. His opinions, as summarized in his report, are as follows:

1.    It is appropriate to review SSRI data collectively when evaluating safety issues.

2.    Post Marketing adverse event data shows strong signals of a relationship between Celexa/Lexapro and suicidal behavior.

3.    The Lexapro and Celexa labels were inadequate at all times prior to 2005 and by June 30, 2001, Forest should have enhanced the warnings for suicidality.

4.    The FDA review does not establish that Celexa and Lexapro do not increase the risk of suicidality in adults.

(JA5742.)   The first opinion is merely his justification for using adverse event reports for all SSRIs to support his second and third opinion.  The fourth opinion is contrary to established facts and unsupported, in any event.  Based on his second opinion, Dr. Hamrell opined that by June 30, 2001, Forest should have implemented a black box warning, changed the warning section of Lexapro's labeling, and developed and distributed a Medication Guide to patients.  (JA5755-57; JA5755 (setting out language for boxed warning).)    With minor differences, the language Dr. Hamrell asserts should have been included in the warning section is verbatim the language FDA mandated SSRI manufacturers include in labeling in 2007, which Dr. Hamrell admitted was adequate.  (JA5756 (setting out language for warning section); JA5882, JA5998.)

Dr. Hamrell claims that he based his opinions

in part upon [his] education, personal experience, and review of documents disclosed during the pendency of the Serotonin Reuptake Inhibitors ("SSRIs"), the Defendant's internal research and reports, Spontaneous

45

Reporting System (SRS), Adverse Event Reporting System (AERS), FDA
records, international regulatory efforts, the expert reports for Plaintiffs'
other expert [Dr. Healy], medical literature, deposition transcripts and
exhibits.

(JA5739.)  However, Dr. Hamrell admits that the sole source of data he used as the

basis of his opinions was data derived from FDA's adverse event ("AERS")

database in 2011, supplied to him by one of plaintiffs' attorneys.  (JA5851,

JA5856, JA5859, JA5958, JA5983.)  Dr. Hamrell took data extracted from FDA's

AERS database regarding SSRIs, purportedly counted the reports related to suicide

and suicidality for three different points in time (June 30, 2001; December 31,

2003; and December 31, 2004) and based on that count alone decided sufficient

data existed to warrant changes to Lexapro's label by June 30, 2001.  Dr. Hamrell

did not qualitatively analyze the AERs, yet he reached qualitative conclusions

about the reports.  Moreover, Dr. Hamrell did not know the details of FDA's

decades-long review of SSRIs or the results of FDA's qualitative analysis of the

very same AERs, the clinical data of all the SSRI manufacturers, and the

worldwide literature.  (JA5958-59.)

## SUMMARY OF ARGUMENT

The district court held that Forest was entitled to summary judgment under

the learned-intermediary doctrine because Mr. Krivicich's prescribing physicians

clearly and unequivocally testified they were aware of the purported risks

associated with the use of Lexapro. Plaintiff, in turn, argues that the district court was wrong both because, according to plaintiff's version of Virginia law, Virginia has not adopted the learned-intermediary doctrine and because the prescribing physicians did not have "any warning from Forest" about the risk of suicidality associated with Lexapro's use. (Plaintiff's Brief, pp. 6, 8.) Plaintiff is wrong on both counts. As the district court discussed at great length, Virginia courts clearly, and continuously, have applied the learned-intermediary doctrine in cases involving prescription drugs. (JA595-99.) And, as the district court also discussed at great length, both of Mr. Krivicich's prescribing physicians were well-apprised of the risk associated with Lexapro's use. (JA600-09.)

Moreover, (1) plaintiff conceded that the exact warning she contends should have been in Lexapro's labeling was in that labeling; (2) plaintiff's expert conceded that the Lexapro labeling with the March 2004 warning was adequate; (3) the Lexapro labeling at the time Mr. Krivicich received his last prescription included the March 2004 warning; (4) the Lexapro labeling with the March 2004 warning was provided to both of Mr. Krivicich's prescribing physicians before Mr. Krivicich received his last Lexapro prescription; and, (5) there is no evidence whatsoever that Mr. Krivicich did not receive the labeling with the March 2004 warning.

In the event plaintiff, on reply, resorts to her earlier allegations that Forest should have included a warning that Lexapro increases the risk of suicide and suicidality, Forest nonetheless is entitled to summary judgment because any claims based on an alleged failure to warn are preempted by federal law.

Finally, the opinions of plaintiff's general causation expert, Dr. Healy, and those of her regulatory expert, Dr. Hamrell, are unreliable and must be excluded.

## ARGUMENT

### A.    STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed de novo. *See Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). Evidentiary rulings, including rulings on the reliability of expert testimony, are reviewed for an abuse of discretion. *See United States v. Davis*, 690 F.3d 226, 257 (4th Cir. 2012). "A district court abuses its discretion when it acts arbitrarily or irrationally, fails to consider judicially recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error of law." *Peters-Martin v. Navistar Intern. Transp. Corp.*, 410 Fed. Appx. 612 (4th Cir. 2011) (quoting *United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007)).

### B.    THE DISTRICT COURT CORRECTLY HELD THAT FOREST IS ENTITLED TO SUMMARY JUDGMENT UNDER THE LEARNED-INTERMEDIARY DOCTRINE

The district court granted Forest's motion for summary judgment based on a detailed analysis of Virginia law and a detailed review of Mr. Krivicich's prescribing physicians' testimony. As the court correctly concluded, the "straightforward application of Virginia law," "the testimony of Drs. Andres and Doyle, and…the overwhelming abundance of information on the issue of SSRIs and the risk of suicidality of which they testified they were aware at the time they treated Mr. Krivicich" mandated entry of summary judgment for Forest. (JA60-10.) The court's conclusion was based on well-established Virginia law applying the learned-intermediary doctrine, which precludes pharmaceutical manufacturers from being held liable for alleged failures to warn where the physician is aware of the risk about which the plaintiff alleges the manufacturer failed to warn. (JA595-99.)

Plaintiff devotes the vast majority of her appellate brief attempting to convince this Court to reject Virginia's decades-long adoption and application of the learned-intermediary doctrine. (Plaintiff's Brief, pp. 29-43.) In the event she fails in that endeavor, plaintiff encourages the Court to "predict" that the Virginia Supreme Court would graft exceptions onto the application of the learned-intermediary doctrine. (*Id.*, pp. 43-44.) She provides no justification for her arguments other than to say other states have done so.

49

Plaintiff devotes a mere 6 pages of her 54-page brief directly addressing the issue she presents in her appeal. In those pages, she argues the district court was wrong for two reasons.[11] First, she argues "[t]here is no evidence that Forest communicated the substance of the warning set forth in the FDA's March 2004 Public Health Advisory to either of the prescribing physicians in this case." (*Id.*, pp. 48-9.) Second, she contends the testimony of Mr. Krivicich's prescribing physicians is not "necessarily dispositive." (*Id.*, p. 49.) Both arguments are riddled with erroneous facts and circular reasoning.

Both plaintiff and her expert admitted that the Lexapro label that included the March 2004 warning was adequate. The facts demonstrate that both Drs. Andre and Boyle received that exact label before Mr. Krivicich received and filled his last Lexapro prescription. And, the facts demonstrate that both Drs. Andre and Boyle knew, appreciated, and relayed the exact warnings and instructions plaintiff contends Forest failed to provide. There simply is no support for plaintiff's arguments, either in the law or in the facts.

---

[11] Plaintiff abandoned two of the three bases for her claims that she identified to the district court during the June 20, 2014, hearing. At that time, plaintiff contended that Forest should have (1) warned prior to March 22, 2004, that Lexapro "could, for a small vulnerable population of patients…cause a person to take their [sic] own life, to be at risk for suicide"; (2) disseminated the March 2004 warning; and (3) unilaterally changed the March 2004 warning by "including Lexapro-specific data for the doctors." (JA278-81, 301, 324-25, 331, 481.) On appeal, plaintiff pursues only the second basis. (*See generally* Plaintiff's Brief.)

1.    **Virginia Has Adopted and Steadfastly Applies the Learned-Intermediary Doctrine**

Plaintiff begins her argument that Virginia has not adopted the learned-intermediary doctrine by mischaracterizing the Virginia Supreme Court's decision in *Pfizer, Inc. v. Jones*, 221 Va. 681 (1980). According to plaintiff, *Pfizer* "cannot be read to adopt the learned intermediary doctrine" as "[t]he only mention of a duty to warn concerns the substance, *not the audience*, of the warning." (Plaintiff's Brief, p. 30 (emphasis in original).) Yet, the *Jones* Court was clear: "[I]n the case of prescription drugs, it is the general rule that the ***duty*** of the drug manufacturer is to warn the physician who prescribes the drug in question…." *Jones*, 221 Va. at 684. There is no ambiguity in that statement—it addresses the "audience," not the "substance."

As courts analyzing Virginia law have noted for more than 30 years: "It is well settled that the manufacturer of an ethical drug has a duty to provide timely and adequate warnings to the medical profession of any dangerous side effects produced by its drugs of which it does, or should, know." *Stanback v. Parke, Davis & Co.*, 502 F. Supp. 767, 770 (W.D. Va. 1980); *see also Barnette v. E.R. Squibb & Sons, Inc.*, 670 F. Supp. 650, 651 (E.D. Va. 1987) (citing *Reyes v. Wyeth Labs.*, 498 F.2d 1264, 1276 (5th Cir. 1974), *cert. denied*, 419 U.S. 1096 (1974)) ("The restriction of the duty to warn to physicians alone in ethical drug cases stands as an exception to the general rule of manufacturers to warn ultimate

51

consumers in products liability cases, but it is a rule supported by sound policy considerations").

Virginia state trial courts recognize that the learned-intermediary doctrine is the law of the Commonwealth. *See Hart v. Savage*, No. L-04-1663, 2006 WL 3021110 (Va. Cir. Ct. Oct. 19, 2006) ("The Supreme Court of Virginia has never explicitly adopted this doctrine, but it seems to have approved it with regard to prescription drugs in *Pfizer, Inc. v. Jones*"); *Hamlett v. Virginia Vascular Assocs.*, 61 Va. Cir. 468 (2003) ("Although no Virginia case mentions the 'learned intermediary doctrine,' the Supreme Court of Virginia has applied the doctrine to a manufacturer of prescription drugs.").

This Court likewise has applied the doctrine under Virginia law. In *Kling v. Key Pharms., Inc.*, 35 F.3d 556 (4th Cir. 1994), this Court stated that "[u]nder well-established Virginia law, a prescription drug manufacturer owes the consumer the duty of warning only the consumer's physician, or other person authorized to prescribe drugs, of risks or contra-indications associated with a drug." The Court affirmed the trial court's ruling that there was no evidence to support causation because the physician stated that "[h]e was familiar with" the product's risks "and had prescribed it frequently." *Id.*

Again, in *Talley v. Danek Med., Inc.*, 179 F.3d 154 (4th Cir. 1999), this Court applied the doctrine (in the context of a medical device):

[I]n circumstances where (1)…medical devices that can be prescribed or installed only by a physician are involved and (2) a physician…installs the medical device after having evaluated the patient, the manufacturer of the…device owes the patient only the duty to warn the physician and to provide the physician with adequate product instructions.

As the district court correctly noted, the learned intermediary doctrine is "an elementary principle of law" that applies in lawsuits involving prescription drugs, and has been applied uniformly and consistently by Virginia state and federal courts. (JA595-99.)

## 2.    The Learned-Intermediary Doctrine Bars Plaintiff's Claims

Plaintiff's arguments that the learned-intermediary doctrine does not support the district court's ruling because "(A) Forest did not warn the prescribing physicians and (B) their equivocal testimony does not support judgment as a matter of law" (Plaintiff's Brief, pp. 47-53), are not supported by the facts.

Plaintiff's contention that "[t]here is no evidence that Forest communicated the substance of the March 2004 warning to either prescribing physician in this case" is wrong. (*Id.*, pp. 48-49.) The testimony establishes:

- Forest submitted an sNDA to incorporate the March 2004 warning, which FDA approved on May 20, 2004. (JA1933.)

- Forest distributed the revised Lexapro package insert with the March 2004 warning to its sales representatives on May 27, 2004.

- Forest began distributing product with the revised package insert on May 31, 2004. (JA1923.)

- A Forest Pharmaceuticals sales representative visited Dr. Doyle's office, leaving samples and the revised Lexapro package insert on June 1, 3, 14, 23, 28, and July 13, 2004. (JA7814-18.)

- A Forest Pharmaceuticals sales representative visited Dr. Andres' office leaving the revised Lexapro package insert on June 24, 2004. (*Id.*)

- Mr. Krivicich visited Dr. Andres for the last time on July 10, 2004, and received his last prescription for Lexapro. (JA1421.)

- Mr. Krivicich visited Dr. Doyle on July 16, 2004. (JA1561.)

There is no contrary evidence.

Plaintiff's second contention is equally wrong. Not only did Forest establish that it disseminated the updated package insert to both Drs. Andres and Doyle, (JA7814-18, JA3200), but also both Drs. Andres and Doyle testified that the issues raised in FDA's March 2004 Public Health Advisory were known to them and known generally in the professional community. (JA4441-42, JA4692.) Indeed, the Public Health Advisory was widely publicized by both professional organizations and the general media. By way of example, two days after FDA issued the March 22, 2004, Public Health Advisory, the president of the American Psychiatric Association issued a press release addressing the advisory. (JA4385.) Both Drs. Andres and Doyle testified that they were members of the American Psychiatric Association. (JA4454, JA4581.) The March 2004 Public Health Advisory also was disseminated through professional journals such as the New England Journal of Medicine and the Journal of the American Medical

54

Association.    (JA4387, JA4391.)    In addition, general media coverage disseminated the advisory nationwide, including in the Washington Post, the New York Times, the Associated Press newswire, and a CBS broadcast. (JA4357-4383.) The scope of the dissemination bears up Drs. Andres' and Doyle's repeated testimony that it was common knowledge.  (JA4440, JA4592.)  The fact that both physicians were well-apprised of the risks associated with the use of SSRIs cannot be seriously disputed.

And, the fact that both were well-apprised bars plaintiff's claims under the learned-intermediary doctrine.   That is so even if Forest had not delivered the updated package inserts to both physicians and even if the updated package insert had not accompanied Lexapro shipments after May 31, 2004, and even if the 2004 Public Health Advisory was not so widely broadcast by the media.    A manufacturer is not liable when the prescribing physician was independently aware of the risks of which the plaintiff claims the manufacturer should have warned and chose to administer the drug anyway.  *See In re Zyprexa Prods. Liab. Litig.*, Nos. 04-MD-1696, 06-CV-2798, 2009 WL 2487305, at *13 (E.D.N.Y. July 27, 2009) (applying Virginia law) (citing *Stanback*, 657 F.2d at 645).  As the court noted in *Zyprexa*, it matters not whether the physician disregards the known risks and it matters not whether the physician communicates those risks to the patient because those acts or omissions have no bearing on the manufacturer's liability for failure

to warn under the learned-intermediary doctrine. *Zyprexa*, 2009 WL 2487305 at *13 (citing *Stanback*, 657 F.2d at 645; *Talley v. Danek Med., Inc*., 7 F. Supp. 2d 725, 730 (E.D. Va. 1998), *aff'd*, 179 F.3d 154 (4th Cir. 1999) ("Even if the manufacturer provides inadequate information, however, the manufacturer will not be liable if the plaintiff's physician independently knew of the risks and failed to advise the plaintiff.")). "The prescribing physician's informed decision to administer the drug constitutes an intervening act breaking the causal chain between the manufacturer's failure to warn and the resulting injury to the patient." *Zyprexa*, 2009 WL 2487305, at *13.

Here, both doctors testified they were aware of the potential risk and they were aware of the need to monitor patients. (JA4448, JA4601.) Indeed, Dr. Andres did exactly what plaintiff claims he should have been instructed to do—he monitored Mr. Krivicich from his very first appointment. Dr. Andres scheduled follow-up appointments at every visit and called Mr. Krivicich when Mr. Krivicich failed to show up for his appointments. (JA4500.) Dr. Doyle too tried to monitor Mr. Krivicich—he specifically asked for consent to speak to Dr. Andres—Mr. Krivicich refused. (JA4632.)

The law and the facts support the district court's decision to grant Forest's motion for summary judgment and this Court should affirm that decision.

### C. ANY ALLEGATIONS THAT FOREST SHOULD HAVE WARNED THAT LEXAPRO INCREASES THE RISK OF SUICIDALITY OR SUICIDE IS PREEMPTED

Throughout the course of her lawsuit, plaintiff has been wont to waffle among various and sundry theories under which she contends Forest should be held liable for Mr. Krivicich's decision to take his own life. Initially, her asserted deficiencies were that Forest failed to include a black box warning, Forest failed to prepare and distribute a Medication Guide, and Forest failed to instruct physicians to monitor patients and to advise family members to monitor patients. Forest responded to those alleged deficiencies in turn:

- Federal law prohibits Forest from unilaterally adding a black box warning.

- Federal law prohibits Forest from unilaterally preparing and distributing Medication Guides.

- There is no state law duty for Forest to include warnings in its product package insert that are not related to a danger inherent in the use of its product and as a result, Forest did not have a state law duty to instruct physicians regarding their treatment and care of patients with psychiatric disorders.

After Forest pointed out the shortcomings of each allegation, plaintiff contended Forest "misconstrue[d]" her claim—she asserted that she did not allege that Forest should have added a black box warning or distributed a Medication Guide. Unable to identify the source of any duty for Forest to instruct physicians in the treatment of their patients, plaintiff swung back to an earlier theory—Forest

should have warned that Lexapro increases the risk of suicidality. The problem there, however, is that her expert, Dr. Hamrell admitted that the current Lexapro labeling is adequate, and the current label does not include a warning that Lexapro increases the risk of suicide. In addition, the allegation, based on a failure to warn, is preempted.

In recent years, the United States Supreme Court has issued three decisions involving preemption of state-law actions involving pharmaceutical products. *See Wyeth v. Levine*, 555 U.S. 555 (2009); *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2466 (2011); *Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466 (2013)[12]. In *Levine*, the Court held the plaintiff's claims were not preempted because Wyeth could have strengthened it warnings or provided additional warnings using FDA's CBE process. *Levine,* 555 U.S. 555. Then in *Mensing*, the Court "limited *Wyeth* to situations in which the drug manufacturer can 'of its own volition...strengthen its label in compliance with its state tort duty.'" *In re Celexa and Lexapro Marketing and Sales Prac. Litig.*, --- F.3d ---, 2015 WL 727970, *6 (1st Cir. 2015) (*quoting Mensing*, 131 S. Ct. at 2581). In short, in actions involving pharmaceutical products, state-law failure-to-warn claims are preempted if the manufacturer cannot utilize FDA's CBE procedure to change product labeling. However, even where the CBE procedure is available, the Supreme Court acknowledged that a

_____

[12] In *Bartlett*, the Court reiterated its holding in *Mensing* and also held design defect claims involving pharmaceutical products are preempted.

plaintiff's claims would be preempted where "clear evidence" showed that FDA would not have approved a change to the drug's label. *Levine*, 555 U.S. at 571.[13]

The CBE procedure is available only to make changes that are based on "newly acquired information" that warrants a change (1) adding or strengthening a contraindication, warning, precaution, or adverse reaction; (2) adding or strengthening a statement about drug abuse, dependence, or overdosage; (3) adding or strengthening an instruction about dosage and administration that is intended to increase the safe use of the drug product; or (4) deleting false, misleading, or unsupported indications for use or claims for effectiveness. 21 C.F.R. §314.70(c); *In re Celexa and Lexapro*, 2015 WL 727970 at *7. In addition, "sufficient evidence of a causal association with the drug" must exist. *See* 21 C.F.R. §314.70(c)(6)(iii)(A). In other words, the change must be related to use of the drug product and it must be scientifically substantiated. In all other situations, the

---

[13] The Supreme Court did not "clarify what constitutes 'clear evidence.'" *See Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 391 (7th Cir. 2010). As a result, after *Levine*, lower courts struggled to apply the "clear evidence" standard. *See, e.g., Id.*; *Dorsett v. Sandoz, Inc.*, 699 F. Supp. 2d 1142 (C.D. Cal. 2010); *Forst v. SmithKline Beecham Corp.*, 639 F. Supp. 2d 948 (E.D. Wis. 2009); *Aaron v. Wyeth*, No. 2:07cv927, 2010 WL 653984 (W.D. Pa. Feb. 19, 2010); *Baumgardner v. Wyeth*, No. 06-2518, 2010 WL 3431671 (E.D. Pa. Aug. 31, 2010). The Supreme Court clarified the "clear evidence" standard in *Mensing*. The Court explained that a brand-name drug manufacturer can demonstrate it would be "impossible to do under federal law what state law required" by showing "FDA would have rescinded any change in the label" that might have been made. *Mensing*, 131 S. Ct. at 2582 and n.8.

manufacturer must submit a PAS. If the change could be made only through submission of a PAS, the claim is preempted because the manufacturer cannot independently do under federal law what the state law would require. *Mensing*, 131 S. Ct. at 2579.

Here, no new evidence existed to support the change plaintiff asserts Forest should have made. More specifically, Mr. Krivicich was prescribed Lexapro for the first time in March 2004. The last FDA-approved Lexapro label change was December 2003. No new evidence surfaced between December 2003 and March 2004 to support any change to Lexapro's label.

In March 2004, FDA mandated a change to all SSRI labels. Forest implemented that change, which FDA approved on May 20, 2004, and Forest began distribution of product with the updated label on May 31, 2004. Mr. Krivicich filled his last prescription for Lexapro on July 23, 2004. No new evidence surfaced between March and July 2004 that would have supported a label change using FDA's CBE procedure. As a result, plaintiff's claims against Forest are preempted as explained by the Supreme Court in *Levine* and *Mensing*.

Moreover, no scientific data or justification exists to support a warning that Lexapro increases the risk of suicidality or suicide in adults. FDA analyzed whether antidepressants cause suicide or increase suicidal thinking and behavior for decades. The issue likely is the most scrutinized issue by FDA over the last 30

60

years.  (JA658-59.)  FDA never concluded antidepressants cause suicide.  (JA628, JA664.)  Instead, its analysis repeatedly demonstrated no risk of suicide in adult patients (2003) or suicidality (2006) in patients older than 24.  (JA631-38.)  The analysis FDA completed in 2006 led it to conclude that antidepressants such as Lexapro are protective for suicidality beyond age 30, meaning the drugs decrease suicidality.  The totality of FDA's analysis of the issue—and its conclusions—over several decades is clear evidence there never was, and is not now, scientific substantiation for including a warning that Lexapro increases the risk of suicide or suicidality in adults.  FDA mandated that Forest state in its black box warning that **"[s]hort-term studies did not show an increase in the risk of suicidality with antidepressants compared to placebo in adults beyond age 24; [and] there was a reduction in risk with antidepressants compared to placebo in adults aged 65 and older."**  That language makes clear there was no "newly discovered safety information."  Forest could not have stated that Lexapro increased the risk of suicide in adults.  As explained in *Dobbs v. Wyeth Pharms.*, 797 F. Supp. 2d 1264, 1276 (W.D. Ok. 2011),

> the lengthy regulatory history of SSRIs reflects the FDA's refusal to enhance such warnings without scientific evidence, as well as its reluctance to consider a warning which it believed might reduce the use of antidepressants and thereby undermine the benefits of their use in treating depression.

The *Dobbs* Court correctly concluded that "clear evidence" existed that FDA

would have rejected any attempt by the manufacturer to expand the product warnings and, thus, plaintiff's claims were preempted. *Id.* at 1277. The same is true here.

### D. THE COURT ERRED IN RULING DR. HEALY'S AND DR. HAMRELL'S TESTIMONY IS RELIABLE

Under Federal Rule of Evidence 702, courts are charged as gatekeepers to screen expert testimony for its reliability. *Peters-Martin*, 410 Fed. Appx. at 617-18; *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (*citing Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 591-93 (1993)). In fulfilling that role, the court must consider both the relevance and the reliability of the proffered testimony. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). The proponent of expert testimony bears the burden to prove its admissibility by a preponderance of the evidence. *Lauzon*, 270 F.3d at 685-86.

Under Rule 702, the testimony must be useful in deciding the ultimate issue of fact, the proposed expert must be qualified, and the testimony must be reliable or trustworthy. In assessing the reliability of the proposed testimony, Rule 702 codifies the principles established in *Daubert* requiring that the testimony is based on sufficient facts or data, is the product of reliable principles and methods; and the principles and methods have been applied reliably to the facts. Fed. R. Evid. 702, Comm. Note thereto.

Establishing an expert's methodology is reliable requires "a showing that the methodology is generally applied properly to the facts at issue in the case based on scientifically accepted methodology." *Arnold v. Amada North America, Inc.*, 77 Fed. R. Evid Serv. 248, 2008 WL 2411789, *2 (E.D. Mo. 2008). The line between methodology and conclusion can be subtle and at times elusive. The court must determine that the opinion is supported by the data and not merely the say-so of the expert. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In other words, evidence must be validated by more than the *ipse dixit* statement by a purported expert that "I say it's valid, therefore it must be valid." *Arnold*, 77 Fed. R. Evid Serv. 248, 2008 WL 2411789 *2 (citing *Daubert* at 589-90; *Joiner*, 522 U.S. at 146 (emphasis in original). An opinion becomes speculative when too wide an analytical gap exists between the data and the opinion provided. *See Target Market Publishing, Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1144-45 (7th Cir. 1998) (affirming exclusion of opinion on expected revenues using unrealistic assumptions), *citing Joiner*, 522 U.S. at 146.

*Daubert* established four non-exclusive factors courts could consider in evaluating the reliability of an expert's methods: (1) whether a theory or technique has been, or can be, tested; (2) whether a theory or technique has been subject to peer review and publication; (3) whether a theory or technique has a known or potential rate of error; (4) whether a theory or technique has become generally

accepted. *Daubert* at 593-594. Additional factors can aid a proper analysis of admissibility, including whether the testimony was developed for litigation, whether the proposed expert ruled out alternative explanations, and whether the expert sufficiently connected the testimony to the facts of the case. *Lauzon*, 270 F.3d at 688.

Ultimately, Rule 702 reliability inquiry is intended to ensure that the opinions expressed by experts "adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996). At the end of the day, the expert testimony must be reliable and relevant.

### 1.    Dr. Healy's Opinions Are Not Reliable

The Missouri district court concluded that Dr. Healy's opinions are based on "his ongoing review and analysis of safety relating to SSRIs…." (JA4707.) That conclusion is demonstrably wrong. Moreover, the court's conclusion that Dr. Healy's method at reaching his opinions is reliable does not comport with the *Daubert* principles for admitting expert testimony. The court concluded that Dr. Healy's reliance materials; i.e., the sources of his data, were appropriate bases for his opinions. When examined, however, it becomes clear that Dr. Healy's "sources" are not what he claims they are and his data is manufactured to fit the opinions he wishes to offer. Further, although he states that he relies on certain

"studies," he neither cites those studies, nor has he reviewed them "in detail." Those methods are not the methods that are used by experts in the field, they are not the methods that can form the basis of reliable expert testimony, and they are not the methods that should be countenanced by courts.

In reaching its conclusions, the district court relied heavily on *Tucker v. Smithkline Beecham Corp.*, 701 F. Sup. 2d 1040 (S.D. Ind. 2010), in which the court concluded that Dr. Healy's general causation opinions were admissible. There is a major distinction between *Tucker* and this case, however: In *Tucker*, Dr. Healy was offering opinions regarding Paxil and, while his methodology was much the same as that he used here, he did at least use Paxil data. In contrast, much of the data Dr. Healy's used to form his opinions regarding Lexapro did not involve Lexapro.

And, while the *Tucker* Court is correct that "no one should be too surprised by the prospect that a scientist's views may evolve as more data become available and the question receives more study," that does not describe Dr. Healy's opinions. Instead, Dr. Healy's opinions have remained static over the past decade. Rather than evolving as more data became available, he manipulates the data so to achieve results that purportedly continue to support his opinions. Neither approach is scientific or reliable.

As the district court in *Rimbert v. Eli Lilly & Co.*, No. 1:06-cv-00874, 2009 WL 2208570 at *13 (D. New Mex. 2009), *aff'd* 647 F.3d 1047 (10th Cir. 2011) explained, "[t]here are numerous peer-reviewed publications on controlled clinical trials, meta-analyses of controlled clinical trials, and other epidemiological studies that support the proposition that … SSRIs are not associated with suicidality or violent, aggressive behavior." Yet, Dr. Healy cites none of those. More troubling, is his failure to consider the myriad epidemiological studies that refute his conclusions. Quite simply, "where there is a large body of contrary epidemiological evidence, it is necessary to at least address it with evidence that is based on medically reliable and scientifically valid methodology." *Norris v Baxter Healthcare Corp.*, 397 F.3d 878, 882 (10th Cir. 2005). Moreover, "[w]hile the presence of epidemiology does not necessarily end the inquiry, where epidemiology is available, it cannot be ignored. As the best evidence of general causation, it must be addressed." *Id*.

The *Rimbert* Court found the expert's failure to account for any of the many contrary epidemiological studies that showed no medically reliable link between Prozac and homicide/suicide in the target population in reaching her conclusion or writing her report fatal to the reliability of her opinions. *Rimbert*, 2014 WL 2208570 at *14, JA5526. The court concluded that as a consequence, the expert's methodology was ultimately unreliable, as "[n]on-epidemiological studies, singly

or in combination, are not capable of proving causation in human beings in the face of an overwhelming body of contradictory epidemiology evidence." *Id.* Numerous courts agree. *See, e.g., In re Rezulin Products Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) (holding an expert's opinion unreliable if he fails to account for contrary scientific literature and instead "selectively [chooses] his support from the scientific landscape." (quotations omitted) and finding "if the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable"); *Abarca v. Franklin Cnty. Water Dist.*, 761 F. Supp. 2d 1007, 1066 n. 60 (E.D. Cal. 2011) ("A scientist might well pick data from many different sources to serve as circumstantial evidence for a particular hypothesis, but a reliable expert would not ignore contrary data, misstate the findings of others, make sweeping statements without support, and cite papers that do not provide the support asserted." (quotations omitted)).

The same holds true of Dr. Healy's opinions. The district court nonetheless ignored those shortcomings and countenanced his selective use of data and unexplained rejection of other, more recent and exhaustive studies that refuted the conclusions he was paid to offer.

## 2.    Dr. Hamrell's Opinions Are Not Reliable

The Missouri district court abused its discretion when it ruled that Dr. Hamrell's opinions are reliable.  The most notable evidence of that abuse lies in the simple fact that the court's conclusions are not supported by the record.  For instance, the court's determination that "Dr. Hamrell did not base his opinions 'exclusively upon a simple rough count of adverse events plaintiffs' counsel provided to him" is contrary to Dr. Hamrell's testimony.  (JA4736.)  Dr. Hamrell conceded at his deposition that his opinions were not based on his review of "all the materials" listed on the first page of his report "(including but not limited to adverse event reports)."  Instead, the sum total of the documents he used to form his opinions were AERs extracted from FDA's database.  Even without Dr. Hamrell's concession, however, it is clear he did not base his opinions on his laundry list of materials simply from (1) his complete unawareness of existing FDA documents generated through its extensive review of SSRIs (JA5958-59); and (2) the complete absence of any reference in his report to "Defendant's internal research and reports," "FDA records," "international regulatory efforts," or "medical literature."  (JA5739-59.)  Blindly accepting verbiage from an expert's report, while ignoring the expert's contrary testimony is not in accordance with the court's obligation to perform its gatekeeping role.  *See Peters-Martin*, 410 Fed.

Appx. 612 (noting court abuses discretion when it relies on erroneous factual or legal premises).

Similarly, the court's conclusion that "Dr. Hamrell's methodology is sufficiently reliable to pass the threshold test of admissibility," based on its conclusion that "Dr. Hamrell used the same type of methodology or analysis that he used while at the FDA and in the private sector," is wholly unsupported. (JA4737, 4738.) Dr. Hamrell never employed the methodology or analysis he used in generating his opinions in this litigation at any other time in his career. The basis of the court's statement that while at FDA "Dr. Hamrell was [] responsible for reviewing safety data such as adverse event reports submitted by pharmaceutical companies after drug approval" and that he "participated in safety reviews based on 'signal' detection" is a mystery. (JA4730.) Although Dr. Hamrell did work at FDA for a five-year period, neither his report detailing his background (JA5739-42), nor his CV (JA5764-66), describe those "responsibilities" as part of what he did while there. In fact, Dr. Hamrell testified that he had no knowledge whatsoever of how FDA analyzes or uses AERs. (JA5971.) Clearly, he could not have employed a methodology about which he has no knowledge. In reality, Dr. Hamrell's stint at FDA involved reviewing "preclinical" and "clinical" data, primarily bioequivalence data for generic drugs. (JA5740.) In addition, he "served as an expert on computers." (JA5741.) Neither

activity is related to reviewing AERs for "signals." Nor is there any indication he applied that methodology while employed in private industry. His duties there encompassed activities involved in submissions to obtain approval for products.

Dr. Hamrell's opinions are deeply flawed, but the district court choose to ignore those flaws. Dr. Hamrell, by his own admission, used only a quantitative analysis to opine that data existed to support changes to Lexapro's label as of June 30, 2001. The irony in his opinion is that Lexapro was not approved until more than one year later and when it was approved, although FDA rewrote portions of the proposed label Forest submitted with its NDA, FDA *did not* include the language Dr. Hamrell opines Forest should have included. Unlike Dr. Hamrell's analysis, Forest's analysis in preparing the Lexapro NDA and FDA's analysis in reviewing the NDA was qualitative. In other words, both Forest and FDA looked at and analyzed not only the "numbers" reported in the clinical data, adverse drug experiences reported for Celexa, and worldwide literature, but also the background and facts regarding each report. Dr. Hamrell did not; he did not read the narratives associated with the AERs he "counted," he merely counted them. In fact, he could not have read the narratives (and Forest could not have done so either for those AERs not involving its products) because the narratives are not part of the publicly available AERs database. Dr. Hamrell's simple expedient of pulling AERs and purportedly sorting them by using his choice of terms and then counting them and

using the raw numbers as the basis for his opinions does not rise to any level of reliable expertise.

It is well-acknowledged in the scientific and medical community that AERs have numerous limitations.

> FAERS data do have limitations. First, there is no certainty that the reported event (adverse event or medication error) was actually due to the product. FDA does not require that a causal relationship between a product and event be proven, and reports do not always contain enough detail to properly evaluate an event. Further, FDA does not receive reports for every adverse event or medication error that occurs with a product. Many factors can influence whether or not an event will be reported, such as the time a product has been marketed and publicity about an event. Therefore, FAERS data cannot be used to calculate the incidence of an adverse event or medication error in the U.S. population.

FDA Adverse Event Reporting System (FAERS), FDA website.[14]  There also are concerns regarding the potential abuse of FDA's AERs database.  As an example, in a recent article, the authors described the results of an analysis they performed of 3.3 million (+) AERS between 2003-2011 reporting irritable bowel disease (IBD) related to isotretinoin use.  The analysis revealed that of the 2,214 cases of IBD reported for isotretinoin, 1,944 (87.8%) of the reports were made by attorneys, whereas physicians reported only 132 (6.0%) and consumers reported 112 (6.1%). Stobaugh, D.J., et al., "Alleged Isotretinoin-Associated Inflammatory Bowel Disease:    Disproportionate reporting by attorneys to the Food and Drug

---

[14] Available at http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Surveillance/AdverseDrugEffects/default.htm, last visited March 5, 2015.

Administration Adverse Event Reporting System," Journal of the American Academy of Dermatology, May 16, 2013.

Not having performed a qualitative analysis of the AERs, Dr. Hamrell could not, and did not, exclude those AERs from his count that clearly would not have acted as any sort of "signal" to support a label change. Similarly, Dr. Hamrell did not examine the source of any of the reports he "counted." He just counted.

Another fundamental problem with Dr. Hamrell's opinions is that the majority of the data he uses post-dates the time at which he opines Forest should have changed its label by two and three years. More specifically, Dr. Hamrell says as of June 30, 2001, Forest had information to support a label change. Dr. Hamrell's opinions, however, is based in part (if not large part) on his AERs counts from December 31, 2003, and December 31, 2004. The data from 2003 and 2004 could not have been available by June 30, 2001.

It is difficult to discern how the district court concluded that Dr. Hamrell's bases and methodology passed scrutiny under the court's gatekeeping function. Blindly counting reports of events that might or might not be related to the drug associated with the report is hardly scientific, is surely not reliable, and is certainly not reliable expert testimony under the Federal Rules of Evidence.

Finally, Dr. Hamrell's opinions that Forest should, and could have, added a boxed warning and prepared and distributed a Medication Guide are contrary to

law.  An NDA holder may not add black box warnings to its labeling or distribute Medication Guides without prior FDA approval.  *See* 21 C.F.R. §201.80(e) (only FDA may require addition of boxed warning to labeling); 21 C.F.R. §208.24 (manufacturer must "obtain FDA approval of the Medication Guide before [it] may be distributed").

## CONCLUSION

The Court should affirm the district court's decision to grant summary judgment for Forest and should reverse the decision of the Missouri district court finding the opinions of plaintiffs' experts' reliable.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to this Court's Rule 34(a), Forest respectfully states that oral argument is warranted.  This case presents numerous issues and Forest submits that oral argument would materially aid the decisional process.

March 11, 2015                          Respectfully submitted,

*/s/  Linda E. Maichl*_____
Linda E. Maichl
Joseph P. Thomas
Ulmer & Berne LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio  45202
Tel:  (513) 698-5000
Fax:  (513) 698-5001
lmaichl@ulmer.com
jthomas@ulmer.com
*Counsel for Forest Laboratories, LLC*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 16,430 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, in 14 point Times New Roman.

*/s/ Linda E. Maichl*
Linda E. Maichl

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2015, I electronically filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send notice of the filing to registered CM/ECF users.


*/s/  Linda E. Maichl*_____
Linda E. Maichl