NOS. 14-2040 and 14-2133

In The
United States Court of Appeals
For The Fourth Circuit

*KATHLEEN HIGGINS,*
*Individually and as Personal Representative of*
*the Estate of Francis Krivicich, Deceased*
Plaintiff-Appellant,

v.

*FOREST LABORATORIES, INC.,*
Defendant-Appellee.
_____

On Appeal from the United States District Court
for the Western District of Virginia at Harrisonburg
The Honorable Michael F. Urbanski
D.C. No. 5:07-cv-00054-MFU-JGW
_____

RESPONSE AND REPLY BRIEF OF APPELLANT/
CROSS-APPELLEE KATHLEEN HIGGINS
_____

Respectfully submitted,

Arnold Anderson Vickery
Fred H. Shepherd
THE VICKERY LAW FIRM
10000 Memorial Dr., Suite 750
Houston, TX  77024-3485
Telephone:  713-526-1100
*Lead Counsel for Plaintiff-Appellant*

Paul R. Thomson, III
THE THOMSON LAW FIRM, PLLC
2721 Brambleton Avenue, SW
Roanoke, VA  24015
Telephone:  540-777-4900
*Local Counsel for Plaintiff-Appellant*

# **Table of Contents**

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction and Summary of the Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Responsive Statement of the Issues on Cross-Appeal. . . . . . . . . . . . . . . . . . . . . 6

Responsive Statement of the Case: Federal Preemption.. . . . . . . . . . . . . . . . . . . 6

ARGUMENT AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.    THE APPLICABLE STANDARDS OF REVIEW. . . . . . . . . . . . . . . . . . . 12

II.   SUMMARY JUDGMENT UNDER THE "LEARNED INTERMEDIARY" DOCTRINE IS NOT SUSTAINABLE ON THIS RECORD.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     A.    The "Learned Intermediary Doctrine Is Incompatible with Clear Virginia Precedent, and, Ergo, It Is Likely that the Virginia Supreme Court Would Either Reject the Doctrine Outright or Adopt the RESTATEMENT (THIRD) Version of Same. . . . . . . . . . . . 12

     B.    The Prescribing Doctors' Equivocal Testimony Does Not Justify Summary Judgment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.  FOREST HAS FAILED TO PRODUCE "CLEAR EVIDENCE" THAT FDA WOULD HAVE REJECTED REASONABLE EFFORTS TO WARN, IF FOREST HAD MADE ANY SUCH EFFORTS. . . . . . . . . . . . 19

     A.    The Historical View. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     B.    The Fox in the Henhouse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

     C.    *Wyeth v. Levine* Restores the Historical View. . . . . . . . . . . . . . . . 24

     D.    Forest Merely Rehashes the Same Arguments the Supreme Court Rejected.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

E.    FDA Would Not Have Rejected an Appropriate Warning Prior to May 31, 2004. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

F.    Federal Law Did Not Prohibit Reasonable Efforts to Communicate the Warning in the March 2004 Public Health Advisory. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

IV.    JUDGE SIPPEL DID NOT ABUSE HIS *DAUBERT* DISCRETION. . . . . 35

A.    Dr. Healy's Opinions Were Properly Admitted. . . . . . . . . . . . . . . . . 37

B.    Dr. Hamrell's Opinions Were Properly Admitted. . . . . . . . . . . . . . 41

C.    "Vigorous Cross-Examination" is the Preferred Method to Challenge Expert Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Certificate of Compliance with Rule 32(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Certificate of Filing and Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

# Table of Authorities

**Case**                                                                                                         **Page(s)**

*Aaron v. Wyeth*
      2010 WL 653984 (W.D. Pa. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Abbot by Abbot v. Am. Cyanamid Co.*,
      844 F.2d 1108 (4th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Anderson Living Trust v. WPX Energy Prod., LLC*,
      No. CIV 12-0040 JB/KBM, 2014 WL 2750652 (D.N.M. May 16, 2014). . 15

*Baumgardner v. Wyeth Pharms.*,
      2010 WL 3431671 (E. D. Pa. Aug. 31, 2010). . . . . . . . . . . . . . . . . . . . . . . 29

*Benedi v. McNeil-P.P.C., Inc.*,
      66 F.3d 1378 (4th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37, 42

*Bennett v. Forest Labs, Inc.*,
      ___ F. Supp. 2d ___, 2015 WL 1418444 (M.D. Fla. 2015). . . . . . . . . . . . 29

*Bennett v. Forest Labs.*,
      2015 WL 1579404 (M.D. Fla. Apr. 9, 2015). . . . . . . . . . . . . . . . . . . . . . . 40

*Clausen v. M/V NEW CARISSA*,
      339 F.3d 1049 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Colacicco v. Apotex Inc.*,
      No. 06-3107 (3d Cir. Apr. 28, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Cooper v. Smith & Nephew, Inc.*,
      259 F.3d 194 (4th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37

*Cross v. Forest Labs.*,
      2015 WL 728511 (N.D. Miss. Feb. 19, 2015). . . . . . . . . . . . . . . . . . . . . . 40

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
      509 U.S. 579 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Dobbs v. Wyeth Pharm.,*
    797 F. Supp. 2d 1264 (W.D. Okla. 2011)............................. 30

*Dorsett v. Sandoz, Inc.,*
    699 F. Supp. 2d 1142, 1159 (C. D. Cal. 2010)....................... 29

*Featherall v. Firestone Tire & Rubber Co.,*
    252 S.E.2d 358 (1979). ................................ 13, 14, 15, 18

*Forst v. SmithKline Beecham Corp.,*
    639 F. Supp. 2d 948 (E.D. Wis. 2009). ............................. 29

*Funkhouser v. Ford Motor Co.,*
    285 Va. 272, 736 S.E.2d 309 (2013). ............................. 32

*Garside v. Osco Drug, Inc.,*
    976 F.2d 77 (1st Cir. 1992)...................................... 16

*General Electric Co. v. Joiner,*
    522 U.S. 136 (1997). .......................................... 35

*Hillsborough County v. Automated Med. Labs., Inc.,*
    471 U.S. 707(1985)............................................. 21

*Ilich v. Forest,*
    Case 2:05-cv-00667-RSL (W.D. Washington)..................... 40, 41

*In re Celexa & Lexapro Products Liab. Litig.,*
    927 F. Supp. 2d 758 (E.D. Mo. 2013).......................... 36, 38

*In re Celexa & Lexapro Products Liab. Litig.,*
    MDL 1736, 2013 WL 791784 (E.D. Mo. Mar. 4, 2013). ........ 31, 37, 44

*In re Viagra Products Liab. Litig.,*
    658 F. Supp. 2d 950 (D. Minn. 2009)............................. 44

*Koho v. Forest Labs., Inc.,*
    No. C05-0667RSL, 2014 WL 1744267 (W.D. Wash. Apr. 30, 2014)..... 29

*Maryland Cas. Co. v. Therm-O-Disc, Inc.*,
     137 F.3d 780 (4th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Mason v. SmithKline Beecham Corp.*,
     596 F.3d 387 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Matrixx Initiatives, Inc. v. Siracsano*,
     131 S.Ct. 1309, 179 L.Ed.2d 398 (2011). . . . . . . . . . . . . . . . . . . . . . . . . 39

*Muzichuck v. Forest Labs, Inc.*,
     2015 WL 235226 (N.D. W.V. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Peters-Martin v. Navistar Int'l Transp. Corp.*,
     410 F. App'x 612 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Pfizer, Inc. v. Jones*,
     272 S.E.2d 43 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*PLIVA, Inc. v. Mensing*,
     131 S.Ct. 2567 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 25

*Rice v. Norman Williams Co.*
     458 U.S. 654 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Rimbert v. Eli Lilly & Co.*,
     577 F. Supp. 2d 1174 (D.N.M. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Talley v. Danek Med., Inc.*,
     179 F.3d 154 (4th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Moreland*,
     437 F.3d 424 (4th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Watts v. Medicis Pharm. Corp.*,
     236 Ariz. 511, 342 P.3d 847 (Ct. App. 2015). . . . . . . . . . . . . . . . . . . . . . . 14

*Westberry v. Gislaved Gummi AB*,
     178 F.3d 257 (4th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37, 41

*Wyeth v. Levine,*
      555 U.S. 555 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 24


## Statutes, Rules and Regulations                                     Page(s)

21 C.F.R. § 201.56(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27
21 C.F.R. § 201.57(e) (1999) (recodified as 21 C.F.R. § 201.80(e)(2006))
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 20, 22, 26, 27, 52, 40
21 C.F.R. § 314.70(c)(6)(iii)(A). . . . . . . . . . . . . . . . . . . . . . . . 7, 20, 22, 25
21 C.F.R. § 314.80(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

21 U.S.C. § 301. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
21 U.S.C. § 331(a)-(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
21 U.S.C. § 352(a), (f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Civ. P. 30(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

44 Fed. Reg. 37,434 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
63 Fed. Reg. 66,378 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
65 Fed. Reg. 81,082 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 24
71 Fed. Reg. 3922 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26, 27
73 Fed. Reg. 49,603 (Aug. 22 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . 26


## Other                                                                Page(s)

DSM-IV-TR, § 333.99.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

RESTATEMENT (SECOND) § 388.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16, 17

RESTATEMENT (SECOND) § 402A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

RESTATEMENT (THIRD). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

2011 Federal REFERENCE MANUAL ON SCIENTIFIC EVIDENCE: THIRD EDITION. . 36

Hamrell, MR, *Current Regulations and Practices for Adverse Event Reporting:*
*Implications for Labeling*, Drug Information Journal. . . . . . . . . . . . . . . . . . . 49

http://www.diahome.org/Home/About-DIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

https://ecf.wawd.uscourts.gov/doc1/19716268448. . . . . . . . . . . . . . . . . . . . . . . 40

https://ecf.wawd.uscourts.gov/doc1/19716315168. . . . . . . . . . . . . . . . . . . . 41, 52

http://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelope
dandApproved/ApprovalApplications/NewDrugApplicationNDA/default.htm. . 46

http://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDevelope
dandApproved/ApprovalApplications/InvestigationalNewDrugINDApplication/de
fault.htm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Surveillan
ce/AdverseDrugEffects/default.htm. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

http://www.raps.org/. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

http://www.raps.org/focus-online/about-regulatory-focus.aspx. . . . . . . . . . . . . . 45

Plaintiff/Appellant Kathleen Higgins files this single brief *replying* to Forest's response to the very narrow appeal by Higgins concerning the learned intermediary doctrine, and *responding* in a more fulsome manner to the cross appeal by Forest. Because the same critical facts are dispositive of all three issues in this appeal – learned intermediary, federal preemption and *Daubert* – Appellant sets forth these facts in an introductory section, which also functions as a summary of the argument.

## Introduction and Summary of the Argument

For the first 15 years of the modern antidepressant era, SSRI antidepressant labels cautioned only that the possibility of suicide was "inherent in major depressive disorder." JA 2711. Although the labels contained no suggestion that the drug itself might play a role in inducing suicidal behavior, however, many reputable scientists – including Appellant's expert neuro-psychopharmacologist, Dr. David Healy – continued to assert in peer-reviewed publications that these antidepressants themselves might paradoxically increase the risk of suicidal behavior, particularly early in treatment, before the antidepressant effect fully "kicked in." Appellant discussed many of the events from this period in her Opening Brief at 9-17. Because of the publicity that this discussion generated, many physicians who prescribed antidepressants had some level of general awareness of a controversy on this issue. This included both Dr. Francis Andres

and Dr. Brian Doyle, the physicians who prescribed Lexapro to Francis Krivicich. But with no warning to substantiate or clearly describe a real association between the drug itself and suicidal behaviors – communicated by drug companies or FDA, rather than the media – prescribers were left to assume that there was no risk sufficient to alter their prescribing habits or modify their informed consent discussion with their patients and their caregivers.

Forest and its sister antidepressant companies had the duty under both federal and state law to investigate, discover and communicate the true risk in a reasonable, effective manner. "[T]hrough many amendments to the FDCA and to FDA regulations, it has remained a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times." *Wyeth v. Levine,* 555 U.S. 555, 570-71 (2009). According to Appellant's FDA expert, Dr. Michael Hamrell, Forest should have warned of the true risk long before even the initial prescription to Francis Krivicich. JA 108 ¶ 2, 622. Neither Forest nor its sister antidepressant manufacturers did so.

But in May 2003, FDA finally saw the risk that antidepressant companies should have seen years earlier.[1] While reviewing data submitted by GlaxoSmithKline ("GSK") in conjunction with an application to approve its

---

[1] Actually, the regulatory changes in this and other countries were presaged by a June 2001 verdict and judgment establishing that the SSRI drug Paxil "can cause some people to become homicidal and/or suicidal." *See* discussion on pages 3-5 of Opening Brief.

antidepressant Paxil for use by pediatric patients, FDA itself finally saw the signal of which Dr. Healy and other scientists had warned for years. This was a "finding" that "clearly got [FDA's] attention" and "has us worried." JA 2194, 2200; *see also* JA 2324-25. FDA asked antidepressant manufacturers to reanalyze their data, beginning a process that would ultimately lead to strong warnings of the actual risk, and would vindicate the few scientific voices that had identified the risk years before.

On February 2, 2004 – four weeks prior to the initial prescription of Lexapro to Francis Krivicich – FDA's advisory committee met to review the reanalyzed data from the drug companies. The following month, FDA sent a letter to Forest, advising it that "we believe that labeling changes are warranted." JA 1913. Three days later, on March 22, 2004, FDA issued a Public Health Advisory, requiring that all antidepressant labels be changed to warn of the true risk. JA 2733-34. This was "the real watershed moment for [antidepressant] labeling." JA 2335, 2364.

Confirmation of the long-rumored risk of such a tragic adverse reaction called for swift and decisive action. It was critical to warn physicians who might prescribe antidepressants that the "controversy" surrounding antidepressants and suicide was not idle speculation, but was a sufficiently real risk to merit a Public Health Advisory ("PHA") and a label change. But Forest's response was woefully

inadequate. While it began to disseminate the new warning with new batches of Lexapro shipped on May 31, 2004, it made no effort to highlight the risk to physicians who were already prescribing the drug or who would be prescribing it in the future. JA 1923. The changed label was subsequently published in the 2005 Physicians Desk Reference ("PDR"),[2] but this did not become available to doctors until November 2004. JA 622. Perhaps most egregiously, Forest made no attempt to communicate the true risk through its drug representatives, who made periodic, personal visits to prescribing physicians to encourage them to prescribe its drugs. Even as of her visit to Dr. Andres on June 24, 2004, Forest's Lexapro representative had not seen the March 22, 2004 PHA, did <u>not</u> know that the drug she was selling might pose an increased risk of suicidal thoughts and behaviors, and believed that the most significant adverse effect was "dry mouth." JA 2457, 2468 - 70, 2473. If she had been made aware of these risks, she would have warned Dr. Andres when she visited him to market Lexapro more than a month before Francis Krivicich died. JA 2461, 2474.

Having failed in its parallel duties under both federal regulations and Virginia law to adequately warn of the risks posed by its drug, Forest tries to shift the spotlight to everyone else. Forest points to the prescribing physicians' general awareness of a "controversy" to confirm summary judgment under the learned

---

[2]   The PDR is the most common source of drug labeling information for physicians. *See* 65 Fed. Reg. 81,082, 81,083 (2000).

intermediary doctrine.  It claims that federal law somehow preempted any effort to implement and communicate the very warnings that FDA determined were in fact justified.  And it brands as unreliable and inadmissible the opinions of one of the few scientists who identified the actual risk years before FDA recognized it. Forest's arguments ignore that there was a tectonic shift in the landscape of antidepressants and suicidality preceding and during the time that Lexapro was prescribed to Francis Krivicich.  This shift validated the science and the risk, and foreclosed the possibility that general knowledge of a "controversy" could render a prescribing physician "learned."

Judge Sippel recognized this shift in the context of denying Forest's *Daubert* motion to exclude Dr. Healy's general causation opinion.  He recognized that the 2004 warnings "ultimately validated" Dr. Healy's opinions in the 2001 *Miller* case, in which a district court in Oklahoma had excluded his testimony.  With all due respect, the district court in this case ignored the same shift.  While recognizing that whether Forest acted reasonably in implementing and communicating an appropriate warning is a question of fact for the jury, the court based summary judgment on the notion that Forest had no duty to warn the prescribing physicians at all.  The court equated some knowledge of a "controversy" to knowledge of a risk that was sufficiently substantiated to form the basis of a label change and a Public Health Advisory.  Appellant submits that this was reversible error.

## Responsive Statement of the Issues on Cross-Appeal

1.  Whether Forest has presented "clear evidence" that FDA would have rejected attempts by Forest to implement and communicate a warning of the increased risk of suicidal thoughts and behaviors posed by Lexapro, prior to Francis Krivicich's death on July 25, 2004.

2.  Whether the district court in the MDL abused its discretion in holding reliable and admissible the testimony of Dr. Healy and Dr. Hamrell.  (Forest's statement of the issue in terms of "erred" fails to account for the appropriate standard of review.)

## Responsive Statement of the Case:  Federal Preemption

Forest's statement of the case and facts contains a myriad of facts beyond those needed to inform determination of the narrow preemption issue in this case. More problematic, Forest has constructed its preemption argument on questionable sources, notably sources explicitly rejected by the Supreme Court in *Levine*.  To fully understand the shaky foundation of Forest's preemption argument, Appellant puts them in context in sections III A-D, *infra*.  In this section, Appellant set forth the core facts relevant to the preemption issue.

Federal regulations give manufacturers of brand-name drugs such as Lexapro the power and the duty to add warnings to their drugs' labels unilaterally, independently, and without prior FDA approval.  21 C.F.R. § 201.57(e) (1999)

(recodified as 21 C.F.R. § 201.80(e)(2006)); 21 C.F.R. § 314.70(c)(6)(iii)(A) (the "Changes Being Effected," or "CBE" regulation). The regulatory history of antidepressants and their propensity to increase the risk of suicidal thoughts and behaviors illustrates the reliance FDA places on drug companies to insure the adequacy of their drugs' labels, and the deference that FDA gives to their use of the CBE regulation to discharge their regulatory responsibilities.

There are only two instances in which an antidepressant manufacturer has used the CBE regulation to add a warning of an increased risk of suicidal behavior. In August 2003, Wyeth utilized the CBE regulation to warn of an increased risk of suicide to pediatric patients, associated with its antidepressant Effexor, without prior FDA approval. JA 2798-99, 2808-09. As an FDA official confirmed in sworn testimony to Congress, FDA did not reject this added warning, but allowed it to stand until it began to require a stronger warning for all antidepressants, seven months later. JA 2196; *see also* JA 2348 ("obviously, we let it stand"). Less than three years later, in May 2006, GSK utilized the same CBE regulation to warn of an increased risk of suicide in adult patients, associated with the use of its SSRI antidepressant Paxil, without prior FDA approval. JA 2494-95. FDA did not reject this added warning, but allowed it to stand for a full year, until it again required stronger warnings for the entire class of antidepressants. JA 2375-76; *see also* JA 2501.

In deciding whether FDA would have reacted differently to a warning added and effectively communicated by Forest, the Court must examine the regulatory climate at the time(s) the drug at issue was prescribed to the patient. In this case, the initial prescription of Lexapro to Francis Krivicich was on February 28, 2004. He took it for a brief period, then stopped, then restarted on July 6, 2004. Forest. Br. 28. Dr. Andres re-prescribed it on July 10, 2004, instructing him to double the dose. *See* Forest Br. at 27. Mr. Krivicich killed himself on July 25 2004, 19 days after re-starting Lexapro, and after doubling the dose. As explained in the introduction, this was the exact time during which FDA had finally seen the danger signal and had initiated regulatory changes; and his death occurred "at the beginning of therapy or when the dose either increases or decreases," JA 2733 – in exactly the time predicted by the peer-reviewed literature and warned of in the Public Health Advisory.

A year before Mr. Krivicich's death, FDA saw a signal for an increased risk of suicidal behavior in the GSK data in May 2003. This was a "major finding" that "clearly got [FDA's] attention" and "has us worried." JA 2194, 2200; 2324-25. When FDA discovered that GSK had hidden the true risk by coding potential suicidal events as "emotional lability," its frustration that the drug company had not acted proactively was palpable: "[GSK] has not proposed labeling changes, and makes a feeble attempt to dismiss the finding." JA 2194, 2200. In response,

FDA asked all antidepressant manufacturers to reanalyze their pediatric data. JA 2396.

FDA eventually received the reanalysis of pediatric data from all antidepressant manufacturers, and on February 2, 2004, there was a meeting of FDA's Psychopharmacologic Drugs Advisory Committee ("PDAC") to discuss the results. JA 2397.

On March 19, 2004, FDA sent a letter to Forest, advising it that "we believe that labeling changes are warranted in order to caution practitioners and patients about the need for close observation of patients being treated with antidepressants for clinical worsening, for the emergence of suicidality, and for the emergence of a variety of other symptoms that may represent a precursor to suicidality." JA 1913. On March 22, 2004, FDA issued a Public Health Advisory, requesting that all antidepressant labels be changed to warn that increased suicidal thoughts or behaviors "could be due to the underlying disease **or might be a result of drug therapy**." JA 2733-34; 2188 (boldface added).[3] The Advisory emphasized that the potential risk was greatest "**at the beginning of therapy or when the dose either increases or decreases**" and identified several conditions for which family members should be on the lookout, especially if they were "abrupt in onset." *Id.*

---

[3] Forest sought "judicial notice" of this Advisory. JA 581.

(boldface added).  *See also* JA 2332.  This was "the real watershed moment for [antidepressant] labeling."  JA 2335, 2364.

Forest did not use the CBE regulation to add any such warning on its own initiative, or even in response to FDA's letter advising that the current warnings were inadequate. Likewise, it did <u>not</u> communicate the risk that FDA had finally recognized by sending a "Dear Doctor" letter, by sending out copies of the Public Health Advisory, by linking the Advisory to its website or by communicating the warning through its sales representatives.  Federal law prohibited none of these actions.

Instead, on April 30, 2004, Forest forwarded to FDA proposed label changes incorporating the warning FDA had requested in its March 19, 2004 letter.  JA 1923.  Forest indicated its intention to begin distributing the new warning "on or before May 31, 2004," but only on "packages distributed from the Company's manufacturing facilities."  JA 1923.  FDA approved the proposed change on May 20, 2004, requesting that Forest provide FDA a copy of any "letter communicating important information . . . to physicians and others responsible for patient care."  JA 1933-34.  Forest sent no such letter.  The changed label was subsequently published in the 2005 PDR, which did not become available to doctors until November 2004.  JA 622.

Beginning in March 2004, FDA recognized that a warning of an increased risk "early in treatment" was justified, even if longer-term use ultimately proved benign or beneficial. In a November 2006 memo, FDA emphasized that "the dual findings of an early increase in the risk of suicidality but also a longer-term benefit with antidepressant treatment would, if both true, not necessarily be inconsistent. It is quite possible for a drug to have opposite effects over time, even within the same domain." JA 1204. The warning of an increased risk of suicidal thoughts and behaviors "early in treatment," even though the same drug might produce the opposite effect once the antidepressant effect "kicks in," carries forward to this day. The current **BLACK BOX** warning provides that "[p]atients of all ages who are started on antidepressant therapy should be monitored appropriately and observed closely for clinical worsening, suicidality, or unusual changes in behavior," and underscores that "[f]amilies and caregivers should be advised of the need for close observation and communication with the prescriber." JA 2074. The warnings section of the label warns in **bold** print of the need for appropriate monitoring and close observation, "especially during the initial few months of a course of drug therapy, or at times of dose changes, either increases or decreases." JA 2078.

## ARGUMENT AND AUTHORITIES

### I.    THE APPLICABLE STANDARDS OF REVIEW.

The parties agree that the Court must review the grant of summary judgment *de novo*, and that Judge Sippel's decision to admit the testimony of Dr. Healy and Dr. Hamrell can be reversed only if Judge Sippel abused his discretion. *See* Forest Br. at 48.

Although Forest does not differentiate between its motion for summary judgment on learned intermediary and its motion on federal preemption, the standard applicable to the preemption issue merits clarification. Federal preemption is an affirmative defense on which Forest bears the burden of proof. The inquiry is a narrow one: whether Forest can prove by "clear evidence" that FDA would have rejected any attempt to implement and communicate a warning of an increased risk of suicide prior to Francis Krivicich's death on July 25, 2004, if Forest had undertaken those efforts. *Levine*, 555 U.S. at 571. Although the standard of review is nominally *de novo*, therefore, the "clear evidence" standard of proof raises Forest's burden much higher than in a typical summary judgment.

### II.   SUMMARY JUDGMENT UNDER THE "LEARNED INTERMEDIARY" DOCTRINE IS NOT SUSTAINABLE ON THIS RECORD.

#### A.    The "Learned Intermediary Doctrine Is Incompatible with Clear Virginia Precedent, and, Ergo, It Is Likely that the Virginia Supreme Court

**Would Either Reject the Doctrine Outright or Adopt the RESTATEMENT (THIRD) Version of Same**. Forest fails to discuss, much less cite, the lead "duty to warn" case from the Virginia Supreme Court, *i.e.*, *Featherall v. Firestone Tire & Rubber Co.*, 252 S.E.2d 358 (1979), which explicitly held that "the duty to warn . . . extends not only to the immediate purchaser but **to other persons who might in the ordinary and natural course of events be subjected to danger**." Nor does it cite or discuss RESTATEMENT (SECOND) § 388, on which *Featherall* was decided, and which Appellant cited and discussed at length in her principal brief.  Opening Brief at 24-26.

Like the court below, Forest continues to cite *Pfizer, Inc. v. Jones*, 272 S.E.2d 43, 45 (1980), a case that does not even use the phrase "learned intermediary," for the proposition that "Virginia has adopted and steadfastly applies the learned intermediary doctrine."  This case, decided one year after *Featherall,* discusses the adequacy of a warning to the physician, but does not begin to undermine *Featherall's* express holding that the duty to warn also extends to "other persons."

No Virginia appellate court, either before or after the *Pfizer* opinion has even used the phrase "learned intermediary."  Respect for the common law prerogatives of the Virginia Supreme Court and the concomitant comity limitations on the *Erie* prerogatives of federal courts cannot conclude that Virginia has "adopted" the

learned intermediary doctrine. To be sure, federal courts, including this Court, have either predicted or assumed that this would be the law in Virginia, but without confirmation from any Virginia appellate court.

Because the "learned intermediary" doctrine is incompatible with *Featherall,* in the absence of certification,[4] the Court should predict that a 2015 Virginia Supreme Court would adhere to its own explicit teachings in *Featherall* and reject the learned intermediary doctrine.

Such a prediction would be consistent with changing times. For example, since this summary judgment was granted, the Arizona Court of Appeals, which had specifically embraced the learned intermediary doctrine in 1978, reversed itself and held that the doctrine is incompatible with the statutory system of comparative fault and with the current environment of direct-to-consumer advertising for drugs. *Watts v. Medicis Pharm. Corp*., 236 Ariz. 511, 342 P.3d 847, 855 (Ct. App. 2015). This is the latest case in the national trend of cases cited in Higgins' principal brief and in her separate Motion for Certification. It is a safe *Erie* prediction that the Virginia Supreme Court will stick to its own precedent in *Featherall* and follow this trend.

---

[4]    Higgins believed, and still believes, that the total absence of any Virginia appellate case law concerning this doctrine warrants certification of the issue. However, this Court has denied Higgins' motion for same. Therefore, it is incumbent on the Court to make an *Erie* prediction from the perspective of 21st century law and society.

This Court could, and should, do the same. The Court's *Erie* obligation is to decide the case in the manner that it honestly believes the Supreme Court of Virginia would do ***today***. *Rimbert v. Eli Lilly & Co.,* 577 F. Supp. 2d 1174, 1188-89 (D.N.M. 2008) (predicting that the New Mexico Supreme Court would not, in 2008, adopt the learned intermediary doctrine, in spite of prior appellate authority in support thereof).

The author of the *Rimbert* opinion is Judge James Browning, a former U.S. Supreme Court law clerk and extremely scholarly and distinguished federal judge. In a recent opinion he grappled with the situation which now confronts this Court, *i.e.*, the existence of federal court cases, including cases like *Talley v. Danek Med., Inc.,* 179 F.3d 154, 163 (4th Cir. 1999), which have either assumed that "learned intermediary" is the law of Virginia, or have made an *Erie* prediction that, quite frankly, no longer seems valid. Judge Browning bluntly wrote that "The *Erie* doctrine results in federal cases that interpret state law withering with time." *Anderson Living Trust v. WPX Energy Prod., LLC,* No. CIV 12-0040 JB/KBM, 2014 WL 2750652 (D.N.M. May 16, 2014). With great respect for this Court, Appellant submits that *Talley* and other "learned intermediary" decisions of this Court and the lower courts applying Virginia substantive law have "withered" over time, and that a fresh look, in light of current conditions in society, precedents in law, the continued viability of *Featherall,* and the fact that Virginia is a negligence

state that follows RESTATEMENT § 388 rather than § 402A strict liability, should result in either an outright rejection of the doctrine or, at minimum, a prediction that Virginia would adopt the RESTATEMENT (THIRD) formulation of the doctrine, as discussed in Appellant's principal brief. Either result would lead to reversal of the summary judgment in this case.

**B.    The Prescribing Doctors' Equivocal[5] Testimony Does Not Justify Summary Judgment**. It is black letter law that the adequacy of drug warnings, and the reasonableness of a company's efforts to communicate them are fact questions for the Jury. The court below did not challenge that law or base its decision on it. Rather, the court held that because the two prescribing physicians had a vague recollection of a "controversy" concerning the potential for SSRI-induced suicidality, Forest had no duty to warn them in the first place. A comparison of the information contained in FDA's March 2004, Public Health Advisory with the doctors' testimony demonstrates that they were not fully aware of the dangers of SSRI-induced suicidality, and with the exception of a non-specific obligation to "monitor" the patients, had no knowledge whatsoever about the various protective measures that FDA advisory recommended. Significantly,

---

[5]    The case law upholding summary judgments on the basis of prescribing physicians' testimony was synopsized in the frequently cited First Circuit case, *Garside v. Osco Drug, Inc.*, 976 F.2d 77 (1st Cir. 1992) as follows: "In all such cases, courts have required that the physician's testimony show **unequivocally** that s/he knew at the relevant time *all* the information which would have been included in a proper warning." *Id.* at 82 (Italics in original; boldface added).

this included the importance of warning family members to watch out for the precursor conditions. Because the district court did not appreciate the magnitude of FDA's decision in March 2004, it impermissibly assessed the weight to be given to the prescribers' testimony and supplanted the constitutionally mandated role of the Jury as trier of fact.

As noted in Appellant's opening brief, the thrust of RESTATEMENT § 388 and of the March 2004 FDA advisory was that the prescribing doctors needed to have information about the risk of drug-induced suicidality, not only to guide their own decisions as to whether to prescribe or recommend the drug, but more importantly, so that they would be on alert on the need to be effective "conduits" for that information to the patients. Dr. Andres was not fully informed when he prescribed Lexapro to Francis Krivicich. His testimony[6] confirms this was new information that was not contained in the previous warning label. Moreover, both Dr. Andres[7] and Dr. Doyle[8] unequivocally stated they would have warned Francis' wife to monitor for these symptoms if they had been so warned, as FDA Advisory directs, because family members are in the best position to protect a patient from suicide.

---

[6] JA 2751:21-2753:3.

[7] JA 2754:25-2756:1; 2759:23-2761:9.

[8] JA 2914:9-2915:6.

Perhaps most significantly, Dr. Doyle testified he had no recollection of ever seeing the March advisory, but would expect drug companies to inform him about true risks known to them. JA 2904. He also unequivocally stated he would have warned Francis' wife Kathleen about these risks if he had been warned to do so. JA 2914 - 15. Given Francis' obvious distress during his appointment with Dr. Doyle, six days after doubling his Lexapro dose, JA 2869, *i.e.*, significant agitation, restlessness, and an inability to sit still, JA 2902; 2917-18; 2871-72; 3049, all precursor conditions to suicide described by FDA in the March 2004 PHA – and the fact that he did not warn Francis and his wife of the true risk – he was not "learned" as a matter of law. Because Forest did not bring the now-recognized risk to his attention, an avoidable, tragic string of events continued. The result clearly demonstrates the fallacy of the district court's interpretation of the learned intermediary doctrine.

As noted in Appellant's opening brief, moreover, the summary judgment in this case cannot stand even under the learned intermediary doctrine. The Court should reach the same result it did in *Abbot by Abbot v. Am. Cyanamid Co*., 844 F.2d 1108 (4th Cir. 1988). Virginia law does not support the notion that the treating physician's *subjective* view as to adequacy conclusively determines that issue," and, accordingly, that "[s]ummary judgment on the failure to warn claim was improper. *Id*. at 1115. As with *Featherall,* Forest deals with this dispositive

authority from this very Court by ignoring it.  There is no citation to the case in its brief.

## III.  FOREST HAS FAILED TO PRODUCE "CLEAR EVIDENCE" THAT FDA WOULD HAVE REJECTED REASONABLE EFFORTS TO WARN, IF FOREST HAD MADE ANY SUCH EFFORTS.

Forest next argues that there was a conflict between federal and state law, mandating preemption of Appellant's claims.  Federal law preempts state law when it is impossible to comply with both.[9]  In the context of failure to warn cases involving prescription drugs, the issue typically arises when the plaintiff asserts that the defendant failed to give an adequate warning of risks posed by its drug.  To sustain the affirmative defense of federal preemption, the defendant must prove that federal law *prohibited* it from doing so.  As the Supreme Court has acknowledged however, "[i]mpossibility pre-emption is a demanding defense." *Levine*, 555 U.S. at 573.  This is true in almost all cases involving brand-name prescription drugs such as Lexapro because federal regulations give manufacturers of these drugs the power and the duty to add warnings to their drugs' labels unilaterally, independently, and without prior FDA approval.[10]  21 C.F.R. §

---

[9]   There are other types of preemption as well: express preemption, field preemption and "obstacle" preemption.  Forest bases its motion solely on impossibility preemption. *See* Forest Br. at 59 n. 13.

[10]   The Supreme Court found no preemption in *Levine*, which addressed preemption of claims involving brand name drugs such as Lexapro.  The Court reached the opposite conclusion with respect to generic drugs in *PLIVA, Inc. v.*

201.57(e) (1999) (recodified as 21 C.F.R. § 201.80(e)(2006)); 21 C.F.R. § 314.70(c)(6)(iii)(A). It is understandably difficult to prove that it was impossible to do exactly what federal regulations empower one to do.

Furthermore, Forest's preemption argument in this case is considerably weaker than preemption arguments in most prescription drug cases. Appellant outlines the reasons in sections III.E and F, *infra*. But to make its arguments in the first instance, Forest has had to cobble together outdated and rejected sources to attempt to give at least a semblance of foundation. Before directly addressing the preemption analysis applicable to this case, therefore, Appellant first turns to an historical overview of how Congress, FDA and the courts view preemption of prescription drug cases to put Forest's arguments in context.

A.    **The Historical View.** Both the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.,* and the applicable federal regulations reflect the judgment of Congress and the traditional view of FDA that failure to warn suits under state law do not conflict with federal regulation of prescription drugs, but complement it. *Levine*, 555 U.S. at 578. Thus, for decades, patients injured by prescription drugs successfully brought state law failure-to-warn claims

---

*Mensing*, 131 S.Ct. 2567 (2011), holding that generic drug manufacturers could *not* use the CBE regulation to add warnings. Because Lexapro is a brand-name drug, Forest's attempt to argue that *Mensing* has some applicability is mistaken. *Levine* squarely controls this case, and Appellant does not address preemption of claims involving generic drugs.

against drug companies, with no serious suggestion that federal law preempted these claims.  As recently as six years before Lexapro was prescribed to Francis Krivicich, moreover, FDA recognized the complementary nature of drug companies' duties under federal and state law, confirming that FDA "does not believe that the evolution of state tort law will cause the development of standards that would be at odds with the agency's regulations."  63 Fed. Reg. 66,378, 66,384 (1998).  This understanding was consistent with principles of federalism, including the recognition that "[t]he regulation of health and safety matters is primarily, and historically, a matter of local concern."  *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985).

This understanding was also, and remains, consistent with the practical reality that FDA is simply incapable of being the sole guardian of consumer safety with respect to prescription drugs.  The FDA has limited resources to monitor the 11,000 drugs on the market, and *manufacturers have superior access to information about their drugs*, especially in the post-marketing phase as new risks emerge. State tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly.      *Levine*, *supra*, 555 U.S. at 578-79 (italics added, footnote omitted).  Several scientific organizations have also recognized this reality.  *Id*. at 578 n. 11.

Although federal law controls the conditions under which FDA approves drugs for marketing, therefore, FDA approval "does not represent a finding that the drug, as labeled, can never be deemed unsafe by later federal action, or [by] the application of state law." *Id.* at 592 (Thomas, J., concurring in judgment). Federal regulations expressly place the duty to maintain adequate warnings on the shoulders of drug companies. Drug labels "shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved." 21 C.F.R. § 201.57(e) (1999) (recodified as 21 C.F.R. § 201.80(e)(2006)). As FDA explained when promulgating that regulation, "it is *essential* to the safe use of a drug for the physician to know *all* adverse reactions that are likely to occur with it;" "the act requires labeling to include warnings about both *potential* and verified hazards;" and the agency "believes that practicing physicians will welcome such information so that they can make their best informed medical judgments in the care of their patients." 44 Fed. Reg. 37,434, 37,443, 37,447 (1979) (italics added). That proved true in this case as well as Dr. Doyle expressly expected drug companies to warn him of dangers known them. JA 2904.

To keep drug labels current, drug companies such as Forest have the power and the duty to add or strengthen warnings unilaterally, *without prior FDA approval*. 21 C.F.R. § 314.70(c)(6)(iii)(A). These regulations make clear that

-22-

federal law parallels state law with respect to the warnings on drug labels. Just as a drug label that contains inadequate warnings subjects the company to liability under Virginia law, federal law considers a drug whose label does not contain adequate warnings to be "misbranded." *See* 21 U.S.C. §§ 331(a)-(c), 352(a), (f).

**B.    The Fox in the Henhouse.**    Despite the clear provisions of the statutes and regulations and decades of recognition of the complementary roles of federal regulation and state tort law, there was a temporary shift in the early years of the millennium. Drug companies, supported by certain elements within FDA, began to argue against the traditional, federalism-based understanding, and to expand the role of the federal government, advocating FDA as a paternalistic, effectively all-powerful regulator. The basic argument was that FDA approval of a drug's label reflected a careful balancing of risks and benefits, culminating in labeled warnings that state law should not be allowed to disturb. *See* Forest Br. at 7. The justifications were that "certain state-law actions, such as those involving failure-to-warn claims, 'threaten FDA's statutorily prescribed role as the expert Federal agency responsible for evaluating and regulating drugs,'" *see Levine*, 555 U.S. at 575-76; and that "the evolution of state tort law will cause the development of standards that would be at odds with the agency's regulations," *see id.* at 578. To advocate for the reversal of its historical position, FDA adopted an amicus strategy, notably filing four separate amicus briefs in antidepressant/suicide cases.

-23-

Remarkably, FDA also advocated this view through a last-minute amendment to a preamble to pending drug labeling regulations – after the period for notice and comment had closed[11] – to declare that FDA approval establishes "both a 'floor' and a 'ceiling,'" so that "FDA approval of labeling . . . preempts conflicting or contrary State law."  71 Fed. Reg. 3922, 3934-35 (2006).

**C.**    *Wyeth v. Levine* **Restores the Historical View.**  The Supreme Court squarely rejected FDA's changed position in *Levine*.  The Court gave no deference either to the preamble or to FDA's amicus brief, 555 U.S. at 577, 580 n. 13, concluding that **"the FDA's recently adopted position that state tort suits interfere with its statutory mandate is entitled to no weight**," *id*. at 581 (boldface added).   Confirming the intent of Congress and the historical understanding of FDA, the Court observed that evolution of drug labels is both necessary and inevitable because "risk information accumulates over time and [] the same data may take on a different meaning in light of subsequent developments."  *Id.* at 569.  Furthermore, drug companies -- not FDA -- have the duty to insure that drug labels remain current as the drug performs in the market and as knowledge about the drug accumulates.  *Id.* at 570-71.  And perhaps most importantly, the Court confirmed that "through many amendments to the FDCA

---

[11]   During the six years the proposed regulation was pending, including the entire period for notice and comment, the regulation expressly provided that the "proposed rule does not preempt State law."  65 Fed. Reg. 81,082, 81,103 (2000).

and to FDA regulations, it has remained a *central premise* of federal drug regulation that the manufacturer bears responsibility for the content of its label *at all times*." *Id.* at 570-71 (italics added).

Significantly because of brand-name drug companies' unilateral power and duty to add or strengthen warnings pursuant to 21 C.F.R. § 314.70(c)(6)(iii)(A), the Court in *Levine* held that FDA approval of a drug label does not preempt a failure-to-warn claim under state law except in one very narrow circumstance: where the drug company can prove by "clear evidence" that FDA would have rejected a warning added *by the drug company*. 555 U.S. at 571. *See also PLIVA, Inc. v. Mensing*, 131 S.Ct. 2567, 2581 n. 8 (2011) ("Wyeth could have attempted to show, by "clear evidence," that FDA would have rescinded any change in the label). This narrow exception precludes a preemption defense in all but the most extraordinary cases. Following *Levine*, FDA's campaign to advocate for preemption was thoroughly discredited, and FDA withdrew the amicus briefs it had filed in the two antidepressant/suicide cases that were still pending. JA 2504 – 2510.

**D.    Forest Merely Rehashes the Same Arguments the Supreme Court Rejected.**  Undeterred, Forest advocates for preemption based on the same sources the Supreme Court rejected in *Levine*.  Forest relies expressly on the preamble and on FDA's discredited amicus campaign.  Forest Br. at 7, 10, 18; JA 762ff, 988ff,

1128ff.  Forest then attempts to emasculate the CBE regulation by relying on superseded federal regulations.  First, Forest quotes from a *proposed* change to the CBE regulation, implying that it can be used only with respect to information not previously considered by FDA.  *See* Forest Br. at 10; JA 934ff; 73 Fed. Reg. 2848, 2851 (2008).  In the *final* version of the regulation, however, FDA explained that "newly acquired information" justifying an added warning under the CBE regulation includes "new analyses of previously submitted data."  Thus, "[i]f a sponsor submits information to FDA, then later conducts a new analysis that demonstrates that labeling should be revised to account for that information, a CBE would be appropriate."  73 Fed. Reg. 49,603, 49,607 (Aug. 22 2008).  Indeed, both warnings of an increased risk of suicide added by antidepressant manufacturers using the CBE regulation, *see* pages 6-7, as well as FDA-mandated label changes beginning in 2004, were based on a reanalysis of previously-submitted data.  JA 2347, 2374; *see also* JA 2494.

Forest perpetuates the error by citing the current version of 21 C.F.R. § 201.57 to imply that there must be proof of a *causal* association to justify use of the CBE regulation.  Forest Br. at 10.  But this provision did not exist in 2004.  It was added in 2006.  *See* 71 Fed. Reg. 3922, 3990 (2006).  Furthermore, it expressly applies only "to prescription drug products described in § 201.56(b)(1)."  21 C.F.R. § 201.57.  These are "newer" drugs, and the provision Forest cites has

-26-

never applied to Lexapro. *See* 21 C.F.R. § 201.56(b)(1). *See also* 71 Fed. Reg. 3922 at 3923 ("The agency proposed that older approved drug products would not be subject to these proposed changes. These older products would, instead, be subject to the labeling requirements at proposed § 201.80. The agency proposed to redesignate then-current § 201.57 as § 201.80 to describe labeling requirements for older drugs and add new § 201.57 to describe labeling requirements for new and recently approved drugs."). The standard relevant to Lexapro in 2004 is the one that appeared in 21 C.F.R. § 201.57(e) at that time: "a causal relationship need not have been proved."

Finally, Forest has recruited one of the advocates of FDA's discredited campaign for preemption to be its standard bearer. *E.g.,* Forest Br. at 18. Dr. Thomas Laughren, who worked for FDA for 29 years, holds exactly the views that the Supreme Court rejected, and believes that federal regulation and state tort law do not complement one another, but conflict. *Compare* JA 2256-57 *with Levine*, 555 U.S. at 575-78. He has pursued his agenda with a vengeance, even though he is no longer authorized to speak for FDA. JA 2240-41. Within two months of retiring from FDA, he had formed a business to provide consulting services to the same entities he had regulated for the previous 29 years. JA 2249. Although he served as an expert witness for Forest (hired by Forest's law firm in this case) in a previous antidepressant/suicide case, JA 2249-50, he purported to appear for his

deposition in this litigation as a "fact witness." JA 2238. Nonetheless, he spent 12 hours with Forest's counsel prior to his deposition, in addition to his other preparation, JA 2210, 2231, then appeared for deposition, all the while being paid $500/hour by Forest for his "fact" testimony. JA 2232, 2250. Dr. Laughren's biased opinions cannot constitute "clear evidence."

**E.      FDA Would Not Have Rejected An Appropriate Warning Prior to May 31, 2004.** As discussed above, *Levine* eliminated preemption as a defense in all but the most extraordinary prescription drug cases. But the case for preemption in antidepressant/suicide cases is even more tenuous than in other prescription drug cases. The typical drug case involves evaluation of a hypothetical: what would FDA have done in response to a warning that was never actually added?[12] In antidepressant/suicide cases, however, the Court need not rely solely on a hypothetical, but can look to two warnings of an increased risk of suicide *actually* added by antidepressant manufacturers using the CBE regulation. *See supra* at 6-7. FDA rejected neither added warning. FDA's failure to reject the two warnings of the same risk, actually added by manufacturers of the same class of drugs,

---

[12]   Analyzing preemption based on a hypothetical puts the analysis in tension with long-standing Supreme Court precedent. "The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of" state law. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982). Hypothesizing scenarios that might result in a conflict "ignore[s] the teaching of this Court's decisions which enjoin seeking out conflicts between state and federal regulation when none clearly exists." *Id.* at 664.

renders it practically impossible to provide any credible evidence, much less "clear evidence," that FDA would have reacted differently if the situation had arisen a third time. *See Dorsett v. Sandoz, Inc.*, 699 F. Supp. 2d 1142, 1159 (C. D. Cal. 2010) ("A mere possibility that the FDA might not have allowed an enhanced suicidality warning for Prozac, despite allowing it for Effexor and Paxil, is not enough to warrant preemption.").

The strength of the regulatory record has produced an overwhelming rejection of preemption arguments in these cases, under the "clear evidence" standard articulated in *Levine*. *See Mason v. SmithKline Beecham Corp.*, 596 F.3d 387 (7th Cir. 2010); *Colacicco v. Apotex Inc.*, No. 06-3107 (3d Cir. Apr. 28, 2009) (order vacating judgment and remanding to district courts), JA 2545 – 47; *Bennett v. Forest Labs, Inc.*, ___ F. Supp. 2d ___, 2015 WL 1418444 (M.D. Fla. 2015); *Muzichuck v. Forest Labs, Inc.*, 2015 WL 235226 at *6 (N.D. W.V. 2015) (unpublished opinion) ("Indeed, it is hard to see how preemption continues to play any role in this case."); *Koho v. Forest Labs., Inc.*, No. C05-0667RSL, 2014 WL 1744267 (W.D. Wash. Apr. 30, 2014); *Dorsett, supra.*; *Aaron v. Wyeth*, 2010 WL 653984 (W.D. Pa. 2010) (unpublished opinion); *Baumgardner v. Wyeth Pharms.*, 2010 WL 3431671 (E. D. Pa. Aug. 31, 2010) (unpublished opinion); *Forst v. SmithKline Beecham Corp.*, 639 F. Supp. 2d 948 (E.D. Wis. 2009). In the only case to the contrary, a district court in Oklahoma found preemption despite its

candid acknowledgment that "other courts applying the *Levine* clear evidence standard in the context of SSRI label warnings have universally rejected the manufacturers" evidence as insufficient." *Dobbs v. Wyeth Pharms*, 797 F.Supp. 2d 1264, 1277 (W.D. Okla. 2011), *appeal dismissed per settlement stipulation*. Appellant asserts that *Dobbs* stands alone because it is simply wrong.[13]

Finally, the argument for preemption in this case is even weaker than in the usual antidepressant/suicide case. Four months before Francis Krivicich killed himself, FDA explicitly advised Forest that the existing warning was inadequate: "we believe that labeling changes are warranted in order to caution practitioners and patients about the need for close observation of patients being treated with antidepressants for clinical worsening, for the emergence of suicidality, and for the emergence of a variety of other symptoms that may represent a precursor to suicidality." JA 1913. Three days later, FDA issued a Public Health Advisory, requiring warnings of the risk. JA 2733-34. FDA's actions are entirely consistent

---

[13] With due respect to the district court in *Dobbs*, its opinion is riddled with factual errors and misunderstandings. These led the court to the erroneous conclusion that FDA's request that all antidepressants carry a uniform warning in a class-wide portion of the label, beginning in 2004, retroactively absolved all individual antidepressant manufacturers of their failure to give any warning at all in prior years. *Compare id.* at 1271 ("the FDA has consistently reviewed warning labels for SSRIs collectively") *with Levine*, 555 U.S. at 570-71 ("the manufacturer bears responsibility for the content of its label at all times"). Terry Dobbs died in December 2002, 797 F.Supp.2d at 1267, almost two years before FDA first requested a class-wide warning of increased suicidal thoughts and behaviors. The case was appealed to the Tenth Circuit, and settled after oral argument.

-30-

with the opinions of Dr. Michael Hamrell, Appellant's expert, whose former job at FDA involved focusing on the very safety issues that necessitate the need for warnings labels (or changes). *In Re Celexa and Lexapro Products Liab. Litig.*, MDL 1736, 2013 WL 791784, at * 4 (E.D. Mo. March 4, 2013) ("MDL Hamrell Ruling"). In the MDL, Judge Sippel found reliable and admissible Dr. Hamrell's opinion that there was a scientific basis for Forest to add a warning with respect to Lexapro, and that had Forest done so, "[i]n Dr. Hamrell's experience, the FDA would have allowed the change because it relies upon pharmaceutical companies to analyze safety data." MDL Hamrell Ruling at * 5-6. Judge Sippel found that "Dr. Hamrell's testimony is properly grounded and well-reasoned, and he reached his conclusions looking at the same type of data and using the same methods he used while at the FDA. . . ." *Id*. Judge Sippel's finding in this regard forecloses the possibility of "clear evidence" under *Levine*. If Dr. Hamrell's opinion on the exact question upon which the preemption analysis turns is reliable and admissible, the contrary proposition cannot be "clear."

Forest did not implement a warning of the risk until May 31, 2004. JA 1923. It could have done so months before, at a minimum, and there is no credible evidence, much less "clear evidence," that FDA would have rejected such a warning.

**F.     Federal Law Did Not Prohibit Reasonable Efforts to Communicate the Warning in the March 2004 Public Health Advisory.**   As discussed above, FDA's view of antidepressants and an increased risk of suicide began to change in 2003, culminating in its formal recognition of the increased risk, especially early in treatment, in March 2004.  The PHA was the first time FDA had required a warning of such a risk for the entire class of antidepressants. With this formal recognition that Lexapro's long-standing label did not adequately warn prescribing physicians of the actual risks, Virginia law required Forest to take reasonable steps to communicate the new warning.  *See Funkhouser v. Ford Motor Co.*, 285 Va. 272, 281, 736 S.E.2d 309, 313 (2013) (failure to warn claim under Virginia law encompasses failure "to exercise reasonable care to inform . . . of its dangerous condition or of the facts which make it likely to be dangerous"). Certainly, federal law did not preclude reasonable steps to communicate the very warning FDA had required.  Thus, there is no conflict at all between federal and state law.

The March 2004 PHA significantly strengthened the warning of an increased risk of suicide beyond anything that had previously existed.  JA 2333, 2335, 2364. Surely such a change called for serious efforts to communicate the new warnings. This was especially true between March and November 2004 because the new

-32-

warning "was printed in the 2005 PDR, but the 2005 PDR would not have been available to doctors until sometime in November 2004." JA 622.

Forest could have sent the Public Health Advisory directly to prescribing doctors using a "Dear Doctor" letter. JA 2340. It could have linked the Advisory, or at least highlighted the new warning, on its website. And even Dr. Laughren agreed that it would be a "reasonable approach" for drug companies to instruct their sales representatives, who make regular marketing calls to prescribing physicians, to communicate the significantly stronger warning to the prescribers. JA 2341. Rather than using these established channels to communicate the new warning, however, Forest did exactly the opposite.[14]

Patricia Grimm, Forest's sales representative, marketed Lexapro to Dr. Andres for almost two years, from September 6, 2002 through June 24, 2004. JA 2466-67. As a sales representative, her job was to "encourage physicians to prescribe Lexapro," and she was paid commissions, so that she "ma[d]e more money if [she] sold more Lexapro." JA 2443, 2449. Her job was to educate doctors as to both the benefits and the risks of Lexapro, JA 2457, and she was instructed to leave efficacy studies with doctors. JA 2483. In stark contrast,

---

[14]  Although Forest did not send out a "Dear Doctor" letter regarding the new warning, it did apparently draft a letter containing much of the substance of the warnings in the March 2004 Public Health Advisory. JA 2664-65. It appears that this letter was drafted shortly after March 2004. JA 2648, 2658, 2660. For some reason, Forest "embargoed" this letter on August 3, 2004, and it was never sent to physicians or to consumers. JA 2649.

however, Forest instructed Ms. Grimm "not to proactively discuss side effects" with doctors, and she recalls leaving no safety studies. JA 2455, 2483. Forest did not update her on Lexapro's prescribing information after 2002, JA 2475, and the most serious side-effect of which she was aware was "dry mouth." JA 2457. Specifically, she did not know that Lexapro might pose an increased risk of suicidal thoughts. JA 2458-59. Forest did not instruct her to convey the risks contained in the March 2004 PHA to doctors, JA 2473, and she did not see this Advisory, or learn about the risks it contained, during her entire time at Forest. JA 2459, 2468-70, 2473. If she had been made aware of these risks, she would have warned the doctors to whom she marketed Lexapro. JA 2461, 2474.

Forest attempts to meet its "clear evidence" standard by implying that its sales representatives left samples of Lexapro containing the added warning at prescribers' offices. *See* Forest Br. at 33-35, 53-54. Its record cites are to hearsay, self-serving documents - not to sworn testimony by people with personal knowledge. Even so, Forest does not suggest that federal law would preclude additional measures to communicate the warning, effectively conceding preemption on this basis. Furthermore, neither Dr. Andres nor Dr. Doyle had any recollection of seeing the added warning prior to Francis Krivicich's death. JA 2758, 2904; *see also* JA 2751-56. Especially in light of Ms. Grimm's testimony, the only possible effect of this evidence is to raise a question of fact on whether

Forest had adequately warned the physicians. It is no evidence, much less "clear evidence," of federal preemption.

## IV. JUDGE SIPPEL DID NOT ABUSE HIS *DAUBERT* DISCRETION.

Finally, Forest challenges Judge Sippel's rulings denying *Daubert* challenges to both Dr. Healy, a neuro-psychopharmacologist who opines on general causation and warning inadequacies, and Michael Hamrell, Ph.D., a former FDA official who opines regarding warnings and regulatory issues in this case. It is axiomatic that a district judge's decision denying a *Daubert* challenge is reviewed for abuse of discretion[15] focusing on the four *Daubert* criteria in a "flexible" approach that begins with a realization that "Rule 702 was intended to liberalize the introduction of relevant expert evidence." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).[16] *See also Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1384 (4th Cir. 1995), which was this Court's first post-

---

[15] *General Electric Co. v. Joiner*, 522 U.S. 136 (1997).

[16] Although the focus of this appeal is Dr. Healy's general causation opinion, *Westberry* is also important from a specific causation standpoint. It vets the "differential diagnosis" methodology used by Healy in his specific causation opinion in this case and it is ample authority to deny the separate *Daubert* motion filed by Forest, and not ruled upon, by the court below. *Westberry* explains that there are at least two ways to effectively conduct a differential diagnosis. After determining the possible causes of a patient's symptoms, an expert can then *either* eliminate "each of these potential causes until reaching one that cannot be ruled out" *or* the expert can "determin[e] which of those [potential causes] cannot be excluded [as] the most likely." *Id.* at 262. *Accord Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 202 (4th Cir. 2001).

-35-

*Daubert* opinion on Rule 702 and which affirmed the admissibility of medical

causation testimony in a drug side effect case in light of the *Daubert* criteria.[17]

This is, of course, fully consistent with the views of how to harmonize

"Law" and "Science" as set forth in the 2011 Federal REFERENCE MANUAL ON

SCIENTIFIC EVIDENCE: THIRD EDITION. As Justice Breyer recognized in his

Introduction, if a court adopts arguments that are too narrow and precise for the

very scientific orthodoxy that was rejected by the Supreme Court in *Daubert*, and

if that results in a discretionary, exclusionary, dispositive ruling, it may wreak

havoc with the entire system:

> A decision wrongfully denying compensation in a toxic
> substance case, for example, cannot only deprive the
> plaintiff of warranted compensation but also discourage
> other similarly situated individuals from even trying to
> obtain compensation and encourage the continued use of
> a dangerous substance. *Id*. at 4.[18]

Judge Sippel's exhaustive opinions demonstrate a careful and prudent use of

judicial discretion with respect to both Dr. Healy and Dr. Hamrell. *In re Celexa &*

---

[17] Although it is recommended to use this matrix for analysis, it is not essential to
review all four factors. *Maryland Cas. Co. v. Therm-O-Disc, Inc*., 137 F.3d 780,
785n.29 (4th Cir. 1998).

[18] Justice Breyer also reminds us all that the exercise of judicial discretion in the
*Daubert* context must be made with a keen Article III sensitivity to the "basic
human liberties . . . guaranteed by our Constitution's Seventh Amended . . . the
right to a trial by jury." *Id*. at 5. He adds, "Any effort to bring better science into
the courtroom must respect the jury's constitutionally specified role – even if doing
so means that, from a scientific perspective, an incorrect result is sometimes
produced." *Id*.

*Lexapro Products Liab. Litig.*, 927 F. Supp. 2d 758, 768 (E.D. Mo. 2013); *In re Celexa & Lexapro Products Liab. Litig.*, MDL 1736, 2013 WL 791784 (E.D. Mo. Mar. 4, 2013).

In light of the thorough nature of these opinions, Appellant will attempt to keep this Reply *Brief* reasonably "brief."

**A.    Dr. Healy's Opinions Were Properly Admitted.**  In the four pages of its brief challenging Judge Sippel's *Daubert* opinion regarding Dr. Healy, Forest does not cite a single opinion from this Court.  Not one.  Not *Westberry, supra*. Not *Benedi, supra*. Rather, Forest cites district court opinions involving different experts and different drugs, from different jurisdictions.  Appellant will analyze the issue within the framework of the appellate record and the *Daubert* jurisprudence from the Supreme Court and from this Court.

Analyzing the issue in terms of the four *Daubert* criteria, the Court would not reverse even under a *de novo* standard of review.  *Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1384 (4th Cir. 1995); *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

The first criterion is "general acceptance."  Dr. Healy's general causation opinion was "generally accepted" within the relevant scientific community long before 2004 when FDA actually mandated suicidality warnings for the SSRI drugs, and when Francis Krivicich took his own life.  Indeed, in June of 2002, two years

before these events, Judge Ambrose rejected Eli Lilly's similar challenge to Dr. Healy in a Prozac/suicide case. JA 7505-7508. The nexus between SSRI drugs, akathisia, and suicidality was also published in the "generally accepted" DSM-IV-TR, § 333.99, long before the inclusion of that "biologically plausible" pathway in FDA's March 2004 Public Health Advisory. But there can be no question that this Advisory represents "general acceptance" by FDA itself that there is a clear association between SSRI drugs like Lexapro and both suicidality and its incipient, precursor conditions like akathisia, especially early in treatment. Or, to put it in the language that Judge Sippel used, from FDA's own actions "[i]t could be argued, then, that Dr. Healy actually got it right in the *Miller* case and his opinions were ultimately validated by the FDA's own findings." *In re Celexa & Lexapro Products Liab. Litig.*, 927 F. Supp. 2d 758, 760 (E.D. Mo. 2013). This is generally accepted.

The second *Daubert* criterion is "peer review." Dr. Healy has published a multitude of peer-reviewed articles reflecting the very same views regarding the association between SSRI drugs like Lexapro and treatment emergent suicidality (and its precursor conditions) that he has espoused in this litigation. *E.g.,* JA 7488. He has also subjected his views to rigorous peer review via lectures and scientific meetings all across the world. And, finally, his opinions are corroborated by the peer-reviewed publications of numerous other distinguished scientists, as set forth

-38-

in Healy's report and deposition, discussed in the opinion of the court below, and acknowledged by Forest in its Answer. JA 533-34; 7354-58; JA 7345; JA 7488.

The third *Daubert* criterion is "rate of error." Dr. Healy's publications, and his opinions, have been set forth within the established scientific norms of 95% confidence intervals and .05 "p-values." And, even though "statistical significance" is not the *sine qua non*, *Matrixx Initiatives, Inc. v. Siracsano,* 131 S.Ct. 1309, 1319, 179 L.Ed.2d 398 (2011), Dr. Healy's opinions are well supported by ample "statistically significant" data. *E.g.,* JA 7345 (Juurlink study with statistically significant data of 4.8x risk of violent suicidality in early phase of SSRI treatment).

Finally, there is the question of whether an expert's hypothesis has been, or can be, tested. Healy addressed this *ad nauseam* in his report and deposition in the case. Obviously, no one can conduct a clinical trial to see if patients taking an SSRI drug kill themselves. Nonetheless, the association between SSRI drugs, akathisia, and suicidality was "tested" and established by Anthony Rothschild and his Harvard colleagues way back in 1991. JA 7108-7110.

With the singular exception of the *Miller* case, whose holding was significantly undermined by FDA's subsequent actions – as Judge Sippel properly recognized – every single court that has spent its time grappling with SSRI defense counsel's persistent challenge to Dr. David Healy's general and specific causation

opinions regarding SSRI-induced suicidality has rejected those challenges.[19]  But this tidal wave of judicial opinions has not stopped the challenges.  The most recent was Forest's challenge to Dr. Healy's *specific* causation opinions in *Ilich v. Forest*, Case 2:05-cv-00667-RSL (W.D. Washington).  On March 19, 2015, Judge Lasnik conducted an extensive evidentiary hearing, at which Dr. Healy testified live.  On March 31, 2015, he entered his Order denying Forest's motion.  It provides, in relevant part, as follows:

> "It is clear from Healy's report and the acceptance of his testimony in the MDL proceedings that he has scientifically-supported insight into the ability of SSRI antidepressants to cause depressed individuals to commit suicide."

Doc. 126 (Order Denying *Daubert* Motion, available at https://ecf.wawd.uscourts.gov/doc1/19716268448) at 10/12.[20]

---

[19]  Additionally, the inclusion of warnings about a potential role for SSRI drugs in suicide after the 2007 amendments to FDA statute and the 2006 amendment to 21 C.F.R. §§ 201.57 and  201.80 means that FDA itself has concluded that there is credible science supporting a "causative" relationship.  Although no court has yet addressed the issue, this should foreclose an attempt to exclude any general causation opinion from any expert regarding any side effect included in a post-2007 warnings section of the drug's label.

[20]  *See also Cross v. Forest Labs.*, 2015 WL 728511, at *4 (N.D. Miss. Feb. 19, 2015)(" There is ample evidence of an "established scientific connection" between exposure to SSRIs and suicide both in the general population, and specifically to elders, especially within the first few weeks of treatment.")(Footnotes omitted); *Bennett v. Forest Labs.*, 2015 WL 1579404, at *6 (M.D. Fla. Apr. 9, 2015)("[T]here is ample evidence of an established scientific connection between

-40-

The *Ilich* court relied on two Ninth Circuit cases one of which, *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003), relied extensively on this Court's opinion in *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).   On April 29, 2015, Judge Lasnik denied Forest's motion for reconsideration, premised on its contention that he had misread or misunderstood these two controlling Ninth Circuit cases, and, once again, found that "Healy's reliable opinions, which are grounded in scientific knowledge beyond that of the average layperson (and in the facts of the case), are relevant and will help the jury determine the issue of specific causation.   Thus, Healy's opinion testimony is admissible under Rule 702 and <u>Daubert</u>."    Doc. 132 (Order Denying Reconsideration, available at https://ecf.wawd.uscourts.gov/doc1/19716315168).

Appellant urges this Court to do the same.

**B.    Dr. Hamrell's Opinions Were Properly Admitted.**  As it did with respect to Dr. Healy, Forest ignores the controlling precedents from this Court in the few pages of its brief that it devotes to its challenge to the Hamrell ruling.  The only Fourth Circuit opinion it cites is the non-precedential, unreported opinion in *Peters-Martin v. Navistar Int'l Transp. Corp.*, 410 F. App'x 612, 613 (4th Cir. 2011).  This case discusses the limitations on adverse event reports ("AERs") and cites authorities from other jurisdictions in support of its principle argument that

consumption of Lexapro and suicide in the general population, especially within the first few weeks of treatment.").

Dr. Hamrell's opinions should have been excluded because of his reliance on AERs that put Forest on notice of a risk of SSRI-induced suicidality. However, such an argument is ill-founded both in law and in fact for a variety of reasons.

First, Forest completely ignores the teachings from *this Court's* opinion in *Benedi v. McNeil-P.P.C., Inc.,* 66 F.3d 1378, 1387 (4th Cir. 1995) that "the FDA and these cases merely state that case reports cannot serve as the basis for approving a drug; they do not say that these case reports do not give rise to a duty to warn." Thus, adverse event reports can give rise to a duty to warn. This is consistent with Dr. Hamrell's opinions.

Second, the Supreme Court emphasized in *Levine* that the drug company's duty in the post-marketing phase was not limited to clinical trial data, but included analyzing adverse event reports. 555 U.S. at 570 ("In later years, as amputations continued to occur, Wyeth could have analyzed the accumulating data and added a stronger warning about IV-push administration of the drug."). In fact, on September 16, 2006, six months after the Supreme Court's decision, FDA ordered that a BLACK BOX warning be added to the label of the drug at issue in *Levine.* The addition of this BLACK BOX warning was not based on clinical trial data, but on adverse event reports. JA 2511-2513. Thereby, *even if* all Dr. Hamrell did was to analyze adverse event reports related to Celexa and suicide, his methodology would be consistent with both *Levine* and FDA.

-42-

Compounding its error, Forest suggests that Dr. Hamrell arrived at his opinions by simply counting post-marketing adverse event reports. The record shows otherwise. While it is certainly true that Dr. Hamrell quantitatively considered AERs related to Celexa, Lexapro, other SSRI's, and suicidality, he equally relied upon clinical trial data and testimony from Forest's own company officials regarding adverse event reports. Specifically, Forest's own head of pharmacovigilence, whose "day job" is to monitor and analyze AERs, acknowledged that the very same data that Dr. Hamrell utilized in formulating his opinions in this case are a "useful tool" for recognizing safety problems with rare side effects like suicide. JA 2561; JA 7843-7849.[21] She also agreed that it is appropriate, as Dr. Hamrell did, to review all the available data from drugs in the same class to look for safety problems. JA 2560-2561.

An internal slide show prepared by Forest reveals that its argument is constructed purely for litigation. JA 7726-7785. Forest's head of pharmacovigilence specifically describes how in the "real world" Forest utilizes AERs to "mitigate risk" by initiating "labeling/labeling changes," "Dear Doctor letters," "communications," and even "withdrawal" as necessary, based on the

_____

[21]   In fact, Forest uses the very same AER data that it chides Dr. Hamrell for relying upon in its FDA compliance activities. Under FDA regulations, Forest is required to analyze and review post-marketing AER data for "signal detection/evaluation." Its own internal documents reflect the critical nature of this data and Forest's obligation to monitor and act upon the information contained therein. JA 7730, 7733, 7739-7742, 7753.

information that can be gleaned from this data.  To argue to this Court that AER data cannot support Dr. Hamrell's opinions about a safety signal vis-à-vis Celexa/Lexapro and suicidality is inconsistent with Forest's own internal documents.  *See also In re Viagra Products Liab. Litig.*, 658 F. Supp. 2d 950, 962 (D. Minn. 2009) (Finding AER data sufficiently reliable to deny motion to exclude.).

Even though Dr. Hamrell's experiences and credentials in FDA regulations and the pharmaceutical industry have not been contested, the weakness of its challenge to his methodology has led Forest to attack his experience while at FDA. Judge Sippel described Dr. Hamrell's qualifications as "impressive" and described them in detail.  *In re Celexa,* 2013 WL 791784, at *3-4.  Nevertheless, for the Court's convenience, Appellant will again provide them.  Dr. Hamrell earned a BS in Biochemistry from the University of California, Los Angeles in 1973 and a Ph.D. in Pharmacology[22] from the University of Southern California in 1977.  JA 6366-6369; 6390-6393.  Although not a medical doctor, he is by education and training both a pharmacologist and toxicologist.  JA 4138-4139.  He is also specifically qualified as a pharmacologist in evaluating class drug effects.  JA 4156.  As recognition of his regulatory expertise, Dr. Hamrell was awarded a

---

[22]  Pharmacology is a science discipline that combines medicine and biology in the study of drug action.

Regulatory Affairs Certification from the Regulatory Affairs Professional Society (RAPS)[23] in 1996 and was elected a RAPS fellow in 2009.  JA 6392.

During the course of the last 30 years, Dr. Hamrell has been involved with virtually "all aspects of product development in the pharmaceutical, biotech, and medical device industry."  JA  6366.  He has more than 25 years of experience in drug, biologic, and medical device regulatory affairs.  *Id.*  He is past Editor-in-Chief of the peer-reviewed Drug Information Journal (2005-2010) and on the Editorial Board of the Clinical Trial Magnifier (2009-), Clinical Trial Advisor (1999-), Applied Clinical Trials (1990-), Regulatory Affairs FOCUS (1990-2000),[24] and the Drug Information Journal (1995-2001).  JA 6393.  Additionally, he was the Editor-in-Chief for the DIA[25] Forum (2001-2004) and on the DIA Advisory Counsel for North America (2000-2007).  *Id.*

Dr. Hamrell started his career as an Assistant Professor of Pharmacology at McGill University in Montreal, Canada.  *Id.* at 3, 28.  From academia, he moved into the pharmaceutical industry as a Drug Registration Manager in 1982 with

---

[23]   "The Regulatory Affairs Professionals Society (RAPS) is the largest global organization of and for those involved with the regulation of healthcare and related products, including medical devices, pharmaceuticals, biologics and nutritional products."  *See* http://www.raps.org/.

[24]  This journal is the "flagship" publication for regulatory professionals around the world.  *See* http://www.raps.org/focus-online/about-regulatory-focus.aspx.

[25]  DIA is a neutral non-profit association for therapeutic innovation and regulatory science.  *See* http://www.diahome.org/Home/About-DIA.

Anaquest/BOC Group, a private company and was responsible for all of the company's regulatory affairs, to include:   drug registration activities for the International market and regulatory guidance for the company in registration and marketing.  *Id.*; JA 4158-4159.  He directed the preparation and submission of all regulatory applications for this company in more than 30 countries around the world.  JA 6367, 6392.

In 1985, Dr. Hamrell began work as a pharmacologist-reviewer in the Center for Drug Evaluation & Research at FDA.  JA 6366-6367, 6391.  During the five years he spent at FDA, Dr. Hamrell worked in both the Division of Bioequivalence (1985-1988) and the Division of Antiviral Drug Products (1988-1990).  *Id.*  At FDA his work focused on both generic drugs and drugs for serious and life threatening illnesses.  *Id.*  He was the primary reviewer for more than 50 Investigational New Drug Applications[26] and New Drug Applications.[27]  JA 6367-

---

[26]  The IND is the means by which a pharmaceutical company receives FDA approval to transport investigational drugs across state lines to clinical research facilities. It is generally the first step towards seeking FDA approval for marketing a new drug to the public. *See* http://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDeveloped andApproved/ApprovalApplications/InvestigationalNewDrugINDApplication/defa ult.htm.

[27]  "The NDA application is the vehicle through which drug sponsors formally propose that the FDA approve a new pharmaceutical for sale and marketing in the U.S." *See* http://www.fda.gov/Drugs/DevelopmentApprovalProcess/HowDrugsareDeveloped andApproved/ApprovalApplications/NewDrugApplicationNDA/default.htm.

6368, 6385.  He also reviewed more than 200 bioequivalence studies for major drug products.  *Id*.  This experience provided him broad knowledge of FDA regulatory requirements and expectations.  *Id*.  He further authored a major policy paper for FDA on bioequivalence that received peer-reviewed publication and industry wide dissemination as well as an authoritative Task Force Report on bioequivalence.  *Id*.

While at FDA, Dr. Hamrell's responsibilities included review of *all* safety data associated with any IND or NDA application.  JA 4136-4137.  He specifically reviewed the data submitted by the pharmaceutical companies for safety information as part of his primary pharmacology/toxicology role at FDA.  JA 4137.  It was additionally part of his responsibility to review supplemental submissions from pharmaceutical companies (after drug approval) whereby he would review adverse event reports.  JA 4138.  He was responsible for reviewing safety data received from pharmaceutical companies and raising any concerns from his review.  JA 4139; JA 4139-4140.

Further, as part of his role at FDA, Dr. Hamrell would have participated in safety reviews based on "signal" detection.  JA 4145.  And despite Forest's assertions, while at FDA, Dr. Hamrell had input on anything that was in the label as part of FDA review team and could make suggestions about label changes.  JA 4145-4146.

-47-

Additional responsibilities for Dr. Hamrell while at FDA included drafting comprehensive summaries of data he reviewed, JA 6391; meeting with industry/pharmaceutical companies and providing advice on submitted applications (*Id.*); preparation of guidance for pharmaceutical companies on drugs (*Id.*); and *monitoring of post-marketing drug safety data.*[28]

Dr. Hamrell left FDA in 1990 and joined the National Institute of Health as the Chief of the Regulatory Affairs Section for the Division of AIDS/NIAID. JA 6366; 6391. There, Dr. Hamrell was responsible for all regulatory and compliance activities for a network of multi-center groups conducting clinical drug trials for AIDS treatment. *Id.* He managed a staff in the submission of more than 50 active INDs each year while at NIH as well as coordinated all regulatory aspects for four multi-center trials including drugs and biologics being carried out at approximately 200 different worldwide clinical sites. *Id.* Further, while at NIH, Dr. Hamrell liaisoned with the pharmaceutical industry and provided information to NIH staff on regulatory issues concerning clinical trials. *Id.*

---

[28] Dr. Hamrell's opinions in this case are built on this exact type of date. JA 4138.

Dr. Hamrell's use of FDA's AERS[29] database is not limited to litigation. Since leaving FDA and NIH, he has both analyzed and used this database with respect to safety related discussions with his clients in private industry. JA 4094.

In addition to Dr. Hamrell's extensive, detailed, and relevant regulatory experience outlined above, he has also published extensively, including *peer-reviewed* literature regarding *prescription drug labeling*. JA 6366-6367; 6394-6399. For example, Hamrell, MR, *Current Regulations and Practices for Adverse Event Reporting: Implications for Labeling*, Drug Information Journal,[30] Vol. 34, pp. 975-980, 2000 (Exhibit 5), has a section entitled "Labeling Requirements for New Drugs." JA 6495-6496. Dr. Hamrell discusses in this peer-reviewed publication how drug manufactures may make changes to their labels in order to comply with federal regulations as well as how to disseminate safety information via "Dear Healthcare Professional" letters. *Id.* These are the same regulations and opinions he offers in this case. JA 6369.

---

[29]    AERS is FDA's Adverse Event Reporting System. *See* http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Surveillance/AdverseDrugEffects/default.htm. It " is a database that contains information on adverse event and medication error reports submitted to FDA. The database is designed to support the FDA's post-marketing safety surveillance program for drug and therapeutic biologic products." *Id.* The FDA holds it to be "a useful tool" for "looking for new safety concerns that might be related to a marketed product" and one that may prompt "regulatory action" to include "updating a product's labeling information" and "communicating new safety information to the public." *Id.*

[30]  Drug Information Journal is a peer-reviewed publication. JA 4164.

Rule 702 "only requires that an expert possess 'knowledge, skill, experience, training, or education' sufficient to 'assist' the trier of fact, which is 'satisfied where expert testimony advances the trier of fact's understanding to any degree.'" By any fair measure, Dr. Hamrell has demonstrated these attributes with respect to regulatory affairs and drug labeling.

With the above background in mind, it is difficult to comprehend how Forest can suggest to this Court that Dr. Hamrell had no responsibilities with respect to safety issues or the utilization of AER data while at FDA. Dr. Hamrell specifically addressed this in his deposition:

> Q:  Okay. And you're not being asked to give your thoughts and opinions -- it wasn't your responsibility regarding safety issues -- that had anything other to do than pharmacology and toxicology. Is that fair?
>
> A:  That's not true.
>
> Q:  Okay. Explain that to me.
>
> A:  Well, any new drug application or IND is reviewed by a team of experts within FDA. And if anybody on the team had any opinions or any concerns about data, you know, certainly part -- as part of the team you were expected to discuss that with the rest of the team. So I did look at safety data -- at safety information contained in different submissions that were received from the companies.

JA 4139. While at FDA, Dr. Hamrell was responsible for reviewing all safety data and to raise safety concerns stemming from AER signals with the entire review team. Included in this responsibility was to make suggestions regarding label

changes based on the data. JA 4145-4146. To say he has "no knowledge" or experience regarding how FDA uses this type of data is simply wrong.

Forest also provides incomplete information to the Court with respect to the data on which Dr. Hamrell relied upon in reaching his conclusions in this case. While it is true that Lexapro was not approved until after June 2001, Dr. Hamrell reviewed *all* class data that was available to Forest prior to that date.[31] This is the same methodology that Forest's head of pharmacovigilence utilizes when searching for safety signals. JA 2560-2561. And it was not a simple matter of counting. Dr. Hamrell considered not only the AER data, but also the general causation report from Dr. Healy (compiling the peer-reviewed literature that predated June 2001 describing a risk of SSRI-induced-suicide), the "challenge-dechallenge" evidence found in these reports, and his extensive experience in the pharmaceutical industry. JA 2549. The fact of the matter is that once FDA comprehensively reviewed the data, it required Forest and its sister antidepressants to add an extensive warning regarding antidepressant-induced suicide. Arguments that Dr. Hamrell used "post-dated" data ignore the industry standard of aggregating all available data as well as the class effects of these drugs. His opinion was clear: "Therefore, no later than June 30, 2001, Forest possessed sufficient data that they

---

[31]  Indeed, FDA also treats Lexapro as a member of the SSRI class of drugs with respect to warnings.

were required to enhance the label and provide a warning concerning the drugs and suicidality."  https://ecf.wawd.uscourts.gov/doc1/19716315168 108 ¶ 2, 622.

Moreover, Forest also ignores the evidence that Lexapro has the greatest risk of increased suicidality in adults of all the antidepressants FDA considered in 2006.  JA 2609.  When one also considers post-marketing adverse event data – as drug manufacturers must, *see* 21 C.F.R. § 314.80(b); as the Supreme Court did in *Levine, see* 555 U.S. at 570; as FDA did following *Levine,* JA 2511; and as Dr. Hamrell did in his report, *see* JA 2560-2562, Forest's argument for exclusion collapses entirely.  Nothing in the regulations requires that an added warning be based on clinical trial data, and any such requirement would contravene the requirement that a label "shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved."  21 C.F.R. § 201.57(e) (1999) (recodified as 21 C.F.R. § 201.80(e)(2006)).  This is entirely consistent with Dr. Hamrell's opinions in this case.

Finally, Forest suggests that Dr. Hamrell's opinions concluded with the idea that *Forest* should have added a **BLACK BOX** warning to its labeling and a Patient Medication Guide.  Not true.  Dr. Hamrell specifically writes that a Boxed warning "would have been appropriate." He does not claim that Forest could have added it without FDA approval.  But he does assert that Forest should have been more

aggressive in examining the suicide risk before June 2001 given the data available to it.   JA 2564-2566.   If it had taken adequate steps to find the true risk, Dr. Hamrell opines that Forest, unilaterally and without prior FDA approval, could have added an appropriate warning, separate and apart from a boxed warning or a patient medication guide, using the CBE regulation.   This is consistent with FDA regulations and with *Levine*.

Judge Sippel did not "blindly accept" Dr. Hamrell's report.  He reviewed *all* the underlying evidence that Dr. Hamrell reviewed and considered, including Rule 30(b)(6) testimony from the head of the pharmacovigilence, which concurred with Dr. Hamrell's methodology.   Because his methodology was consistent with his private industry consulting practices, and indeed consistent with how Forest itself manages AER data outside litigation, Dr. Hamrell's opinions are methodologically sound and reliable.   As a result, this Court should deny Forest's challenge to Dr. Hamrell.

**C.    "Vigorous Cross-Examination" is the Preferred Method to Challenge Expert Testimony.**   In *United States v. Moreland,* 437 F.3d 424, 431 (4th Cir. 2006) this Court echoed the Supreme Court's admonition that "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof'" are the normal and preferred methods for challenging expert testimony.   *Id*. quoting *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993). Forest's able counsel is more than adequately prepared to cross-examine both Drs. Healy and Hamrell.

Dated this 13th day of May, 2015.

Respectfully submitted,

**THE VICKERY LAW FIRM**

*/s/ Arnold Anderson Vickery*
Arnold Anderson Vickery
Texas Bar No. 20571800
Email: andy@justiceseekers.com
Fred H. Shepherd
Texas Bar No. 24033056
Email: fred@justiceseekers.com
10000 Memorial Dr., Suite 750
Houston, TX 77024-3485
Telephone: 713-526-1100
Facsimile: 713-523-5939
*Lead Counsel for Plaintiff-Appellant*

Earl Landers Vickery
Texas Bar No. 20571900
Email: lanny@justiceseekers.com
3007 Dancy
Austin, TX 78722
Telephone: 512-435-6666
Facsimile: 512-435-6669
*Counsel for Plaintiff-Appellant*

Paul R. Thomson, III
VSB 38765
Email: <u>paul@roanokeinjurylawyer.com</u>
THE THOMSON LAW FIRM, PLLC
2721 Brambleton Avenue, SW
Roanoke, VA 24015
Telephone: 540-777-4900
Facsimile: 540-772-0578
*Local Counsel for Plaintiff-Appellant*

## **Certificate of Compliance with Rule 32(a)**

This reply brief complies with the type-volume limitation of FED. R. APP. P. 28.1(e)(2) or 32(a)(7)(B) because it contains 12,878 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

This reply brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this reply brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 pt. font.

*/s/ Arnold Anderson Vickery*                  May 13, 2015
Arnold Anderson Vickery                       Date

## <u>Certificate of Filing and Service</u>

I certify that on May 13, 2015, the Response and Reply Brief of Appellant/Cross-Appellee Kathleen Higgins was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

> Joseph P. Thomas, Esq.
> John R. Ipsaro, Esq.
> Christopher J. Mulvaney, Esq.
> ULMER & BERNE, LLP
> 600 Vine St., Suite 2800
> Cincinnati, OH  45202-2409
> *Counsel for Defendant-Appellee*

<u>*/s/ Arnold Anderson Vickery*</u>              <u>May 13, 2015</u>
Arnold Anderson Vickery                    Date