Case Nos:  14-2040, 14-2133

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

**KATHLEEN HIGGINS,**
**Plaintiff-Appellant/Cross-Appellee,**

**v.**

**FOREST LABORATORIES, INC.,**
**Defendant-Appellee/Cross-Appellant.**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT HARRISONBURG
CASE NOS: 5:07-CV-00054-MFU-JGW
5:06-MDL1736

## REPLY BRIEF OF FOREST LABORATORIES, LLC
## APPELLEE/CROSS-APPELLANT

LINDA E. MAICHL
JOSEPH P. THOMAS
ULMER & BERNE LLP
600 VINE STREET, SUITE 2800
CINCINNATI, OHIO 45202
TEL:  (513) 698-5000
FAX:  (513) 698-5001

ATTORNEYS FOR FOREST LABORATORIES, LLC

# TABLE OF CONTENTS

INTRODUCTION ..............................................................................1

ARGUMENT ....................................................................................3

    A.    DR. HEALY'S OPINIONS ARE NOT RELIABLE .........................3

    B.    DR. HAMRELL'S OPINIONS ARE NOT RELIABLE ...................15

CONCLUSION ................................................................................20

CERTIFICATE OF COMPLIANCE .................................................21

# TABLE OF AUTHORITIES

## Cases

*Abarca v. Franklin Cnty. Water Dist.*,
   761 F. Supp. 2d 1007 (E.D. Cal. 2011) ...............................................................17

*Allen v. Pennsylvania Eng'g Corp.*,
   102 F.3d 194 (5th Cir. 1996) ...................................................................................7

*Benedi v. McNeil-P.P.C., Inc.*,
   66 F.3d 1378 (4th Cir. 1995) .................................................................................20

*Daubert v. Merrell Dow Pharms., Inc.,*
   509 U.S. 579 (1993) .................................................................................................7

*Dunn v. Sandoz Pharms. Corp.*,
   275 F. Supp. 2d 672 (M.D.N.C. 2003) ...................................................................7

*In re Rezulin Products Liab. Litig.*,
   369 F. Supp. 2d 398 (S.D.N.Y. 2005) ...................................................................17

*Meade v. Parsley,*
   2010 WL 4909435 (S.D.W.V. 2010) ...................................................................7, 8

*Norris v Baxter Healthcare Corp.*,
   397 F.3d 878 (10th Cir. 2005) ..............................................................................17

*Rimbert v. Eli Lilly & Co.*,
   No. 1:06-cv-00874, 2009 WL 2208570 (D. New Mex. 2009),
   *aff'd* 647 F.3d 1047 (10th Cir. 2011) ...................................................................17

*Siharath v. Sandoz Pharms. Corp.*,
   131 F. Supp. 2d 1347 (N.D. Ga. 2001) ...................................................................7

## Other Authorities

Juurlink, David N., M.D., Ph.D., et al.,
  "The Risk of Suicide with Selective Serotonin Reuptake Inhibitors in the
  Elderly," Am. J. Psychiatry, 163:5, May 2006....................................................12

Perlis, Ray H., M.D., et al.,
  "Treatment Associated Suicidal Ideation and Adverse Effects in Open,
  Multicenter Trial of Fluoxetine for Major Depressive Episodes,"
  Psychotherapy and Psychosomatics, 2007, 76:40-46..........................................11

Psychiatric News Update, Daily,
  May 19, 2013, Vol. 3, No. 21 ........................................................................ 16, 17

Reference Manual on Scientific Evidence (Third Edition) 2011 ...........................14

Rothschild, Anthony J., M.D., et al.,
  "Reexposure to Fluoxetine after Serious Suicide Attempts by Three Patients:
  The Role of Akathisia," J. Clin. Psychiatry, 52:12, Dec. 1991...........................15

Stone, Marc, M.D., et al.,
  "Risk of Suicidality in Clinical Trials of Antidepressants in Adults:  Analysis of
  Proprietary Data Submitted to US Food and Drug Administration,"
  BMJ, 2009 ........................................................................................................16

Teicher, Martin H., M.D., Ph.D., et al.,
  "Emergence of Intense Suicidal Preoccupation During Fluoxetine Treatment,"
  Am. J. Psychiatry, 147:2, Feb. 1990. ................................................................10

Teicher, Martin H., M.D., Ph.D., et al.,
  "Antidepressant Drugs and the Emergency of Suicidal Tendencies,"
  Drug Safety, 8(3):186-212, 1993........................................................................10

## INTRODUCTION

Plaintiff's response/reply brief is replete with irrelevant, often incorrect, and at times, obviously false dissertations that attempt to sidestep the issues before the Court. Under the rubric of addressing Forest Laboratories, LLC's issues on "cross-appeal," plaintiff includes a "fulsome" version of "facts" she describes as "critical" to the issues. (*See generally* Response and Reply Brief of Appellant/Cross-Appellee Kathleen Higgins ("Resp. Br.").) In doing so, she demonstrates a propensity for criticizing and maligning Forest that is not factually supportable. The intent apparently is to cast Forest in a bad light and hopefully prejudice the Court against it. And, as she did in the trial court, plaintiff again waffles on the theory of liability she espouses in the case, reverting once more to the early theory that Forest should have warned that Lexapro increases the risk of suicidality even though plaintiff's expert Dr. Hamrell admitted that the Lexapro label *without* any warning that Lexapro increases the risk of suicide is *adequate*. (*Id.*, p. 2; JA5756, JA5882, JA5998.)

Plaintiff's appeal involves the district court's order granting Forest's motion for summary judgment finding that the learned-intermediary doctrine bars her claims. In response to that issue, Forest explained that not only was the district court correct in granting Forest summary judgment motion based on the learned-intermediary doctrine, but also in the event plaintiff attempted to reinsert her

earliest theory of liability (i.e., that Forest should have warned that Lexapro increases the risk of suicidality), Forest is entitled to summary judgment because plaintiff's claim is preempted. Forest's preemption argument is not an issue on its cross appeal. Forest's cross appeal relates to the MDL Court's rulings on the reliability of the opinions of plaintiff's general causation and regulatory experts (Drs. Healy and Hamrell). As to those issues, plaintiff offers little to support her argument that the MDL Court did not abuse its discretion in ruling both experts passed *Daubert* muster.

For Dr. Healy, plaintiff devotes a little over 4 pages of her 53-page brief to her argument that his testimony was properly ruled reliable and 2 of those pages are used to discuss specific causation opinions he was retained to provide in other cases, which, of course, have no bearing on the issue presented in Forest's cross appeal. And for Dr. Hamrell, plaintiff devotes approximately 7 of the 12 pages she allotted to defend his opinions to a textual recitation of Dr. Hamrell's purported "experience and credentials" – neither of which bear on the reliability of his opinions and some of which is contradicted by Dr. Hamrell's testimony. In plaintiff's limited remaining discussion regarding her experts' opinions, she chides Forest for not citing to legal authority from this Court, but fails to offer support for her argument that her experts' opinions or the methodology they employed are reliable and, therefore, pass scrutiny under *Daubert*. When analyzed appropriately,

it is imminently apparent that neither expert's methodology nor his opinions are reliable, and the MDL Court's ruling to the contrary should be reversed.

## ARGUMENT

### A.    DR. HEALY'S OPINIONS ARE NOT RELIABLE

Plaintiff argues that Dr. Healy's opinions satisfy *Daubert's* criteria and were properly admitted.  (Resp. Br., pp. 37-41.)  First, plaintiff claims that Dr. Healy's general causation opinion "was 'generally accepted' within the relevant scientific community long before 2004 when FDA actually mandated suicidality warnings for the SSRI drugs, and when Francis Krivicich took his own life."[1]  (*Id.*, p. 37.) Plaintiff's citations in support of her "general acceptance" arguments, however, are to an article Dr. Healy wrote in 2006 and to FDA's 2004 Public Health Advisory. (*Id.*, p. 38.)  Neither supports plaintiff's contention of general acceptance.

Initially, it hardly can be disputed that an expert opinion cannot be supported as generally accepted by citing to that same expert's publications.   Second, numerous courts have held that FDA-mandated warnings are not substantive proof of causation and do not meet the standard for admissible evidence.  Third, FDA's extensive meta-analyses repudiate, rather than support, Dr. Healy's opinions.

---

[1]It is interesting that plaintiff contends the risk was "generally known" and "accepted" when it suits her purpose in arguing Dr. Healy's opinions are reliable, but merely a "controversy" when it comes to Mr. Krivicich's physicians' knowledge for purposes of applying the learned-intermediary doctrine.

In order to constitute scientific knowledge, evidence "must be derived by the scientific method … [and] supported by appropriate validation – *i.e.,* 'good grounds,'" *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590 (1993), and pointing to FDA-mandated warnings does not satisfy that standard. The decision in *Meade v. Parsley,* 2010 WL 4909435, *8 (S.D.W.V. 2010), demonstrates the point. There, the court rejected the plaintiffs' argument that Reglan labels and a black box warning added to the label in 2009 are evidence of causation, stating:

> Inasmuch as the risk-benefit balancing employed by the FDA differs from the threshold standard for establishing causation in tort actions, this court likewise concludes that the FDA-mandated tardive dyskinesia warning cannot establish general causation in this case.

*Id. See also Allen v. Pennsylvania Eng'g Corp*., 102 F.3d 194, 198 (5th Cir. 1996) ("[r]egulatory and advisory bodies ... utilize a 'weight of the evidence' method to assess the carcinogenicity of various substances in human beings .... The agencies' threshold of proof is reasonably lower than that appropriate in tort law"); *Siharath v. Sandoz Pharms. Corp*., 131 F. Supp. 2d 1347 (N.D. Ga. 2001) (holding FDA statements did not support the reliability of plaintiff's causation experts' testimony because of different standard used by FDA); *Dunn v. Sandoz Pharms. Corp*., 275 F. Supp. 2d 672, 684 (M.D.N.C. 2003) (holding that FDA determination was insufficient evidence of general causation; reasoning that "[t]he FDA is concerned with safety and risk benefit analysis ... The FDA balanced Parlodel's possible harm against its limited beneficial use. The FDA's balancing does not demonstrate that

4

Parlodel may cause stroke in postpartum women."). A "drug label, which merely warns of [the product's] potential side effects without explaining the scientific basis for the warning, is no substitute for expert testimony that establishes causation in terms of reasonable probability." *Meade*, 2010 WL 4909435 at *7. The same principles and conclusion apply here. Plaintiff cannot support her expert's general causation opinions with arguments about warning language mandated by FDA.

Moreover, contrary to plaintiff's and Judge Sippel's contention, Dr. Healy did not "get it right" and his opinions have not been validated by FDA – they have been repudiated.[2] As reflected in the labeling for SSRIs, FDA concluded no reasonable evidence exists of an association, much less evidence of causation, between SSRIs and an increased risk of suicide. (*See* JA7180.) To argue FDA's March 2004 Public Health Advisory (which states that "FDA has not concluded that these drugs cause worsening depression or suicidality") is evidence of "general acceptance" is specious.

---

[2] Again, it is interesting that plaintiff asserts FDA's 2004 Public Health Advisory constitutes "'general acceptance' by FDA itself that there is a clear association between SSRI drugs like Lexapro and [] suicidality ...," for purposes of arguing the reliability of Dr. Healy's opinions (Resp. Br., p. 38), but ignores the fact that when FDA wrote and approved Lexapro's label more than one year after the June 2001 date by which Dr. Hamrell opines Forest should have included certain language in Lexapro's label, FDA *did not* include Dr. Hamrell's language.

FDA conducted extensive meta-analyses of both pediatric and adult clinical trial data after its March 2004 Public Health Advisory and revised the label multiple times thereafter as its analysis evolved. (*See* JA1203-1341; JA4809-4818.) Both of FDA's meta-analyses lacked enough power to reach any conclusions about suicide in any population. As every SSRI label states: "No suicides occurred in any of the pediatric trials. There were suicides in the adult trials, but the number was not sufficient to reach any conclusion about drug effect on suicide." (JA7184.) Even as to suicidality (an expanded concept of suicidal thinking and behavior FDA created as part of its analysis), the black box warning reflects FDA's conclusion that short-term studies did NOT show an increased risk in adults beyond age 24, and there was a reduction in suicidality in adults aged 65 and older. (*Id.*) The fact that plaintiff focuses on FDA's March 2004 Public Health Advisory as evidence of "general acceptance," while ignoring the plain language of that Advisory and FDA's subsequent exhaustive analyses and its ultimate conclusions, establishes only that Dr. Healy's opinions lack general acceptance.

Citing four items in the joint appendix, plaintiff next argues that Dr. Healy's opinions have been peer-reviewed and corroborated by "numerous other distinguished scientists." (Resp. Br., p. 38.) The first cite is to Forest's answer in the case. Plaintiff claims that Forest acknowledged that two articles plaintiff cited

in her complaint are peer-reviewed publications that corroborate Dr. Healy's opinions. (JA533-534.) Not so. Forest merely acknowledged that the articles exist – because they do. (*Id.*) Forest specifically denied that plaintiff "set forth accurately or completely the conclusion[s] of the authors" – because she did not. (*Id.*)

The first article, a 1990 article by Teicher and Cole,[3] is a case report about six patients taking fluoxetine with different drug and mental health histories. The authors noted that "[t]he purpose of this report is to suggest the surprising possibility that fluoxetine may induce suicidal ideation in some patients." (JA2514.) The second article, also by Teicher and Cole,[4] like the first is very dated (1993). It is a review article that did not involve Lexapro. It is not original research and like the 1990 case report, it is rife with terms of hypothesis generation such as "may, "suggests," "appears," and "possible." The authors do not conclude that causation between any antidepressants and suicide has been medically or scientifically established. Instead, they state, for example: "[W]e are suggesting that, in some instances, the medication may interfere with normal neuropsychological processes .... We are particularly concerned with the

---

[3] Teicher, Martin H., M.D., Ph.D., et al., "Emergence of Intense Suicidal Preoccupation During Fluoxetine Treatment," Am. J. Psychiatry, 147:2, Feb. 1990. (JA2514.)

[4] Teicher, Martin H., M.D., Ph.D., et al., "Antidepressant Drugs and the Emergency of Suicidal Tendencies," Drug Safety, 8(3):186-212, 1993 ("Teicher 1993").

possibility that antidepressant drugs may redistribute suicide risk." (Teicher 1993, p. 207.) The authors conclude that "very sophisticated studies will need to be conducted to ascertain whether" antidepressants redistribute suicide risk.[5] (*Id*.) A case report and a review article from over 20 years ago, both of which admittedly are hypothesis-generating, are not evidence of general acceptance, especially in the face of the large body of subsequent epidemiology, including the FDA's own meta-analyses, repudiating the hypothesis.

Plaintiff's second cite is to an article by Perlis,[6] which again was limited to fluoxetine and examined suicidal ideation, as opposed to completed suicide. (JA7354.) Based on the absence of a placebo or active comparator group, the authors expressly state that it is "impossible to establish a specific association between fluoxetine and ... treatment emergent suicidal ideation – the observed events could also represent nonspecific (placebo-like) effects or simply natural fluctuation in depression itself." (JA7359.)

---

[5] The authors also note that "the overwhelming preponderance of data indicate that these drugs are relatively safe and of unquestionable value" and "these drugs quell depression and ease suicidal thoughts in the majority of recipients."

[6] Perlis, Ray H., M.D., et al., "Treatment Associated Suicidal Ideation and Adverse Effects in Open, Multicenter Trial of Fluoxetine for Major Depressive Episodes," Psychotherapy and Psychosomatics, 2007, 76:40-46. (JA7354.)

Plaintiff's third cite is to an article by Juurlink,[7] who reviewed prescription and death records in Canada from 1992 to 2000 for elderly persons taking antidepressants, and found that those taking SSRIs (no results were reported for Celexa, and Lexapro was not involved) committed suicide more often, within 30 days of initiating medication, than those taking non-SSRI antidepressants. (JA7345.) However, the article discloses, without discussion, that the persons taking SSRIs had an almost seven-fold greater prevalence of suicide attempt in the three years prior to starting SSRIs than those taking other antidepressants. (JA7347, table 2.) Juurlink also reports "the first month of treatment with SSRI antidepressants was not associated with a disproportionate increase in suicide among women." (JA7348.) In addition, the article relates to a population of people for whom FDA concluded the drug is protective against suicidality.

As far as the "violent means" observed for SSRI suicides, Juurlink notes "[t]hese drugs ... are safer in overdose than traditional antidepressants," (JA7345) meaning that the SSRI users lack that significant "non-violent" means of suicide (i.e., overdose). Those are but three features of the article that should give one pause in using it as exemplary of the large body of available SSRI research. Juurlink concludes that "individuals with depression must not be deterred from

---

[7] Juurlink, David N., M.D., Ph.D., et al., "The Risk of Suicide with Selective Serotonin Reuptake Inhibitors in the Elderly," Am. J. Psychiatry, 163:5, May 2006. (JA 7345.)

seeking treatment based upon our findings. (Citation omitted.) Indeed in patients with major depression, the hazards of undertreatment almost certainly outweigh the risks of therapy, which our study suggests are low and transient." (JA7351.) Fairly read, Juurlink is not "corroboration" of Dr. Healy's opinions.

The final cite (JA7488) is to the third page of an article by Dr. Healy and, as noted above, a party cannot support his or her expert's opinion by relying on the same expert's publications.

As the district court did in assessing Dr. Healy's opinions, plaintiff ignores the fact that the materials supposedly supporting those opinions are decades-old hypothesis generating articles that are unrelated to Celexa, Lexapro, or suicide, and expressly state they cannot be used to establish an association. Meanwhile, the epidemiology that shows there is no association between SSRIs generally or Lexapro specifically establish that Dr. Healy's opinions are not generally accepted and have not been corroborated by "numerous other distinguished scientists." The district court abused its discretion in ruling to the contrary.

Next, in discussing the "rate of error" criteria, plaintiff contends that "Dr. Healy's publications, and his opinions, have been set forth within the established scientific norms of 95% confidence intervals and .05 'p-values.'" (Resp. Br., p. 39.) That contention is pure fiction as evidenced by the lack of any citation. While plaintiff claims Dr. Healy's opinions are "ampl[y]" supported by

"statistically significant" data, she cites to only the Juurlink study, which even Dr. Healy did not cite in support of his opinions, and rightfully so. The Juurlink article does not corroborate Dr. Healy's opinion. It is an isolated article from a large body of literature and it does not conclude that Lexapro, or antidepressants in general, are ineffective or cause a significant percentage (i.e., Dr. Healy's ten percent "or higher") of users to become suicidal or commit suicide. (*See* JA7345.)

Furthermore, plaintiff's argument that *Daubert* criterion of "rate of error" is satisfied by Dr. Healy's purported use of conventional 95% confidence intervals and p-values below 0.05 fails to recognize that confidence intervals and p-values are means of assessing only one kind of error: random sampling error. The Reference Manual on Scientific Evidence (Third Edition) 2011, points out that the inferences that can be drawn from data turn on p-values and confidence intervals, as well as on study design, data quality, and the presence or absence of systematic errors, such as bias or confounding. Reference Manual, p. 240. Random errors are reflected in the size of p-values or the width of confidence intervals, but those measures of random sampling error ignore systematic errors such as confounding and study biases. *Id.*, p. 249 & n.96. Although the Reference Manual notes that assessing the role of chance in producing a particular set of sample data is "often viewed as essential when making inferences from data," the Manual never suggests that random sampling error is the only kind of error that must be assessed when

interpreting data. The *Daubert* criterion encompasses all varieties or error, not just random error.

Finally, relying on an article published almost 25 years ago, plaintiff argues "the association between SSRI drugs, akathisia, and suicidality was 'tested' and established by Anthony Rothschild and his Harvard colleagues way back in 1991." (Resp. Br., p. 39.)    Plaintiff's reference is to a three-page case report by Dr. Rothschild that involved three persons who attempted suicide while using fluoxetine (Prozac).[8]  (JA7108.)  Again, Lexapro was not involved.  Moreover, the persons described in the three-page article each had been suicidal, or attempted suicide, prior to taking any antidepressants.  (*Id.*)  The article does describe a known side effect of fluoxetine, akathisia, and states "[i]t is *conceivable* that the development of akathisia in patients with a past history of suicidal or homicidal ideation is particularly problematic." (JA7110 (emphasis added).)  The article goes on "[t]he cases described in this report suggest that caution should be used when *rapidly increasing fluoxetine dosages*." (*Id.* (emphasis added).)  However, the large body of research since that time (much of which Dr. Healy ignores) shows otherwise. (*See, e.g.,* JA4809.[9])

---

[8] Rothschild, Anthony J., M.D., et al., "Reexposure to Fluoxetine after Serious Suicide Attempts by Three Patients:  The Role of Akathisia," J. Clin. Psychiatry, 52:12, Dec. 1991.  (JA7108.)

[9] Stone, Marc, M.D., et al., "Risk of Suicidality in Clinical Trials of Antidepressants in Adults:  Analysis of Proprietary Data Submitted to US Food

As does her expert, plaintiff ignores more recent information and this time from the same author she uses to support her contention that Dr. Healy's opinions satisfy *Daubert's* fourth criteria; i.e., whether an expert's hypothesis has been, or can be, tested. In 2013, Dr. Rothschild spoke at the annual meeting of the American Psychiatric Association where he stated unequivocally that antidepressants do "really work" and do not "cause suicide." *See* Psychiatric News Update, Daily, May 19, 2013, Vol. 3, No. 21.[10]   In his talk, Dr. Rothschild explained that the totality of the reliable scientific evidence does not indicate SSRIs cause suicide, but noted that nonetheless FDA has required SSRI labels to include a black box warning that there is an association between SSRI use and "suicidality" in children, adolescents, and young adults up to age 24. *Id.*   Dr. Rothschild cautions, however, that clinicians should be aware of two salient facts. First, that the boxed warning does not indicate SSRIs increase the risk of suicide in any person taking them or that they increase the risk of suicidal thinking or behavior in patients 25 and older. Second, even though FDA adopted the term "suicidality" as a proxy for "completed suicide," they are not the same. *Id.*   Dr. Rothschild explained that the term "suicidality" has been criticized as grossly over-estimating the risk of suicide and as being less useful clinically than the more

---

and Drug Administration," BMJ, 2009 (discussing FDA's conclusions that there is no connection).

[10] Available at http://www.psychnews.org/update/report2_AM13_8.html.

13

specific terms ideation, behavior, attempts, and suicide. *Id.* In short, far from establishing an association between SSRI drugs, akathisia, and suicidality, Dr. Rothschild disputes it.

What plaintiff never addresses, and are quite notable by their absence, are any of the shortcomings Forest pointed out in its brief. She does not address the fact that Dr. Healy's reliance materials are not what he claims they are or that his data is manufactured to fit the opinions he wishes to offer. She does not address the fact that although Dr. Healy states that he relies on certain "studies," he neither cites those studies, nor has he reviewed them "in detail." She does not address the fact that the data on which Dr. Healy bases his opinions did not involve Lexapro – the product at issue in this lawsuit. She does not address the fact that Dr. Healy neither considered nor accounted for the myriad epidemiological studies that show there is no medically reliable link between SSRIs and suicide. Those shortcomings are the hallmark of unreliable methodology. Experts in the field do not ignore epidemiological studies that refute their opinions. *See, e.g., Rimbert v. Eli Lilly & Co.*, No. 1:06-cv-00874, 2009 WL 2208570 at *13 (D. New Mex. 2009), *aff'd* 647 F.3d 1047 (10th Cir. 2011); *Norris v Baxter Healthcare Corp.*, 397 F.3d 878, 882 (10th Cir. 2005); *In re Rezulin Products Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005); *Abarca v. Franklin Cnty. Water Dist.*, 761 F. Supp. 2d 1007, 1066 n.60 (E.D. Cal. 2011).

The district court abused its discretion when it ignored the obvious flaws in Dr. Healy's methodology and countenanced his selective use of data and unexplained rejection of other, more recent and exhaustive studies that refuted the conclusions he was paid to offer. That decision should be reversed.

### B.    DR. HAMRELL'S OPINIONS ARE NOT RELIABLE

Plaintiff has just as little to say about the reliability of Dr. Hamrell's methodology or opinions.   As a result, plaintiff regales the Court with Dr. Hamrell's "experience and credentials." Aside from the fact that neither experience nor credentials turn unreliable methodology or opinions into reliable ones, however, plaintiff's version of Dr. Hamrell's "experience and credentials" does not match Dr. Hamrell's testimony about his own experience and credentials. Further, as with Dr. Healy, plaintiff does not even attempt to discuss the myriad problems with Dr. Hamrell's methodology or opinions discussed in Forest's opening brief.  Instead, she attempts to convince the Court that Dr. Hamrell did more than simply count AERs, even though, again his testimony is to the contrary.

According to plaintiff (without any cited support), while at FDA, Dr. Hamrell's responsibilities included "*monitoring of post-marketing drug safety data*" and in a footnote claims "Dr. Hamrell's opinions in this case are built on this exact type of date [sic]." (Resp. Br., p. 48 & n.28 (emphasis in original).) Dr. Hamrell, however, testified that he had no knowledge whatsoever of how FDA

analyzes or uses AERs (JA5971), and neither his CV (JA5764-66) nor his report (JA5739-42) describe the "responsibilities" ascribed to him by either plaintiff or the district court. Nor does plaintiff's suggestion that Dr. Hamrell was involved with reviewing Investigational New Drug Applications or New Drug Applications speak to the issue – the data accompanying those applications is not post-marketing adverse event data, as it obviously cannot be for products that have not been approved yet.

Qualifications aside, however, if Dr. Hamrell's methodology of examining AERs is the same methodology FDA employs, plaintiff's contention leaves unanswered the looming, overarching question as to why, when FDA approved Lexapro and wrote its labeling in August 2002, FDA did not include the language Dr. Hamrell claims was supported by his quantitative analysis of the AERs by June 2001, especially in light of the fact that FDA had access to and was scrutinizing the narratives accompanying those AERs, which Dr. Hamrell did not. Of course, plaintiff does not attempt to even discuss that dichotomy. She simply ignores it.

Similarly, rather than explain how Dr. Hamrell's opinions as to what should have been included in Lexapro's label in June 2001 are reliable when the data he used post-dates the time at which he opines Forest should have changed its label by two and three years, plaintiff argues that fact "ignore[s] industry standard of aggregating all available data as well as the class effect of these drugs." (Resp.

Br., p. 51.)  Plaintiff does not offer any explanation of how industry standards, aggregating available data, or class effect of these drugs solves that fundamental problem with Dr. Hamrell's methodology and opinions.  Nor does she explain how Forest could have (much less would have) had access to data two and three years before it existed to suggest the need for a label different from the one FDA, with all the aggregated available data and fully knowing any class effect of the drugs, wrote and approved for Lexapro in August 2002.

Instead, plaintiff chides Forest for "completely ignor[ing] the teachings from *this Court's* opinion in *Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1387 (4th Cir. 1995), that 'the FDA and these cases merely state that case reports cannot serve as the basis for approving a drug; they do not say these case reports do not give rise to a duty to warn.'"  (Resp. Br., p. 42 (emphasis in original).)  Actually, this Court's decision in *Benedi* (which was addressing case reports as support for establishing causation) supports Forest – not plaintiff – exactly for the reason just discussed: FDA wrote the Lexapro labeling in August 2002; FDA had all the "case reports" (AERs) Dr. Hamrell used (at least those pre-dating 2002) and had been reviewing them substantively as to the specific issue of suicidality for many years; and FDA *did not* include Dr. Hamrell's language.  Clearly, even if AERs alone are sufficient to support label language, they did not support the warning Dr. Hamrell advocates even as of August 2002, much less June 2001.

17

Plaintiff's attempt to avoid the fact that the district court's determination that "Dr. Hamrell did not base his opinions 'exclusively upon a simple rough count of adverse events plaintiffs' counsel provided to him'" (JA4736) is contrary to Dr. Hamrell's testimony by arguing the record "shows otherwise" is unsupported. (Resp. Br., p. 43.)   After first conceding that Dr. Hamrell did "quantitatively consider[] AERs," plaintiff suggests that Dr. Hamrell "equally relied upon clinical trial data and testimony from Forest's own company officials regarding adverse event reports." (*Id.*)  The only support plaintiff cites, however, is to portions of a deposition of a Forest witness (Dr. Boerstoel), some of which is quoted by Dr. Hamrell in his report, and an internal PowerPoint presentation.  Yet, the fact remains that Dr. Hamrell admitted his opinions were not based on the list of materials on the first page of his report; his report does not reference any of Forest's internal research and reports, FDA records, international regulatory efforts, or medical literature; and Dr. Hamrell admitted that the sum total of the documents he used to form his opinions were AERs extracted from FDA's database by someone else. (JA5839-59, JA5851, JA5856, JA5859, JA5958-59, JA5983.)

In addition, the fact that Forest regulatory personnel perform pharmacovigilance activities to, as plaintiff describes it, "'mitigate risk' by initiating 'labeling/labeling changes,' 'Dear Doctor letters,' 'communications,' and

even 'withdrawal' as necessary," does not support the reliability of Dr. Hamrell's methodology in using a quantitative count of AERs to offer opinions regarding label content. The one is totally unrelated to the other and appears intended to distract the Court from Dr. Hamrell's methodological flaws. Dr. Hamrell's "analysis" (if one even could attach that label to what he did) did not include any qualitative aspects. He counts. FDA and Forest analyze – they look at AERs against the backdrop of the clinical data, the world literature, and the facts (i.e., narratives for each AER), Dr. Hamrell did not. There simply is no comparison, and plaintiff's suggestion that the activities are the same is unsupportable.

Furthermore, there is no explanation for Dr. Hamrell not knowing about FDA's qualitative review of many or all the same AERs Dr. Hamrell counted to arrive at his conclusion that Forest should have altered Lexapro's labeling. Any true "regulatory expert" in this area would have known about FDA's years-long qualitative review of suicidality related AERs and its consistent comments on the limitations of such reports in that context (where you have confounding by indication – the disease state being treated causes the event being reported). But, Dr. Hamrell did not. Any true "regulatory expert" in this area must have some articulable, rationale basis for explaining why and how a raw count was – from a methodological perspective – superior to FDA's qualitative review (or at least valid enough to arrive at a conclusion different from FDA's). But, Dr. Hamrell

does not. Dr. Hamrell cannot escape the gaping methodological flaws in his approach through willful ignorance.

Dr. Hamrell's opinions are not supportable, they are not reliable, and the district court erred to hold otherwise.

## CONCLUSION

The Court should affirm the district court's decision to grant summary judgment for Forest and should reverse the decision of the Missouri district court finding the opinions of plaintiff's experts' reliable.

May 27, 2015                                Respectfully submitted,

*/s/  Linda E. Maichl*
Linda E. Maichl
Joseph P. Thomas
Ulmer & Berne LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio  45202
Tel:  (513) 698-5000
Fax:  (513) 698-5001
lmaichl@ulmer.com
jthomas@ulmer.com
*Counsel for Forest Laboratories, LLC*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 4624 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, in 14 point Times New Roman.

*/s/ Linda E. Maichl*
Linda E. Maichl

## CERTIFICATE OF SERVICE

I hereby certify that on May 27, 2015, I electronically filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send notice of the filing to registered CM/ECF users.


*/s/ Linda E. Maichl*
Linda E. Maichl